# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| HARRY HILBURG, MARIANNE BIGELOW, and WILLIAM SIMMONS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware Corporation,<br><br>Defendant. | Case No. 2:25-cv-10970<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................1

II.   JURISDICTION ...................................................................5

III.  VENUE ...............................................................................5

IV.  PARTIES ............................................................................6

      A.    Plaintiffs ...................................................................6

            1.    Harry Hilburg (Missouri) ...............................6

            2.    Marianne Bigelow (Washington) .................7

            3.    William Simmons (Wisconsin) .....................8

      B.    Defendant ................................................................10

V.    FACTUAL ALLEGATIONS ................................................11

      A.    Ford marketed the Fire Risk Vehicles as a safe and reliable plug-in electric hybrid and knew these attributes were material to customers .................................11

      B.    The high-voltage lithium-ion batteries pose a Spontaneous Fire Risk ...........................................24

      C.    Ford knew or should have known about the Spontaneous Fire Risk before selling the Fire Risk Vehicles to consumers ................................................32

            1.    Thermal runaway and fire were known risks of lithium-ion batteries and Ford failed to adequately design around them. ..................................32

            2.    Ford knew about the fire risk in this and other similar high-voltage batteries .....................45

VI.  FRAUDULENT CONCEALMENT ...........................................47

VII. TOLLING OF THE STATUTE OF LIMITATIONS ...................51

011305-11/3181219 V1

A.    Discovery Rule Tolling ........................................................51

B.    Fraudulent Concealment Tolling.........................................52

C.    Estoppel .............................................................................52

VIII.  CLASS ALLEGATIONS .................................................................52

IX.    CLAIMS ......................................................................................56

A.    Nationwide Claims ............................................................56

COUNT I VIOLATION OF THE MAGNUSON-MOSS
WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) ...........................................56

B.    State-Specific Claims .........................................................61

1.    Missouri .................................................................61

COUNT II VIOLATION OF MISSOURI MERCHANDISING
PRACTICES ACT (Mo. Rev. Stat. § 407.010, *et seq.*) .................................61

COUNT III FRAUDULENT CONCEALMENT (Common Law) .........................65

COUNT IV FRAUDULENT OMISSION (Common Law)....................................68

COUNT V BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER MISSOURI LAW (Mo. Stat.
§ 400.2-314)..............................................................................70

COUNT VI UNJUST ENRICHMENT (Common Law)........................................73

2.    Washington .............................................................75

COUNT VII VIOLATIONS OF THE WASHINGTON CONSUMER
PROTECTION ACT (RCW § 19.86.010, *et seq.*) .........................................75

COUNT VIII FRAUDULENT CONCEALMENT (Common Law).....................79

COUNT IX FRAUDULENT OMISSION (Common Law)....................................83

COUNT X BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY UNDER WASHINGTON LAW
(RCW § 62A.2-314) ....................................................................85

COUNT XI UNJUST ENRICHMENT (Common Law).........................................88

    3.    Wisconsin ..................................................................................90

COUNT XII VIOLATION OF THE WISCONSIN DECEPTIVE
    TRADE PRACTICES ACT (Wis. Stat. § 110.18).........................................90

COUNT XIII FRAUDULENT CONCEALMENT (Common Law).....................94

COUNT XIV FRAUDULENT OMISSION (Common Law)................................98

COUNT XV UNJUST ENRICHMENT (Common Law) ....................................100

REQUEST FOR RELIEF ................................................................................102

DEMAND FOR JURY TRIAL ........................................................................103

011305-11/3181219 V1

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and state classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.     INTRODUCTION

1.     The most important duty of a car manufacturer is to provide consumers with a safe car.

2.     Ford Motor Company ("Ford") breached this fundamental duty by selling certain Ford and Lincoln-branded hybrid-electric vehicles that are dangerous and at risk of catching fire and exploding.

3.     Ford designed, manufactured, marketed, and sold more than 20,000 model year 2020-2024 Ford Escape Hybrid and 2021-2024 Lincoln Corsair Grand Touring plug-in hybrid vehicles (PHEV) (the "Fire Risk Vehicles")[1] that contain a defect in their high-voltage lithium-ion batteries that can cause vehicle fires and explosions, even when the vehicles are parked and off (the "Spontaneous Fire Risk").

4.     So far, Ford has publicly identified seven high-voltage battery failures and one vehicle fire suspected to arise from the Spontaneous Fire Risk. But the high-

---

[1] Plaintiffs' counsel continues to investigate whether other model years contain the same defect and should also be recalled. Plaintiffs may update the definition of Fire Risk Vehicles to include additional models and model years.

voltage battery manufacturer, Samsung SDI ("Samsung"), also supplied these batteries to Chrysler and Volkswagen for use in nearly 160,000 other vehicles, and, to date, those manufacturers have reported at least **_twenty-four_** vehicle fires arising from their high-voltage lithium-ion battery packs, including some occurring in Chrysler vehicles that had already received a purported fix for the fire risk defect. Recently, after Ford, Chrysler, and Volkswagen recalled their vehicles, Samsung recalled more than 180,000 of these high-voltage battery packs deemed at risk of failure and sudden fire.

5.     The Spontaneous Fire Risk exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle's high-voltage lithium-ion battery—located under the front seats—fails or catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Spontaneous Fire Risk also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Fire Risk Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

6.     Ford has no remedy yet for the Spontaneous Fire Risk but claims a software update for the batteries is forthcoming. This is cold comfort for Plaintiffs and class members, however, given that such remedies have recently proved ineffective at eliminating fires, as seen in the Jeep Wrangler and Cherokee hybrid-

electric vehicles outfitted with the same Samsung-manufactured high-voltage lithium-ion batteries, and in the Chrysler Pacifica hybrid-electric vehicles equipped with defective LG Energy Solutions high-voltage lithium-ion batteries. In each case, fires continued to occur in vehicles that received the software update, necessitating re-recall and a new fix.

7.      While they await this purported fix, Ford directed Plaintiffs and class members to stop charging their Fire Risk Vehicles, effectively denying them use of the prominent hybrid-electric feature for which they paid a premium. Likewise, Plaintiffs and class members are forced to pay for gas while increasing their carbon footprint. A plug-in electric hybrid vehicle that cannot be operated in all-electric mode and is less efficient than its gas-powered equivalent is not fit for its ordinary purpose.

8.      Ford had all the knowledge it needed to anticipate, test for, and prevent the Spontaneous Fire Risk before the vehicles went to market. This knowledge came from, among other things, industry and scientific studies on the fire risks of lithium-ion battery packs; industry insights on the appropriate specifications and control systems for lithium-ion batteries;[2] rigorous pre-launch testing of the high-voltage

---

[2] *See generally* **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf.

battery and hybrid propulsion system that any responsible auto manufacturer would have conducted; and known fire issues arising in other vehicles with lithium-ion battery packs, including those equipped with the same Samsung batteries here and others used in Ford's own Kuga and Fusion PHEVs. Despite this exclusive knowledge, Ford chose profits over safety and sold and leased the Fire Risk Vehicles to Plaintiffs and putative class members without disclosing or rectifying the serious risk of the Spontaneous Fire Risk.

9.     Owners and lessees of the Fire Risk Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property because of the Spontaneous Fire Risk. They paid thousands of dollars for a plug-in hybrid electric propulsion system that they cannot use and will continue to incur damages until the Spontaneous Fire Risk is fixed. Had Plaintiffs and putative class members known of the Spontaneous Fire Risk, they would not have purchased or leased those vehicles; paid substantially less for them; or purchased non-hybrid versions of the vehicles, which are significantly less expensive.

10.     Plaintiffs bring this class action on behalf of themselves and a proposed class of all owners or lessees of a Fire Risk Vehicle to hold Ford accountable for its defective vehicles and the damages these consumers have incurred as a result. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312. Plaintiffs also seek damages and all available remedies for

- 4 -

Ford's violations of state consumer protection acts, fraudulent concealment and omission laws, breaches of implied warranties, and unjust enrichment.

## II.    JURISDICTION

11.    This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

12.    This Court has personal jurisdiction over Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

## III.   VENUE

13.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

011305-11/3181219 V1

## IV.   PARTIES

### A.   Plaintiffs

#### 1.   Harry Hilburg (Missouri)

14.   Plaintiff and proposed class representative Harry Hilburg ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Olivette, Missouri. On or about May 25, 2022, Plaintiff purchased a new 2022 Ford Escape PHEV from Bo Beuckman Ford in Ellisville, Missouri. On information and belief, Plaintiff's Escape PHEV is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for transportation needs such as household errands. Plaintiff's wife also regularly rides in the vehicle with him. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase. Plaintiff regularly services the vehicle but is now concerned about driving and parking it near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Moreover, because

Plaintiff can no longer charge the plug-in hybrid vehicle as Ford has instructed, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the high-voltage battery able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Escape, had Plaintiff known about the Spontaneous Fire Risk.

### 2. Marianne Bigelow (Washington)

15. Plaintiff and proposed class representative Marianne Bigelow ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Tacoma, Washington. On or about January 13, 2022, Plaintiff purchased a new 2022 Lincoln Corsair Grand Touring PHEV from Puyallup Korum Ford in Puyallup, Washington. On information and belief, Plaintiff's Corsair PHEV is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that this was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for transportation needs such as household errands. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. However, despite touting the safety and dependability of the

Fire Risk Vehicles and the benefits of using the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before her purchase. Plaintiff regularly services the vehicle but is now concerned about driving and parking it near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Plaintiff is also concerned about the Spontaneous Fire Risk because she often transports her seven-year-old and nine-month-old grandchildren, as well as her elderly father, in the vehicle. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as Ford has instructed, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the high-voltage battery able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

### 3. William Simmons (Wisconsin)

16. Plaintiff and proposed class representative William Simmons ("Plaintiff" for the purposes of this paragraph) is a resident and citizen of Janesville, Wisconsin. On or about September 9, 2022, Plaintiff purchased a new 2022 Lincoln Corsair Grand Touring PHEV from Gordie Boucher Ford Lincoln of Janesville in Janesville, Wisconsin. On information and belief, Plaintiff's Corsair PHEV is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk. Plaintiff purchased the

Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for transportation needs such as household errands and vacation travel. Plaintiff's wife also regularly rides in the vehicle with him. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of using the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase. Plaintiff regularly services the vehicle but is now concerned about driving and parking it near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle as Ford has instructed, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the high-voltage battery able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**B.     Defendant**

17.     Defendant Ford Motor Company ("Ford") is a Delaware corporation organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

18.     Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Lincoln is Ford's luxury automobile brand. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

19.     Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford designed and manufactured the Fire Risk Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Fire Risk Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles in every state of the United States.

## V.    FACTUAL ALLEGATIONS

**A.    Ford marketed the Fire Risk Vehicles as a safe and reliable plug-in electric hybrid and knew these attributes were material to customers.**

20.    Plug-in hybrid-electric vehicles like the Fire Risk Vehicles have significant environmental and economic advantages over conventional vehicles with internal combustion engines.

21.    While operating in electric-only mode, the Fire Risk Vehicles do not produce any of the noxious tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that vehicles with internal combustion engines produce.[3] When functioning properly, the Fire Risk Vehicles can be beneficial for air quality and public health, and can help to reduce the overall ecological damage caused by using personal vehicles for transportation.[4]

22.    In addition to the environmental benefits of electric propulsion, the cost of the electricity necessary to enable the operation of the Fire Risk Vehicles in

---

[3] *See* **Exhibit 2**, *Emissions from Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_emissions.html.

[4] *Id.*

electric mode vehicle is generally considerably less than the cost of fueling with gasoline or diesel.[5]

23.    Consumers paid a substantial premium for the plug-in hybrid propulsion system in the Fire Risk Vehicles. In 2022, the base sticker price for the Corsair Grand Touring PHEV was $14,000 more than the price for a standard Corsair.[6] Similarly, the Ford Escape PHEV sells for at least $7,500 more than its non-hybrid counterpart.[7]

24.    The only reason to pay the premium price commanded by the Fire Risk Vehicles was because of the perceived environmental and financial benefits they offered because of their status as plug-in hybrid electric vehicles.

25.    In marketing the Fire Risk Vehicles, Ford stressed both the economic and environmental perks of the hybrid propulsion system, which were material

---

[5] *See* **Exhibit 3**, Mary Cunningham, *How much will an electric vehicle really cost you? Here's what to know.*, CBS NEWS (Aug. 14, 2024), https://www.cbsnews.com/news/electric-vehicle-ev-true-cost-of-ownership/.

[6] *See* **Exhibit 4**, Drew Dorian, *2022 Lincoln Corsair Hybrid*, CAR AND DRIVER, https://www.caranddriver.com/lincoln/corsair-hybrid-2022; **Exhibit 5**, Drew Dorian, *2022 Lincoln Corsair*, CAR AND DRIVER, https://www.caranddriver.com/lincoln/corsair-2022.

[7] *See* **Exhibit 6**, Drew Dorian, *2022 Ford Escape Hybrid*, CAR AND DRIVER, https://www.caranddriver.com/ford/escape-hybrid-2022; **Exhibit 7**, Drew Dorian, *2022 Ford Escape*, CAR AND DRIVER, https://www.caranddriver.com/ford/escape-2022.

issues for prospective buyers. Indeed, a major selling point of the Fire Risk Vehicles is their ability to run on electric power.

26. With the Escape PHEV, Ford emphasized the vehicle's "advanced fourth-generation hybrid technology system" and "best-in-class EPA-estimated economy rating of 100 MPGe combined and an EPA-estimated 37 miles of all-electric driving range:"[8]

---

[8] *See* **Exhibit 8**, *100 MPGE! All-new Ford Escape Plug-in Hybrid brings best-in-class EPA-estimated combined fuel economy*, FORD NEWSROOM (Jun. 8, 2020), https://media.ford.com/content/fordmedia/fna/us/en/news/2020/06/08/100-mpge-all-new-ford-escape-plug-in-hybrid.html.

011305-11/3181219 V1

## 100 MPGE! ALL-NEW FORD ESCAPE PLUG-IN HYBRID BRINGS BEST-IN-CLASS EPA-ESTIMATED COMBINED FUEL ECONOMY

JUN 8, 2020 | DEARBORN, MICH.   



All-new Ford Escape Plug-In Hybrid

- All-new Ford Escape Plug-In Hybrid with advanced fourth-generation hybrid technology system has a class-leading EPA-estimated fuel economy rating of 100 MPGe combined
- Ford Escape Plug-in Hybrid has an EPA-estimated all-electric range of 37 miles – 11 more miles than even Ford Fusion Energi, with more passenger space and up to four times the cargo volume behind its second-row seats
- In addition to potential savings at the pump, purchasing an Escape Plug-In Hybrid may qualify a customer for state tax incentives or rebates[1]; Escape Plug-In Hybrid starts under $35,000 MSRP

27.     Ford also touted the Escape's purported gas savings and tax incentives,

saying:

> Hybrids can serve as a hedge against rising gas prices. The Escape Plug-In Hybrid is available as gas prices are expected to rise, according to AAA, following the easing of stay-at-home mandates across the country. As consumers begin returning to work and taking weekend trips, demand for gasoline is expected to spike from the

- 14 -

decades-low prices of the past two months. Whether gas is $1.87 a gallon like today or $2.87 a gallon like this time last year, Escape Plug-In Hybrid is suited for both, with an EPA-estimated all-electric range of 37 miles and an EPA-estimated rating of 41 miles per gallon combined when running strictly on gasoline.[9]

And "[i]n addition to potential savings at the pump, purchasing an Escape Plug-In Hybrid may qualify a customer for state tax incentives or rebates."[10]

28.    Ford's hybrid-electric powertrain in the Fire Risk Vehicles is prominently marketed for its utility and versatility.

29.    For example, with the Escape PHEVs: "You can drive the Plug-in Hybrid in EV (Electric Vehicle) mode when the battery is charged, and continue seamlessly on your way as the vehicle switches to gas power when needed."

---

[9] *Id.*

[10] *Id.*



**2022 Ford Escape brochure**

**2020 Ford Escape brochure**

30. Similarly, Lincoln advertises the Corsair Grand Touring's "advanced hybrid powertrain" and its benefits:

SPARK YOUR SOPHISTICATED SIDE

When innovation sits at the table of luxury, astonishing things will happen. Introducing the Lincoln Corsair Grand Touring plug-in hybrid.¹ Agile but smooth. Sporty but elegant. Powerful but graceful. This is a hybrid in more ways than one. Corsair Grand Touring seamlessly blends an advanced hybrid powertrain with an impressively vigorous electric motor to offer you effortless acceleration, electric AWD, and a peaceful cabin. Go ahead, make a grand escape.



**2021 Lincoln Corsair Grand Touring brochure**

011305-11/3181219 V1



**THRIVE WITH LINCOLN DRIVE MODES**

Corsair puts the power to adapt right at your fingertips. Simply turn the knob to choose a Lincoln Drive Mode, and the system adjusts traction control, steering and pedal response, available Intelligent AWD and available adaptive suspension settings, even the sound of the engine, to help provide a remarkable driving experience.

Grand Touring models also feature additional drive modes. "Preserve EV" mode can help recharge the vehicle up to as much as 75% by saving battery power for later use. "Pure EV" mode offers a quiet, all-electric drive well-suited to your shorter trips around town. That's two intelligent modes, for one extraordinary drive.

**2021 Lincoln Corsair Grand Touring brochure**

**2.5-LITER I-4 GRAND TOURING PLUG-IN HYBRID 266 COMBINED HORSEPOWER[1]**

Agile, sporty and a true pleasure to drive, the Lincoln Corsair® Grand Touring[2] SUV is a plug-in hybrid with the confidence of Intelligent all-wheel drive (AWD). It's easy to charge when you want electric power at the ready, and you can simply fuel it up. Experience the seamless convergence of modern technologies in Corsair Grand Touring.

**2022 Lincoln Corsair Grand Touring brochure**

31.    As Ford proclaims in marketing for the model year 2023 Escape PHEV:

"Ford is among the leading hybrid automakers in the U.S. because we understand

that not all of our customers are ready to go all-electric,' said [brand manager

Adrienne] Zaski. 'With two hybrid powertrain choices, customers can spend less time at the gas station and keep more money in their pockets.'"[11]

32.    Despite marketing the Escape as a "road-trip ready" vehicle fit for "the fun-loving freedom of spontaneous road trips," as the examples below demonstrate, the Spontaneous Fire Risk has left consumers unable to utilize their hybrid-electric feature at all, let alone for trips, and diminished the Fire Risk Vehicles' overall reliability and utility.

---

[11] **Exhibit 9**, *2023 Ford Escape*, FORD NEWSROOM, https://media.ford.com/content/fordmedia/fna/us/en/products/crossovers---suvs/escape/2023-ford-escape.html.

## ROAD-TRIP READY.
# INSPIRATION.

Since its conception, the Ford Escape® SUV has epitomized the fun-loving freedom of spontaneous road trips. For an engaging driving experience, Hybrid and Plug-In Hybrid models feature an eCVT transmission with electric launch. Gas-only models utilize an 8-speed automatic transmission for smooth, responsive performance. And the electric power-assisted steering provides light, responsive steering while parking, and confident control at higher speeds. These and a myriad of other details are purposefully combined to help Escape empower your urban adventures and back-road getaways alike. Lifting your spirits at every turn.



**SE.** Iced Blue Silver Metallic. Available SE Sport Appearance Package. Available equipment.

**2022 Ford Escape brochure**

011305-11/3181219 V1



**2021 Ford Escape brochure**

33.    Throughout its marketing brochures for the Fire Risk Vehicles, Ford also emphasizes the vehicles' safety features and reliability, evidencing the materiality of these qualities to consumers.



**2021 Ford Escape brochure**



MAKE YOUR WAY.
## CONFIDENTLY.

Changing lanes. Keeping your distance. Parallel and perpendicular parking. Our extensive well-rounded collection of standard and available Ford Co-Pilot360™ Technology features can help you with these everyday situations and so many more. Our advanced technologies are about supplementing your driving skills.¹ Helping you feel confidently in command on the road.

### FORD CO-PILOT360™ TECHNOLOGY

**FORD CO-PILOT360**

*Standard on every 2022 Ford Escape® SUV*
- Pre-Collision Assist with Automatic Emergency Braking (AEB)
- BLIS® (Blind Spot Information System) with Cross-Traffic Alert
- Lane-Keeping System
- Auto High-Beam Headlamps
- Rear View Camera
- Autolamp (Automatic On/Off Headlamps)
- Post-Collision Braking

**FORD CO-PILOT360 ASSIST+**

*Standard on Titanium; Available on SE and SEL*
- Intelligent Adaptive Cruise Control with Stop-and-Go and Lane Centering Includes Speed Sign Recognition
- Evasive Steering Assist
- Voice-Activated Touchscreen Navigation System



SCAN TO LEARN MO...
or visit
Ford.com/Technolo...
Data rates may appl...

### AVAILABLE FEATURES

- Active Park Assist 2.0
  *Standard on Titanium Elite Package*
- Front Parking Sensors
  *Standard on Titanium*
- Rear Parking Sensors
  *Standard on SEL and Titanium*
- Rain-Sensing Windshield Wipers
  *Standard on Titanium*
- Remote Start System
  *Standard on SEL and Titanium; Available on S and SE*

SE, Rapid Red Metallic Tinted Clearcoat.³ Available SE Sport Appearance Package. Available equipment.
1. Driver-assist features are supplemental and do not replace the driver's attention, judgment and need to control the vehicle. It does not replace safe driving. See Owner's Manual for details and limitations. 2. If vehicle is stopped for more than 3 seconds, driver must intervene and press "RES" button or accelerator pedal to resume system operation. 3. Additional charge.

**INTELLIGENT ADAPTIVE CRUISE CONTROL**
INCLUDES SPEED SIGN RECOGNITION¹
Once activated, this available system can detect and automatically adjust to speed limit signs along your route.¹ It can also bring the vehicle to a stop if traffic ahead has stopped or slowed. When things clear, your set speed is resumed.² The system's Lane Centering feature even scans lane markings to help you keep your vehicle centered between the lines.¹

**2022 Ford Escape brochure**



### JOURNEY WITH CONFIDENCE

Our extensive collection of standard and available driver-assist technologies³ utilizes a network of sensors and sophisticated cameras to offer you support during many scenarios. These advanced features are all aimed at helping you feel confident and in control.

**2021 Lincoln Grand Corsair brochure**

**SAFETY & SECURITY**

| |
|---|
| Personal Safety System™ for driver and front passenger with dual-stage front airbags,⁹ safety belt pretensioners, safety belt energy-management retractors, safety belt usage sensors, driver's seat position sensor, crash severity sensor, restraint control module and Front-Passenger Sensing System |
| Driver's knee airbag⁹ |
| Front- and rear-seat side airbags⁹ |
| Glove-box-door-integrated knee airbag⁹ |
| AdvanceTrac® with RSC® (Roll Stability Control™) |
| Individual Tire Pressure Monitoring System (excludes spare, when equipped) |
| Intelligent Access with push-button start |
| LATCH (Lower Anchors and Tether Anchors for Children) |
| MyKey® technology to help encourage responsible driving |
| Perimeter alarm |
| Safety Canopy® side-curtain airbags⁹ with roll-fold technology and rollover sensor |
| SecuriCode™ invisible keypad |
| SecuriLock® Passive Anti-Theft System |
| SOS Post-Crash Alert System™ |

**2021 Lincoln Grand Corsair brochure**

There to help you stay on the course ahead or to take the guesswork out of what's behind, Corsair driver-assistance features² can help you in some tough situations. Take control of your travels with help from our Lincoln Co-Pilot360™ Technology.

STANDARD LINCOLN CO-PILOT360 1.5

Auto High-Beam Headlamps

Blind Spot Information System

Cross-Traffic Alert with Braking

Lane-Keeping System: includes Lane-Keeping Aid, Lane-Keeping Alert and Driver Alert System

Pre-Collision Assist with Automatic Emergency Braking: includes Pedestrian Detection, Forward Collision Warning and Dynamic Brake Support

Rear Parking Sensors

Rear View Camera

**2022 Lincoln Grand Corsair brochure**

34.     Even as Ford consistently and pervasively promoted the vehicles' safety, reliability, and hybrid-electric powertrains, Ford never disclosed the Spontaneous Fire Risk to buyers before they purchased or leased the Fire Risk Vehicles.

**B.      The high-voltage lithium-ion batteries pose a Spontaneous Fire Risk.**

35.      Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, advertising, promoting, marketing, and selling them as suitable and safe for use in an intended and reasonably foreseeable manner.

36.      In its December 20, 2024 notification of safety recall number 24V-954 sent to the National Highway Traffic Safety Administration ("NHTSA"), Ford acknowledges a defect in the Fire Risk Vehicles' high-voltage lithium-ion batteries that can cause them to fail and catch fire.[12] To date, Ford has identified seven high-voltage battery failures and one vehicle fire suspected to arise from the Spontaneous Fire Risk.[13]

37.      The high-voltage batteries in the Fire Risk Vehicles are 14.4-kWh lithium-ion batteries that were manufactured by Samsung at its Hungary plant between July 1, 2019, and March 28, 2023.[14]

38.      On information and belief, the high-voltage lithium-ion batteries in the Fire Risk Vehicles are made up of 84 prismatic-style cells arranged in 14 modules.[15]

---

[12] **Exhibit 10**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Dec. 20, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-5979.PDF.

[13] **Exhibit 11**, *Recall No. 24V-954 Chronology*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V954-4969.pdf.

[14] **Exhibit 12**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-9851.PDF.

[15] *See* **Exhibit 13**, *2025 Ford Escape PHEV Battery: A Canadian Perspective*, FORMULA FORD (Jan. 7, 2025), https://formulafordlincoln.com/blog/2025-ford-

39.     The high-voltage batteries are located under the Fire Risk Vehicles and below the seats. They are labeled as part number 1 in the diagrams below.



**Model Year 2020-2025 Ford Escape PHEV[16]**

escape-phev-battery-a-canadian-perspective/#:~:text=2025%20Ford%20Escape-,Battery%20Specifications,minimizing%20intrusion%20into%20cargo%20space; **Exhibit 14**, *Corsair Grand Touring: Effortless Power, Quiet Confidence*, LINCOLN, https://media.lincoln.com/content/dam/lincolnmedia/lna/us/product/2020/Corsair/Grand-Touring/All-New-Lincoln-Corsair-Grand-Touring-Fact-Sheet.pdf; **Exhibit 15**, Bob Gritzinger, *Ford's First E-Axle Hybrid Debuts in '21 Lincoln Corsair Grand Touring*, WARDSAUTO, (Nov. 19, 2019), https://www.wardsauto.com/lincoln/ford-s-first-e-axle-hybrid-debuts-in-21-lincoln-corsair-grand-touring.

[16] **Exhibit 16**, *2020-2025 Ford Escape Hybrid and Plug-in Hybrid Emergency Response Guide*, FORD (Oct. 2024), https://www.vdm.ford.com/content/dam/



**High Voltage Electrical System Information** 1-5

## Section 1: High Voltage Electrical System Information

**Component Location and Identification — PHEV Vehicles**

The following illustrations provide the location, description and basic function of the High Voltage system components.

**NOTE:**
All High Voltage wires and harnesses are orange in color.

**PHEV Vehicles**

N0183121

**Model Year 2021-2025 Lincoln Corsair PHEV**[17]

40.      The Fire Risk Vehicles utilize a hybrid drivetrain that integrates a 2.5-liter four-cylinder gasoline engine and two electric motors. Together, these motors enable all-electric, hybrid, and gasoline-powered driving.

---

brand_ford/en_us/brand/firstresponder/pdf/ford/2020-2025_Escape_Hybrid_Emergency_Response_Guide.pdf.

[17] **Exhibit 17**, *2021-2025 Corsair Plug-in Hybrid Emergency Response Guide*, FORD (Oct. 2024), https://www.vdm.ford.com/content/dam/brand_ford/en_us/brand/firstresponder/pdf/lincoln/2021-2025_Corsair_Emergency_Response_Guide.pdf.

41.     The high-voltage batteries support charging at both Level 1 (120-volt) and Level 2 (240-volt).

42.     The high-voltage batteries in model year 2020 Ford Escape and 2021 Lincoln Corsair PHEVs retail for around $6,756.47,[18] and those for the model year 2023-2025 Ford Escape and Lincoln Corsair PHEVs retail for around $7,185.88.[19]

43.     Under NHTSA Recall No. 24V-954, Ford recalled 16,480 model year 2020-2024 Ford Escape and 4,004 model year 2021-2024 Lincoln Corsair vehicles because their high-voltage battery cells' separator layer between its cathode and anode may be damaged, resulting in an internal short circuit.[20]

44.     As Ford admits, a high-voltage battery cell internal short circuit can cause "shutdown of the vehicle's propulsion system," and such "[l]oss of motive power increases the risk of crash and injury."[21] Even worse, this internal short circuit

---

[18] *See* **Exhibit 18**, *Drive Motor Battery Pack 2.5L*, FORDPARTS.COM, https://parts.ford.com/shop/en/us/electrical/wire-looms-and-connectors/drive-motor-battery-pack-25l-p-lx6z10b759k?pdp=y.

[19] *See* **Exhibit 19**, *Battery – 2.5L*, FORDPARTS.COM, https://parts.ford.com/shop/en/us/electrical/battery-and-related-components/battery-p-pz1z10b759a?pdp=y#/collapseRelated2.

[20] **Exhibit 12**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-9851.PDF.

[21] *See id.*

can cause "battery thermal venting potentially resulting in a vehicle fire, increasing the risk of injury."[22]

45.    Between April and August 2024, three vehicles in Europe were reported to experience this battery thermal venting.[23] Ford and Samsung inspected these high-voltage battery packs to determine the root cause of their internal short circuits between September and November 2024.[24]

46.    In December 2024, Ford learned of a fourth vehicle that experienced battery thermal venting suspected to be related to the Spontaneous Fire Risk.[25]

47.    Then, after Ford approved the recall to address the Spontaneous Fire Risk on December 13, 2024, Ford learned of three more battery thermal venting reports in the European vehicle population, one of which ignited a vehicle fire that caused property damage.[26]

48.    The Fire Risk Vehicles are not the only cars impacted by the Spontaneous Fire Risk. Samsung supplied the same or similar high-voltage battery in the Fire Risk Vehicles for use in other hybrid-electric vehicles that have also

---

[22] *See id.*

[23] **Exhibit 11**, *Recall No. 24V-954 Chronology*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V954-4969.pdf.

[24] *Id.*

[25] *Id.*

[26] *Id.*

recently been recalled by their manufacturers for fire risk, such as Chrysler's Jeep Wrangler and Grand Cherokee vehicles[27] and Volkswagen's Audi Q5 and A7 vehicles.[28]

49.    In response to these vehicle manufacturer recalls, on February 5, 2025, Samsung recalled 180,196 of these high-voltage batteries for fire risk, including those in 20,484 Fire Risk Vehicles, along with those in 155,096 Chrysler vehicles and 4,616 Audi vehicles.[29]

50.    Samsung acknowledges these high-voltage batteries pose a serious fire risk that "could result in personal injury and/or property damage."[30]

51.    According to Samsung's recall chronology, it learned of at least twenty fires in Jeep Grand Cherokee and Wrangler plug-in electric vehicles between May 2023 and July 2024, including some fires that occurred after implementation of the software update that purported to remedy the fire risk.[31] Samsung also learned of

---

[27] *See* NHTSA Recall Nos. 23V-787 (Nov. 2023); 24V-720 (Oct. 2024); 24E-080 (Oct. 2024).

[28] *See* NHTSA Recall No. 24V-898 (Dec. 2024).

[29] **Exhibit 20**, *Part 573 Recall Report 25E-007*, NHTSA.GOV (Feb. 5, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25E007-3917.PDF.

[30] *Id.*

[31] **Exhibit 21**, *Samsung SDI – High Voltage Battery Module/Pack*, NHTSA.GOV (Jan. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RMISC-25E007-8543.pdf.

more than four fires in Audi plug-in electric vehicles between August 2023 and April 2024.[32]

52.     When Ford first recalled the Fire Risk Vehicles in December 2024, it explicitly told vehicles owners they did not need to stop driving the Fire Risk Vehicles or otherwise stop using its hybrid-electric function.[33]

53.     But then, in February 2025, Ford reversed course, re-issuing recall notices to Fire Risk Vehicles owners that instructed them to "immediately refrain from charging [their] vehicle[s] to maintain a lower charge level in the high voltage battery, reducing the risk of a vehicle fire until a remedy is available."[34]

54.     Ford's directive prevents vehicle owners from using the primary feature they paid a premium for—the hybrid-electric propulsion system—while forcing them to incur greater fuel costs.

55.     What's more, Ford currently has no remedy for the Spontaneous Fire risk. As reported to NHTSA, Ford states a software update is forthcoming that will

---

[32] *Id.*

[33] **Exhibit 22**, *Safey Recall Notice 24S79 / NHTSA Recall 24V954*, NHTSA.GOV (Jan. 2025) https://static.nhtsa.gov/odi/rcl/2024/RIONL-24V954-1052.pdf.

[34] *See* **Exhibit 23**, *Safey Recall Notice 24S79 / NHTSA Recall 24V954 - Update*, NHTSA.GOV (Feb. 2025), https://static.nhtsa.gov/odi/rcl/2024/RIONL-24V954-2080.pdf.

"have an enhanced capability to detect cell anomalies indicative of separator damage."[35]

56.     But a superior remedy is already available to Ford: replacing the high-voltage batteries in all Fire Risk Vehicles. Yet Ford purportedly plans to implement this remedy on a limited basis, stating it will only replace the high-voltage batteries where the recall software update detects a cell anomaly.

57.     As recent history has shown, this approach is insufficient to remedy the fire risks arising from high-voltage batteries used in vehicle applications. For example, in July 2024, Chrysler reported three additional vehicle fires in Jeep Wrangler PHEVs after receiving the purported software fix under NHTSA Recall No. 23V-787, leading to additional recalls.[36] Likewise, certain Chrysler Pacifica PHEVs were recalled twice, in February 2022 and July 2024,[37] for fire risk arising from their LG Energy Solutions-manufactured high-voltage batteries after the initial software remedy failed to prevent at least seven vehicle fires. In both instances, it remains to be seen whether the revised software updates are effective at preventing fires.

---

[35] **Exhibit 12**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-9851.PDF.

[36] *See* **Exhibit 21**, *Samsung SDI – High Voltage Battery Module/Pack*, NHTSA.GOV (Jan. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RMISC-25E007-8543.pdf at 4-5.

[37] *See* NHTSA Recall Nos. 22V-077 and 24V-536.

**C.     Ford knew or should have known about the Spontaneous Fire Risk before selling the Fire Risk Vehicles to consumers.**

58.     Ford knew or should have known about the Spontaneous Fire Risk before it sold the Fire Risk Vehicles, and certainly long before it disclosed the problem, as evidenced by: the well-documented risks of thermal runaway and fires in lithium-ion batteries; NHTSA warnings of safety risks for lithium-ion batteries and design considerations for reducing such risks; the rigorous pre-sale testing Ford did or should have done on the high-voltage batteries and hybrid-electric propulsion system; and similar fire risk issues and recalls with high-voltage lithium-ion batteries like those in the Fire Risk Vehicles.

**1.     Thermal runaway and fire were known risks of lithium-ion batteries and Ford failed to adequately design around them.**

59.     Most electric and hybrid-electric vehicles like the Fire Risk Vehicles use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge."[38]

60.     Lithium-ion batteries are made up of multiple power-generating compartments called cells.[39] Each cell contains the basic functional components of

---

[38] *See* **Exhibit 24**, *Batteries for Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_batteries.html.

[39] **Exhibit 25**, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF (Sept. 11, 2023), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html.

a simple battery: a positive electrode, a negative electrode, and an electrolyte.[40] Each cell also contains a separator designed to keep the positive electrode from contacting and discharging into the negative electrode.[41]

61. The active materials (either cathode or anode) store the lithium. The electrolyte carries the lithium ions between electrodes.[42] When lithium ions flow from the negative electrode, or anode, to the positive electrode, or cathode, energy is discharged from the battery cell in the form of electricity.[43] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[44]

62. Cells are then grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[45] A module ordinarily contains an array of cells, sensors, controls, protective safety devices, mounts, cooling elements or cooling provisions, and communications capabilities.[46]

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf, at chapter 4.

[46] *Id.* at § 4.1.1.

63.     Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with vehicle also plays an important role in the safety of the lithium-ion battery.[47]

64.     Thermal runaway and the resulting fire risk in lithium-ion batteries used in vehicles were well-documented at the time Ford designed, manufactured, and sold the Fire Risk Vehicles to consumers.[48]

65.     In 2017, NHTSA released a report on lithium-ion battery safety issues that documented known battery fire risks, cited to the vast body of academic and engineering studies on those risks, and recommended rigorous design and testing protocols to protect against those risks. All of this would have been known to Ford at the time it launched the Fire Risk Vehicles.

66.     Even before NHTSA released its comprehensive report on lithium-ion battery safety issues in 2017, many scientific and engineering articles discussed the

---

[47] *Id.* at chapter 4.

[48] *See id.* at §§ 2.5, 3.3.

011305-11/3181219 V1

thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.[49]

67.     A central focus of the NHTSA report is the fire risk associated with the use of lithium-ion batteries, and recommended protection methods and rigorous testing required to mitigate that risk.[50] It notes the major cause of these fires is the propagation of thermal runaway, including but not limited to lithium plating-caused thermal runaway.

68.     As the NHTSA Report stresses:

> [T]hermal runaway of a Lithium-ion cell is one of the fundamental failure mechanisms leading to safety hazards from Lithium-ion batteries. Cell heating is normal, but temperatures must be maintained within a predetermined safe operating level. Thermal runaway is most likely to be realized when an event occurs that results in rapid heating of the cell that outpaces the rate of heat dissipation by the cell. Rapid heating may be caused by internal or external short circuits, overcharging, and general use . . . or may be caused by heat from a source external to the cell, such as can be caused by radiant and conductive heating from

---

[49] *See, e.g.,* Wen, Jianwu, et al., *A Review on Lithium-Ion Batteries Safety Issues: Existing Problems and Possible Solutions*, AMERICAN SCIENTIFIC PUBLISHERS (2012); Feng, Xuning, *et al.*, *Thermal runaway mechanism of lithium ion battery for electric vehicles: A review*, SCIENCEDIRECT (2015).

[50] *See* **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf, at xvi; *see also id.* at chapter 6 (management and control systems), 8-10 (testing, "gap assessments," and "hazards, risks and risk mitigation strategies").

adjacent cell heating, high ambient temperatures, and various types of mechanical shock.[51]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[52]

69.     A lithium-ion cell can heat up and catastrophically fail under various scenarios: e.g., cell design and manufacturing defects, overcharging and overdischarging, mechanical damage such as crush or puncture, thermal abuse, internal short circuit, dendrite growth, and component failures.[53] These scenarios generate local heating in the cell. The local heating induces locally high temperatures, which accelerate additional chemical reactions that can promote the degradation of the organic liquid electrolytes in the cell; these electrolytes and their decomposition products are volatile and flammable at high temperatures.[54]

70.     During thermal runaway, chemical reactions produce gases that cause the battery's internal pressure to rise, triggering the battery's vents to open and release the built-up gases.[55] The battery cells may rupture where the cell design does

---

[51] *See id.* at § 3.2.

[52] *Id.*

[53] *Id.* at 10-8 (thermal runaway flowchart).

[54] *Id.* at § 10.2.2.

[55] *Id.* at § 10.2.1.

not include pressure venting at all, if the venting component fails, or if heat generation outpaces the vent response time.[56]

71.    In its 24V-954 Recall, Ford reported battery thermal venting in eight vehicles, and this venting was insufficient to prevent a fire in at least one instance. But even battery venting alone can damage or destroy a battery.

72.    One well-known cause of internal short circuits in lithium-ion cells arises from the formation and growth of metallic dendrites (i.e., lithium plating). Dendrites are "hard metallic lithium deposits that form on electrode surfaces and may continue to grow until they penetrate the separator and cause an internal electrical short, rapid increases in cell temperature, and thermal runaway."[57] Overcharging, overdischarging, recharging in low temperatures, and metal particles in the cell, among other things, can cause dendrite growth over time.[58] When an internal short circuit occurs (or the separator is breached), there is rapid energy release and fire and explosion can result.[59]

73.    Dendrite formation occurs over time and the risk caused by it is cumulative, eventually resulting in catastrophic separator damage and thermal

---

[56] *Id.*

[57] *Id.* at § 2.1.2.

[58] *See id.* at §§ 2.3.1, 2.3.2, 2.3.3.

[59] *See id.* at §§ 2.6, 3.4.1.

runaway propagation. "While failure can sometimes occur very rapidly after a cell is damaged, damage may also sometimes grow over many years and many duty cycles, causing delayed failure long after damage is initiated."[60] In other words, the likelihood of failure continues to increase as the high-voltage batteries are subjected to more and more duty cycles, particularly where the battery system lacks appropriate use parameters.

74.     In recalling the Fire Risk Vehicles, Ford acknowledges that separator damage causing an internal short circuit appears to be the root cause of the Spontaneous Fire Risk.

75.     Troublingly, if separator damage is the root cause, the lurking internal physical damage to the battery has already been done or will be done after Ford arbitrarily declares the Fire Risk Vehicles once again safe to charge; it is unclear how the risk of fire will be resolved if the battery pack is not redesigned and replaced entirely.

76.     Ford's selected lithium-ion cell design likely also contributed to the Spontaneous Fire Risk. Lithium-ion battery cells can take different forms for use in vehicles, including prismatic, pouch, cylindrical, elliptical, and large format.[61] On

---

[60] *See id.* at 11-1.

[61] *See id.* at § 3.1.

information and belief, the high-voltage batteries utilize prismatic, large format-style cells.

77.    As noted in the 2017 NHTSA report, "prismatic cells designed for automotive applications can have much larger capacities than cylindrical cells . , , This increased capacity of these large format cells requires the protective devices to be designed and scaled accordingly."[62]

78.    The high-voltage 14.4-kWh battery cells in the Fire Risk Vehicles are very large, making them more susceptible to runaway fire propagation because each cell contains more flammable material. In contrast, Tesla uses much smaller (1.5-kWh cells) in its EVs because, though more expensive, these smaller cells are less likely to kick off a runaway fire propagation event because if they fail they will not burn as hot for as long as the nearly ten times bigger 14.4-kWh battery cells in the Fire Risk Vehicles.

79.    Given the known, extreme hazards of runaway propagation in high-voltage lithium-ion batteries such as those used in the Fire Risk Vehicles, it is incumbent on manufacturers to implement strong safety measures in the high-voltage battery systems and conduct rigorous testing of these batteries.

---

[62] *See id.* at § 3.1.2.

80.     In this 2017 report, NHTSA reiterated that all car manufacturers have a duty "to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus."[63]

81.     It is critical, especially in automotive applications, to have sophisticated controls and safety monitoring features in lithium-ion battery systems. These include parameters that place limits on the state-of-charge, battery and individual cell voltage, current, and cell temperature, among other things to protect battery integrity.[64] For example, setting low and high-end state of charge buffers prevents overcharging and over-discharging of batteries. In addition, appropriate controls to prevent individual cells from exceeding their maximum voltage can mitigate thermal runaway risk.

82.     While a high-voltage battery itself may be manufactured separately by a third-party supplier like Samsung, the programming of the battery control system is made by the vehicle manufacturer.

---

[63] *See id.* at xx.

[64] *See id.* at 6-5 through 6-6 ("While the failure phenomena have been discussed extensively in previous chapters, here we summarize these phenomena in terms related to the [battery] control systems and their actions. . . . Several approaches [in battery control systems] are used to overcome this problem. The first is empirically setting the allowable voltage, current, and temperature ranges to maintain a sufficient margin with respect to undesired behavior. The second is to use a model, combined with data, to infer the operating margin more carefully. Models may be simple or complex; the various types are discussed briefly in this chapter.").

83.     As of 2017, there were many standards and testing protocols designed to guide manufacturers in constructing lithium-ion battery systems to be safely used in electric and plug-in hybrid electric vehicles, and many safety technologies and testing protocols existed at the time of the launch of the Fire Risk Vehicles.[65]

84.     Appropriate safety measures to prevent thermal runaway at the cellular level included a range of "electrical components and subsystems to prevent heating and overpressure to the cell by opening the circuit, increasing resistance, or changing the chemical composition of the cell."[66]

85.     Protection technology at the module level also existed, including technologies for "charge and discharge management," designed to limit the electric current to and from the battery module or cellular arrays within a module. Such technologies also protect against the potential for abnormal discharge caused by failures, such as short circuiting due to separator damage, which can trigger thermal runaway and ultimately runaway propagation.[67]

86.     Also at the module level, manufacturers must ensure adequate thermal management to monitor and prevent the spikes in temperature associated with thermal runaway. "Thermal management functions at the module level include, first

---

[65] *See id.* at 3-9 through 3-11, chapter 8.

[66] *See id.* at 3-10.

[67] *See id.* at 4-6.

011305-11/3181219 V1

monitoring, then cooling," and various available technologies serve this function.[68] Thermal management must also occur at the battery pack level in order to maintain "an average temperature within the battery's specifications, and with even temperature distribution throughout the pack."[69] Cooling and thermal barrier separation between cells can reduce the rate of thermal runaway propagation and can stop cell-to-cell propagation for properly sized cells and cooling systems.

87.     Safety features at the module level include "interlock circuits, pressure sensors, and communication architecture that allows the battery status to be monitored by the automobile electronic control unit."[70] Other available safety measures operate at the battery pack level, including but not limited to, thermal management; an array of communication, control, and reporting functions;[71] and the appropriate integration of the battery pack with the vehicle.[72]

88.     On information and belief, any number of combinations of the above-referenced safety protocols, in combination with effective safety testing, would have rendered the Fire Risk Vehicles safe and fit for their intended purpose of operating as plug-in hybrid electric vehicles.

---

[68] *See id.* at 4-10 through 4-15.

[69] *See id.* at 4-24.

[70] *See id.* at 4-16 through 4-19.

[71] *See id.* at 4-28.

[72] *See id.* at 4-34.

89.     Instead, the programmed safety margins or modules that Ford implemented in its design of the high-voltage battery system in Fire Risk Vehicles were inadequate to protect against premature battery degradation, lithium plating, and thermal runaway.

90.     As the 2017 NHTSA report noted in a statement that has been prophetic for Plaintiffs and all other owners and lessees of the Fire Risk Vehicles, as of 2017, car manufacturers were not adequately designing and testing electric and plug-in-hybrid electric systems powered by highly volatile lithium-ion batteries. Indeed, the "safety standards" employed by car manufactures such as Ford appeared "to trail—rather than lead—technology development."[73]

91.     The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells."[74] On information and belief, Ford skimped on available protection measures in order to promote the high electric mode range and overall range, speed of charging, and other desirable features, of the Fire Risk Vehicles—

---

[73] *See id.* at 1-3.

[74] *See* **Exhibit 26**, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINEDESIGN (Dec. 26, 2018), https://www.machinedesign.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries.

all to the benefit of Ford's bottom line and to the detriment of owners and lessees of the Fire Risk Vehicles.

92.     Regardless of the safety measures incorporated in the battery and related components designed to prevent runaway propagation, before launching an electric or plug-in hybrid electric vehicle, propagation testing is of the utmost importance.[75]

93.     In addition to the 2017 NHTSA report, at the time of the launch of the Fire Risk Vehicles, there were a wide array of standards and safety testing procedures for lithium-ion batteries and vehicles that use them, including those promulgated by the Society for Automotive Engineers (SAE), the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[76]

94.     Many of these standards and testing protocols protect against runaway propagation and the resulting catastrophe for vehicle owners and anyone or anything in their vicinity.[77]

---

[75] *See* **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf, at 3-9 (discussing propagation testing circa 2014).

[76] *See id.* at 8-1.

[77] *See id.* at chapter 8.

95.     These standards and testing protocols provided Ford with a wide range of guidelines on design and laboratory testing considerations to ensure the safety of the lithium-ion batteries in the Fire Risk Vehicles.

96.     On information and belief, any adequate testing of the Fire Risk Vehicles would have revealed the high-voltage batteries' propensity to fail and combust as the result of thermal runaway. Either Ford followed these standards and testing protocols and discovered the risk, or it failed to follow these protocols and concealed these failures.

**2.     Ford knew about the fire risk in this and other similar high-voltage batteries.**

97.     Ford knew about the automotive industry's issues with the high-voltage battery packs it utilized in the Fire Risk Vehicles and other vehicles.

98.     As previously mentioned, starting in November 2023, two other manufacturers that used the same or similar high-voltage lithium-ion batteries as those in the Fire Risk Vehicles began recalling their vehicles for separator damage and fire risk arising from the batteries. Then, in February 2025, Samsung recalled the high-voltage batteries themselves.

99.     But Samsung's high-voltage battery fire issues go even further back, which Ford certainly knew. For example, in August 2020, Ford recalled its Kuga PHEV due to a fire risk defect and, in a familiar refrain, instructed owners not to

charge the battery. The battery manufacturer was Samsung.[78] Similarly, BMW recalled over 26,000 vehicles due to a fire risk defect because "the battery production process allowed impurities to enter the cells."[79]

100. And in March 2022, Samsung recalled more than 1,100 of its high-voltage batteries—including some in Ford vehicles that may be the same or similar high-voltage batteries used in the Fire Risk Vehicles—because of poor manufacturing quality.[80]

101. Ford was also aware of the fire risk posed by lithium-ion batteries based on its recall of vehicles with high-voltage batteries produced by other manufacturers. For example, in June 2023, Ford recalled certain Fusion PHEVs because a defect in their high-voltage batteries could cause excess voltage and current flow to the battery energy control module, damaging the component, and potentially resulting in loss of power and fire.[81]

---

[78] *See* **Exhibit 27**, Gustavo Henrique Ruffo, *Samsung SDI Might Be The Root of Ford And BMW PHEV Recalls*, INSIDEEVS (Oct. 16, 2020), https://insideevs.com/news/449322/samsung-sdi-root-ford-bmw-phev-recalls/.

[79] *Id.*

[80] *See* **Exhibit 28**, Jung Min-hee, *Samsung SDI Voluntarily Recalls EV Batteries in the U.S.*, BUSINESSKOREA (Feb. 7, 2022), https://www.businesskorea.co.kr/news/articleView.html?idxno=87120.

[81] *See* NHTSA Recall No. 23V-440.

102.   All these facts make it overwhelmingly likely that the Spontaneous Fire Risk is in fact the result of defectively designed, manufactured, or installed high-voltage lithium-ion batteries.

103.   While it is impossible, pre-discovery, to know the precise design of the high-voltage batteries and the methods used or not used in the architecture and testing of the high-voltage batteries in the Fire Risk Vehicles, it is clear that Ford launched them with defective high-voltage battery packs.

104.   Ford knew or should have known about the Spontaneous Fire Risk before the Fire Risk Vehicles went to market. Ford did not inform consumers (or dealerships) of the Spontaneous Fire Risk, but could have done so through advertising, communication of information to dealerships to relay to consumers, written disclosures, etc. Instead, as detailed herein, Ford manufactured vehicles with the Spontaneous Fire Risk and fraudulently omitted this information from consumers at the point of sale.

## VI.   FRAUDULENT CONCEALMENT

105.   Plaintiffs' claims arise out of Ford's fraudulent concealment of the Spontaneous Fire Risk and its representations or omissions about the quality, safety, uses, features, and benefits of, and comfort of the Fire Risk Vehicles.

106.   Plaintiffs allege that at all relevant times, including specifically at the time they and other class members purchased or leased their Fire Risk Vehicles, Ford

- 47 -

knew or should have known of the Spontaneous Fire Risk; Ford was under a duty to disclose the Spontaneous Fire Risk based upon its exclusive knowledge and concealment of it; and Ford never disclosed the Spontaneous Fire Risk to Plaintiffs, class members, or the public at any time or place or in any manner other than an inadequate and ineffective recall of certain Fire Risk Vehicles.

107. Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Ford:

a. **Who:** Ford, as manufacturer and seller of the Fire Risk Vehicles.

b. **What:** As described above, Ford knew, or was deliberately indifferent to knowledge of the Spontaneous Fire Risk because of the cumulative notice provided by each of the following sources: (1) general industry knowledge of fire risk in high-voltage lithium-ion batteries use in plug-in hybrid electric vehicles, as described in the 2017 NHTSA report; (2) Ford's accumulation of knowledge regarding similarly defective parts related to the Samsung high-voltage batteries used Ford and other vehicles; (3) Ford's accumulation of knowledge regarding similarly defective high-voltage batteries in other Ford vehicles; (4) the several Ford vehicles equipped with the Samsung high-voltage lithium-ion batteries that Ford investigated or had the opportunity to investigate regarding the Spontaneous Fire

- 48 -

Risk before recalling the Fire Risk Vehicles; and (5) that even a single incident of unexpected vehicle fire can and should draw immediate and intense scrutiny.

c.      **When:** Ford concealed material information regarding the Spontaneous Fire Risk at all times and made representations about the quality, safety, and comfort of the Fire Risk Vehicles, starting no later than 2019, when it accumulated requisite knowledge of the Spontaneous Fire Risk based on its extensive industry knowledge and fires in similarly defective Samsung high-voltage lithium-ion batteries and other high-voltage lithium-ion batteries used in its vehicles. This was prior to sale of the Fire Risk Vehicles to any class members. Ford still has not disclosed the truth about the full scope of the Spontaneous Fire Risk in the Fire Risk Vehicles to consumers, regulators, and the public.

d.      **Where:** Ford concealed material information regarding the true nature of the Spontaneous Fire Risk in every communication it had with Plaintiffs and class members, including in the pervasive marketing described herein, and including by making or omitting material representations about the quality, safety, comfort, and features of the Fire Risk Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Ford disclosed the truth about the full scope of the Spontaneous Fire Risk in the Fire Risk Vehicles to anyone outside of Ford. Such information is not adequately disclosed in any sales documents,

011305-11/3181219 V1

displays, stickers, advertisements, warranties, owner's manuals, on Ford's website, or by any salesperson at a Ford dealership.

e.     ***How:*** By concealing the truth about the existence, scope, and nature of the Spontaneous Fire Risk from Plaintiffs and class members at all times, even though it knew about the Spontaneous Fire Risk and knew that information about the Spontaneous Fire Risk would be material to a reasonable consumer. Also, by promising and implying in its marketing materials that the Fire Risk Vehicles were safe, reliable, high performing, and had features and attributes they did not actually have.

f.     ***Why:*** Ford actively concealed material information about the Spontaneous Fire Risk in the Fire Risk Vehicles, and made representations conveying and implying that the Fire Risk Vehicles were safe, dependable, high performing, and had attributes they did not actually have, for the purpose of inducing Plaintiffs and class members to purchase and lease Fire Risk Vehicles, rather than purchasing and leasing competitors' vehicles or less expensive, non-hybrid versions of Ford's vehicles. Had Ford disclosed the truth—for example, in its advertisements or other materials or communications—Plaintiffs and class members (all reasonable consumers) would have been aware of the Spontaneous Fire Risk and would not have bought or leased the Fire Risk Vehicles or would have paid less for them.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.   Discovery Rule Tolling**

108.   Because Ford concealed the existence of the Spontaneous Fire Risk, Class members had no way of knowing about the unreasonable fire risk of the Fire Risk Vehicles.

109.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class and Subclasses could not have discovered through the exercise of reasonable diligence that Ford was concealing the conduct complained of herein.

110.   Plaintiffs and the other Class and Subclass members did not discover and did not know facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had concealed information about the unreasonable fire risk of the Fire Risk Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

111.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Risk Vehicles.

011305-11/3181219 V1

**B.     Fraudulent Concealment Tolling**

112.   All applicable statutes of limitation have also been tolled by Ford's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.     Estoppel**

113.   Ford was under a continuous duty to disclose to Plaintiffs and the other Class and Subclass members the true character, quality, and nature of the fire risk of the Fire Risk Vehicles.

114.   Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Fire Risk Vehicles.

115.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VIII.  CLASS ALLEGATIONS

116.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class and Subclasses:

> **Nationwide Class:** All persons or entities who purchased or leased one or more model year 2020–2024 Ford Escape Plug-in Hybrid and 2021–2024 Lincoln Corsair Grand Touring Plug-in Hybrid vehicles (the "Fire Risk Vehicles").

**Missouri Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Missouri.

**Washington Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Washington.

**Wisconsin Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Wisconsin.

117.    Plaintiffs assert claims under the laws of each state set forth below.

118.    Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Fire Risk Vehicles. Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and their immediate family; and Plaintiffs' counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

119.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

011305-11/3181219 V1

120. This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

121. **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be more than 20,000 Fire Risk Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and published notice.

122. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

    a.  Whether Ford engaged in the conduct alleged herein;

    b.  Whether the Spontaneous Fire Risk creates an unreasonable risk of fires in the Fire Risk Vehicles;

    c.  When Ford first knew about the Spontaneous Fire Risk;

    d.  Whether Ford designed, manufactured, marketed, and distributed the Fire Risk Vehicles with defective high-voltage batteries;

e.     Whether Ford's purported forthcoming recall "repair" is a *bona fide* repair of the faulty high-voltage batteries;

f.     Whether Ford's conduct renders it liable for breach of warranties;

g.     Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclass members;

h.     Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

i.     Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

123.   **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

124.   **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

125.   **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## IX.   CLAIMS

### A.   Nationwide Claims

### COUNT I

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
(15 U.S.C. § 2301, *et seq.*)
(Alleged by all Plaintiffs on behalf of the Nationwide Class
or, in the alternative, the State Subclasses)**

126.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

127.   Plaintiffs bring this claim on behalf of the Nationwide Class.

128. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

129. The Fire Risk Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

130. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

131. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

132. Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Fire Risk Vehicles were fit for their ordinary purpose as safe plug-in hybrid electric motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

133. Ford breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without

limitation, the Fire Risk Vehicles share a common defect in that they are all equipped with a high-voltage battery that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles as well as their homes, passengers, and bystanders. This defect rendered the Fire Risk Vehicles, when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, Ford specifically advised owners and lessees not to charge their high-voltage batteries and not to drive the Fire Risk Vehicles in electric mode.

134.   As alleged above, on information and belief, Ford skimped on available design and safety technologies that would have precluded the Spontaneous Fire Risk, and, through the sort of testing that any responsible vehicle manufacturer would have done prior to launching the Fire Risk Vehicles, Ford knew or should have known of the defect. Yet, to pad its bottom line and launch a plug-in hybrid electric vehicle with the highest possible electric and overall range, Ford intentionally or recklessly foisted the outrageously dangerous Fire Risk Vehicles on unwitting Class members.

135.   Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Fire Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

136.   Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

137.   Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew that the Fire Risk Vehicles were defective and that the Fire Risk Vehicles could ignite when used as intended long before Plaintiffs and the Class. Ford failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

138.   Plaintiffs had sufficient direct dealings with Ford to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here or exceptions to privity apply in these circumstances. Finally, privity is also not required because the Fire Risk Vehicles are dangerous instrumentalities due to the aforementioned defect, as battery fires present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles as well as their homes, other nearby structures and vehicles, passengers, and bystanders.

139.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until

such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

140. Plaintiffs would suffer economic hardship if they returned their Fire Risk Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Fire Risk Vehicles by retaining them.

141. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class Members in connection with the commencement and prosecution of this action.

142. Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class Members to recover out-of-pocket costs incurred

attempting to rectify and mitigate the effects of the Spontaneous Fire Risk in their Fire Risk Vehicles.

**B.    State-Specific Claims**

    **1.    Missouri**

**COUNT II**

**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Rev. Stat. § 407.010, *et seq.*)**
**(Alleged by Plaintiff Hilburg on behalf of the Missouri Subclass)**

143.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

144.    Plaintiff Harry Hilburg ("Plaintiff" for purposes of the Missouri claims) brings this claim on behalf of himself and the Missouri Subclass ("Subclass" for purposes of the Missouri claims).

145.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.

146.    Ford is a "person" and the Fire Risk Vehicles are "merchandise" within the meaning of Mo. Rev. Stat. §§ 407.010(4)-(5) and 407.020.

147.    Plaintiff is a "person" who purchased the Fire Risk Vehicle for personal, family, or household use under Mo. Rev. Stat. §§ 407.010(5) and 407.025.

- 61 -

148.   In the course of "trade" or "commerce," within the meaning of Mo. Rev. Stat. § 407.010(7), Ford engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Risk Vehicles.

149.   Ford knew it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

150.   By marketing the Fire Risk Vehicles as safe, reliable, and of high quality, Ford engaged in deceptive business practices in violation of the Missouri MPA.

151.   In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Fire Risk. Ford compounded the deception by repeatedly asserting that the Fire Risk Vehicles were safe, reliable, and of high quality.

152.   Ford's unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety, performance, and value of the Fire Risk Vehicles.

153. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with an intent to mislead Plaintiffs.

154. Ford knew or should have known that its conduct violated the Missouri MPA.

155. As alleged above, Ford made material statements about the safety and utility of the Fire Risk Vehicles that were either false or misleading.

156. Ford owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because Ford:

    a. Possessed exclusive knowledge about the Spontaneous Fire Risk;

    b. Intentionally concealed the foregoing from Plaintiff and the Subclass;

    c. Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and

    d. Had duties under the TREAD Act and related regulations to disclose and remedy the Spontaneous Fire Risk.

157. Ford fraudulently concealed the Spontaneous Fire Risk and the true performance of the Fire Risk Vehicles.

158. The true performance and safety of the Fire Risk Vehicles were material to Plaintiffs.

159. Plaintiffs suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material

information. Plaintiffs who purchased the Fire Risk Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Missouri MPA.

160.  Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of the Fire Risk Vehicles suffered ascertainable loss in the form of overpayment and the diminished value of their vehicles because of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

161.  Ford's violations present a continuing risk to Plaintiffs and Class and Subclass members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

162.  As a direct and proximate result of Ford's violations of the Missouri MPA, Plaintiffs have suffered injury-in-fact and actual damage.

163.  As a result of Ford's conduct, Plaintiff and the Subclass seek to recover from Ford all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, civil penalties, punitive damages, attorneys' fees and costs, any orders necessary to enjoin Ford's unfair and deceptive practices, and any other just and proper relief authorized under Mo. Rev. Stat. § 407.025 or Missouri law.

011305-11/3181219 V1

## COUNT III

## FRAUDULENT CONCEALMENT
### (Common Law)
### (Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)

164. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

165. Plaintiff brings this claim on behalf of himself and the Subclass.

166. Under Missouri law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

167. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

168. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

169.   Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

170.   Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

171.   Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not

just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

172.   Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

173.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk.

174.   Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

175.   Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff did not get the benefit of the bargain since the vehicle was worth less than it would have

been without the defect, and because he owns a vehicle that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

176. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

177. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## FRAUDULENT OMISSION
### (Common Law)
### (Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)

178. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

179.   Plaintiff brings this claim on behalf of himself and the Subclass.

180.   Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

181.   Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

182.   Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

183.   For the reasons set forth above, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

184.   In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

185. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

186. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

187. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MISSOURI LAW
### (Mo. Stat. § 400.2-314)
### (Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)

188. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

189. Plaintiff brings this claim on behalf of himself and the Subclass.

- 70 -

190.   Ford is a "merchant" and "seller" of motor vehicles and the Fire Risk Vehicles are "goods" under Missouri law. Mo. Stat. § 400.2-104.

191.   Under Missouri law, an implied warranty of merchantability attaches to the Fire Risk Vehicles under Mo. Stat. § 400.2-314.

192.   The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

193.   As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

194.    Plaintiff and the Subclass members had sufficient direct dealings with Ford to establish privity of contract with Ford. Nonetheless, privity is not required here or exceptions to any privity requirement apply here. Furthermore, privity is also not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members.

195.    It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

196.    Pre-suit notice is not required to pursue a breach of implied warranty claim under Missouri law.

197.    Nevertheless, Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by correspondence from Plaintiffs' counsel to Ford, consumer complaints regarding the defect that is the subject of this Complaint, and by the allegations contained in this Complaint.

198.    Alternatively, Plaintiff and Subclass members were excused from providing Ford with notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Fire Risk Vehicles, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual

- 72 -

cause of the defect. As a result, Plaintiff and Subclass members had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair.

199.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and Subclass members have been damaged in an amount to be determined at trial.

### COUNT VI

### UNJUST ENRICHMENT
**(Common Law)**
**(Alleged by Plaintiff Hilburg on behalf of the Missouri Subclass)**

200.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

201.   Plaintiff brings this claim on behalf of himself and the Subclass.

202.   Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

203.   Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and

misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

204. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

205. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

206. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

207. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

208. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

209. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

210. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

211. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

### 2. Washington

**COUNT VII**

**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
(RCW § 19.86.010, *et seq.*)
(Alleged by Plaintiff Marianne Bigelow on behalf of
the Washington Subclass)**

212. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

213. Plaintiff Marianne Bigelow ("Plaintiff" for purposes of the Washington claims) brings this claim on behalf of herself and the Washington Subclass ("Subclass" for purposes of the Washington claims).

214.   Washington Consumer Protection Act ("WCPA") declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

215.   Plaintiff and the Subclass members are "persons" and the Fire Risk Vehicles are "assets" that were sold in "trade" and "commerce" under RCW § 19.86.010. Plaintiff and the Subclass members were injured in their business or property by Ford's violations of the WCPA. Ford is a proper defendant under the WCPA.

216.   Ford violated the WCPA in multiple ways including by engaging in unfair or deceptive acts or practices in its conduct of trade or commerce regarding the Fire Risk Vehicles, in violation of RCW § 19.86.020.

217.   Ford concealed and failed to disclose the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Risk Vehicles.

218.   By failing to disclose and actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality,

and fit for use as plug-in hybrid electric vehicles, Ford engaged in unfair and deceptive acts or practices in violation of the WCPA.

219.   In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Fire Risk Vehicles.

220.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

221.   Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

222.   Ford's unfair or deceptive acts or practices were injurious to the public interest because Ford's conduct injured other persons and has the capacity to injure other persons, under RCW § 19.86.093.

223.   Ford knew or should have known that its conduct violated the WCPA.

224.   As alleged above, Ford made material statements about the safety and reliability of the Fire Risk Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

225.   Ford owed Plaintiff and Subclass members a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

      a.    Possessed exclusive knowledge about the Spontaneous Fire Risk;

b.    Intentionally concealed the foregoing from Plaintiff and the Subclass;

c.    Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Spontaneous Fire Risk.

226.   Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and Subclass members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the other Subclass members known of the Spontaneous Fire Risk in their Fire Risk Vehicles, they would not have bought or leased the Fire Risk Vehicles or would have paid less for them.

227.   Ford's concealment of the Spontaneous Fire Risk in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

228.   Plaintiff and the Subclass suffered actual damages caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Had they known the truth about the Fire Risk Vehicles, Plaintiff and Subclass members either would have paid less for the Fire Risk Vehicles or would not have purchased or leased them at all. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as

alleged herein, Ford has yet to offer any effective remedy for the Fire Risk Vehicles. Ford's unlawful acts and practices complained of herein affect the public interest.

229.   As a direct and proximate result of Ford's violations of the WCPA, Plaintiff and Subclass members have suffered injury-in-fact and actual damage as alleged above.

230.   As a result of Ford's conduct, Plaintiff and the Subclass seek to recover from Ford all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, treble damages, civil penalties, attorneys' fees and costs, any orders necessary to enjoin Ford's acts or failures to act, and any other just and proper relief authorized under RCW § 19.86.090, RCW § 19.86.140, or other Washington law.

## COUNT VIII

### FRAUDULENT CONCEALMENT
**(Common Law)**
**(Alleged by Plaintiff Marianne Bigelow on behalf of
the Washington Subclass)**

231.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

232.   Plaintiff brings this claim on behalf of herself and the Subclass.

233.   Under Washington law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in

connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

234.   Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

235.   Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

236.   Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

237.   Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and

safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

238. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

239. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

240.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk.

241.   Plaintiff was unaware of these omitted material facts and would not have acted as she did if she had known of the concealed and suppressed facts, in that she would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

242.   Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff did not get the benefit of the bargain since the vehicle was worth less than it would have been without the defect, and because she owns a vehicle that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the

Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

243.   Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

244.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IX

### FRAUDULENT OMISSION
**(Common Law)**
**(Alleged by Plaintiff Marianne Bigelow on behalf of
the Washington Subclass)**

245.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

246.   Plaintiff brings this claim on behalf of herself and the Subclass.

247.   Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

248.   Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having

known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

249. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

250. For the reasons set forth above, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

251. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

252. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

253. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles

that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

254. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT X

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER WASHINGTON LAW (RCW § 62A.2-314) (Alleged by Plaintiff Marianne Bigelow on behalf of the Washington Subclass)

255. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

256. Plaintiff brings this claim on behalf of herself and the Subclass.

257. Ford was and is a merchant with respect to motor vehicles under Revised Code of Washington § 62A.2-104.

258. Under Revised Code of Washington § 62A.2-314, a warranty that the Fire Risk Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Subclass purchased or leased their Fire Risk Vehicles.

259. The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk, which, among other things, makes the vehicles susceptible to battery fire and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

260. As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

261. Plaintiff and the Subclass members had sufficient direct dealings with Ford to establish privity of contract with Ford. Nonetheless, privity is not required here or exceptions to any privity requirement apply here. Furthermore, privity is also not required because the Fire Risk Vehicles are inherently dangerous and defective

due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members.

262.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

263.   Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by correspondence from Plaintiffs' counsel to Ford, consumer complaints regarding the defect that is the subject of this Complaint, and by the allegations contained in this Complaint.

264.   Alternatively, Plaintiff and Subclass members were excused from providing Ford with notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it recalled the Fire Risk Vehicles, Ford still does not have a repair available, and Ford has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and Subclass members had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair.

265.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XI

### UNJUST ENRICHMENT
### (Common Law)
### (Alleged by Plaintiff Marianne Bigelow on behalf
### of the Washington Subclass)

266. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

267. Plaintiff brings this claim on behalf of herself and the Subclass.

268. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

269. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

270. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

271.   At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

272.   Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

273.   Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

274.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

275.   Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

276.   Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

277.   Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

### 3.   Wisconsin

### COUNT XII

### VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT
### (Wis. Stat. § 110.18)
### (Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)

278.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

279.   Plaintiff William Simmons ("Plaintiff" for purposes of the Wisconsin claims) brings this claim on behalf of himself and the Wisconsin Subclass ("Subclass" for purposes of the Wisconsin claims).

280.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

281.   Ford is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

282.   Plaintiff is a member of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiff and the Subclass members purchased or leased one or more of the Fire Risk Vehicles.

283.   Ford participated in misleading, false, or deceptive acts that violated the Wisconsin DTPA. By concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, Ford engaged in deceptive business practices prohibited by the Wisconsin DTPA, including: (1) representing that the Fire Risk Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Fire Risk Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Fire Risk Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

284.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

285.   In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely

- 91 -

upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

286.   By failing to disclose and by actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the Wisconsin DTPA.

287.   In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Risk Vehicles.

288.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

289.   Ford intentionally and knowingly misrepresented and omitted material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

290.   Ford knew or should have known that its conduct violated the Wisconsin DTPA.

291.   As alleged above, Ford made material statements about the safety and reliability of the Fire Risk Vehicles when operating as hybrid electric vehicles that were either false or misleading.

292.   Ford owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Fire Risk Vehicles because Ford:

     a.    Possessed exclusive knowledge about the Spontaneous Fire Risk;

     b.    Intentionally concealed the foregoing from Plaintiff and the Subclass;

     c.    Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and

     d.    Had duties under the TREAD Act and related regulations to disclose and remedy the Spontaneous Fire Risk.

293.   Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and Subclass members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and Subclass members been aware of the defects in their vehicles, they would have either not have bought or leased their Fire Risk Vehicles or would have paid less for them.

294.   Ford's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

295.   Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose Spontaneous Fire

Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

296. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to fix the Fire Risk Vehicles. Ford's unlawful acts and practices complained of herein affect the public interest.

297. As a direct and proximate result of Ford's violations of the Wisconsin DTPA, Plaintiff and the Subclass have suffered injury-in-fact and actual damage as alleged above.

298. As a result of Ford's conduct, Plaintiff and the Subclass seek to recover from Ford all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, treble damages, punitive damages, attorneys' fees and costs, any orders necessary to enjoin Ford's acts or failures to act, and any other just and proper relief authorized under the Wisconsin DTPA or Wisconsin law.

## COUNT XIII

### FRAUDULENT CONCEALMENT
#### (Common Law)
#### (Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)

299. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

300. Plaintiff brings this claim on behalf of himself and the Subclass.

011305-11/3181219 V1

301.   Under Wisconsin law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

302.   Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

303.   Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

304.   Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

305.   Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles,

and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

306.    Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

307.    Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

- 96 -

308.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk.

309.   Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

310.   Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff did not get the benefit of the bargain since the vehicle was worth less than it would have been without the defect, and because he owns a vehicle that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the

- 97 -

Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

311.   Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

312.   Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XIV

### FRAUDULENT OMISSION
**(Common Law)**
**(Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)**

313.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

314.   Plaintiff brings this claim on behalf of himself and the Subclass.

315.   Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

316.   Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having

011305-11/3181219 V1

known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

317.   Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

318.   For the reasons set forth above, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

319.   In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

320.   Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

321.   Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles

that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

322.   As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

**COUNT XV**

**UNJUST ENRICHMENT**
**(Common Law)**
**(Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)**

323.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

324.   Plaintiff brings this claim on behalf of himself and the Subclass.

325.   Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

326.   Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and

011305-11/3181219 V1

misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

327.   Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

328.   At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

329.   Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

330.   Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

331.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

011305-11/3181219 V1

332.   Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

333.   Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

334.   Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.   Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.   A repair for the Spontaneous Fire Risk and restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Fire Risk Vehicles, or the overpayment for their vehicles;

011305-11/3181219 V1

C.      Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D.      An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs and attorneys' fees; and

F.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.


Dated: April 4, 2025                    Respectfully submitted,

*/s/ Steve W. Berman*
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Rachel E. Fitzpatrick
**HAGENS BERMAN SOBOL SHAPIRO LLP**
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 224-2626
rachelf@hbsslaw.com

011305-11/3181219 V1

E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com

*Attorneys for Plaintiffs and the
Putative Classes*

- 104 -