**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

HARRY HILBURG, MARIANNE BIGELOW, WILLIAM SIMMONS, KENNETH STEUCK, CHARLES CHRONICLE, AMANDA BERARDI, NOAH WOODCOCK, GREGORY TRAVERS, EDNA VASQUEZ, ROBERT MULLER, MARC SCHWEDELSON, MARLA KERR, and LISA FRIEDLAND, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware Corporation,

Defendant.

Case No. 2:25-cv-10970-LVP-CI

Honorable Linda V. Parker

**JURY TRIAL DEMANDED**

**AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. JURISDICTION .......... 5

III. VENUE .......... 6

IV. PARTIES .......... 6

- A. Plaintiffs .......... 6
  - 1. Kenneth Steuck .......... 6
  - 2. Charles Chronicle .......... 9
  - 3. Amanda Berardi .......... 12
  - 4. Noah Woodcock .......... 14
  - 5. Gregory Travers .......... 17
  - 6. Harry Hilburg .......... 20
  - 7. Edna Vasquez .......... 23
  - 8. Robert Muller .......... 25
  - 9. Marc Schwedelson .......... 28
  - 10. Marla Kerr .......... 31
  - 11. Lisa Friedland .......... 33
  - 12. Marianne Bigelow .......... 36
  - 13. William Simmons .......... 39
- B. Defendant .......... 42

V. FACTUAL ALLEGATIONS .......... 43

A. Ford marketed the Fire Risk Vehicles as a safe and reliable plug-in electric hybrid and knew these attributes were material to customers. ....43

B. The high-voltage lithium-ion batteries pose a Spontaneous Fire Risk. ....56

C. Ford knew or should have known about the Spontaneous Fire Risk before selling the Fire Risk Vehicles to consumers. ....64

1. Thermal runaway and fire were known risks of lithium-ion batteries and Ford failed to adequately design around them. ....64

2. Ford knew about the fire risk in this and other similar high-voltage batteries. ....77

VI. FRAUDULENT CONCEALMENT ....79

VII. TOLLING OF THE STATUTE OF LIMITATIONS ....83

A. Discovery Rule Tolling ....83

B. Fraudulent Concealment Tolling ....84

C. Estoppel ....84

VIII. CLASS ALLEGATIONS ....84

IX. CLAIMS ....89

A. Nationwide Claims ....89

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) ....89

B. State-Specific Claims ....94

1. California ....94

COUNT II VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) ....94

COUNT III VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) ........................... 99

COUNT IV VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) ........................... 102

COUNT V FRAUDULENT CONCEALMENT (Common Law) ........................ 105

COUNT VI FRAUDULENT OMISSION (Common Law) ........................ 110

COUNT VII VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792) ........................ 112

COUNT VIII UNJUST ENRICHMENT (Common Law) ........................ 115

2. Florida ........................ 117

COUNT IX VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*) ........................ 117

COUNT X FRAUDULENT CONCEALMENT (Common Law) ........................ 122

COUNT XI FRAUDULENT OMISSION (Common Law) ........................ 126

COUNT XII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW (Fla. Stat. § 672.314) ........................ 128

COUNT XIII UNJUST ENRICHMENT (Common Law) ........................ 131

3. Kansas ........................ 133

COUNT XIV VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT (Kan. Stat. § 50-623, *et seq.*) ........................ 133

COUNT XV FRAUDULENT CONCEALMENT (Common Law) ........................ 138

COUNT XVI FRAUDULENT OMISSION (Common Law) ........................ 142

COUNT XVII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER KANSAS LAW (Kan. Stat. Ann. § 84-2-314) .......... 144

COUNT XVIII UNJUST ENRICHMENT (Common Law) .......... 147

4. Massachusetts .......... 149

COUNT XIX DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW (Mass. Gen. Laws Ch. 93A, § 1, *et seq.*) .......... 149

COUNT XX FRAUDULENT CONCEALMENT (Common Law) .......... 154

COUNT XXI FRAUDULENT OMISSION (Common Law) .......... 158

COUNT XXII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MASSACHUSETTS LAW (ALM GL Ch. 106, § 2-314) .......... 160

COUNT XXIII UNJUST ENRICHMENT (Common Law) .......... 163

5. Missouri .......... 165

COUNT XXIV VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT (Mo. Rev. Stat. § 407.010, *et seq.*) .......... 165

COUNT XXV FRAUDULENT CONCEALMENT (Common Law) .......... 170

COUNT XXVI FRAUDULENT OMISSION (Common Law) .......... 174

COUNT XXVII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MISSOURI LAW (Mo. Stat. § 400.2-314) .......... 176

COUNT XXVIII UNJUST ENRICHMENT (Common Law) .......... 178

6. Michigan .......... 181

COUNT XXIX VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (Mich. Comp. Laws § 445.901, *et seq.*) .......... 181

COUNT XXX FRAUDULENT CONCEALMENT (Common Law) .......... 187

COUNT XXXI FRAUDULENT OMISSION (Common Law)............................191

COUNT XXXII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MICHIGAN LAW (Mich. Comp. Laws § 440.2314) .......................................................................193

COUNT XXXIII UNJUST ENRICHMENT (Common Law)..............................196

7. New York ..........................................................................198

COUNT XXXIV VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. Gen. Bus. Law § 349 *et seq.*) ....................198

COUNT XXXV VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. Gen. Bus. Law § 350, *et seq.*) ...................202

COUNT XXXVI FRAUDULENT CONCEALMENT (Common Law).................................................................................205

COUNT XXXVII FRAUDULENT OMISSION (Common Law)........................209

COUNT XXXVIII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEW YORK LAW (N.Y. U.C.C. §§ 2-314 and 2A-212) ...................................................................211

COUNT XXXIX UNJUST ENRICHMENT (Common Law)..............................215

8. Ohio.................................................................................217

COUNT XL VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (Ohio Rev. Code Ann. §§ 1345.01, *et seq.*).................217

COUNT XLI VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT (Ohio Rev. Code Ann. §§ 4165.01, *et seq.*).................221

COUNT XLII FRAUDULENT CONCEALMENT (Common Law)...................225

COUNT XLIII FRAUDULENT OMISSION (Common Law) ............................229

COUNT XLIV VIOLATION OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER OHIO LAW (Ohio Rev. Code Ann. §§ 1302.27 and 1310.19) ...............................................................231

COUNT XLV UNJUST ENRICHMENT (Common Law)..................................235

9. Tennessee ....................................................................237

COUNT XLVI VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT (Tenn. Code Ann. § 47-18-101, *et seq.*)....................237

COUNT XLVII FRAUDULENT CONCEALMENT (Common Law)................242

COUNT XLVIII FRAUDULENT OMISSION (Common Law)..........................246

COUNT XLIX UNJUST ENRICHMENT (Common Law) ................................248

10. Washington ....................................................................250

COUNT L VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (RCW § 19.86.010, *et seq.*) ......................................250

COUNT LI FRAUDULENT CONCEALMENT (Common Law) .......................255

COUNT LII FRAUDULENT OMISSION (Common Law)................................259

COUNT LIII BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER WASHINGTON LAW (RCW § 62A.2-314) ....................................................................261

COUNT LIV UNJUST ENRICHMENT (Common Law) ..................................264

11. Wisconsin....................................................................266

COUNT LV VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (Wis. Stat. § 110.18)....................................266

COUNT LVI FRAUDULENT CONCEALMENT (Common Law) ....................271

COUNT LVII FRAUDULENT OMISSION (Common Law).............................275

COUNT LVIII UNJUST ENRICHMENT (Common Law) ................................277

REQUEST FOR RELIEF ....................................................................279

DEMAND FOR JURY TRIAL ....................................................................280

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and state classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I. INTRODUCTION

1. The most important duty of a car manufacturer is to provide consumers with a safe car.

2. Ford Motor Company ("Ford") breached this fundamental duty by selling certain Ford and Lincoln-branded hybrid-electric vehicles that are dangerous and at risk of catching fire and exploding.

3. Ford designed, manufactured, marketed, and sold more than 20,000 model year 2020-2024 Ford Escape Hybrid and 2021-2024 Lincoln Corsair Grand Touring plug-in hybrid vehicles (PHEV) (the "Fire Risk Vehicles")[1] that contain a defect in their high-voltage lithium-ion batteries that can cause vehicle fires and explosions, even when the vehicles are parked and off (the "Spontaneous Fire Risk").

4. So far, Ford has publicly identified seven high-voltage battery failures and one vehicle fire suspected to arise from the Spontaneous Fire Risk. But ***twenty-***

[1] Plaintiffs' counsel continues to investigate whether other model years contain the same defect and should also be recalled. Plaintiffs may update the definition of Fire Risk Vehicles to include additional models and model years.

***four*** vehicle fires have arisen in FCA and Volkswagen vehicles that use the same batteries supplied by the same high-voltage battery manufacturer, Samsung SDI ("Samsung"), as the Fire Risk Vehicles here. This includes some fires that occurred in FCA vehicles that had already received a purported fix for the fire risk defect. Recently, after Ford, FCA, and Volkswagen recalled their vehicles, Samsung recalled more than 180,000 of these high-voltage battery packs deemed at risk of failure and sudden fire.

5. The Spontaneous Fire Risk exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle's high-voltage lithium-ion battery—located under the front seats—fails or catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Spontaneous Fire Risk also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Fire Risk Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

6. After many months of being unable to use their PHEV vehicles' electric driving function—a feature for which Plaintiffs paid a premium—at Ford's directive, Ford recently issued a recall repair that it purports will remedy the Spontaneous Fire Risk. But this "fix" is merely a software update meant to catch abnormal batteries before they spontaneously ignite. This is cold comfort for

Plaintiffs and class members given that such remedies have recently proved ineffective at eliminating fires, as seen in the Jeep Wrangler and Cherokee hybrid-electric vehicles outfitted with the same Samsung-manufactured high-voltage lithium-ion batteries, and in the Chrysler Pacifica hybrid-electric vehicles equipped with defective LG Energy Solutions high-voltage lithium-ion batteries. In each case, fires continued to occur in vehicles that received the software update, necessitating additional recalls and new purported remedies.

7. While they awaited this purported fix, Ford directed Plaintiffs and class members to stop charging their Fire Risk Vehicles, effectively denying them use of the prominent hybrid-electric feature for which they paid a premium. Likewise, Plaintiffs and class members were forced to pay for gas while increasing their carbon footprint. A plug-in electric hybrid vehicle that cannot be operated in all-electric mode and is less efficient than its gas-powered equivalent is not fit for its ordinary purpose.

8. Ford had all the knowledge it needed to anticipate, test for, and prevent the Spontaneous Fire Risk before the vehicles went to market. This knowledge came from, among other things, industry and scientific studies on the fire risks of lithium-ion battery packs; industry insights on the appropriate specifications and control

systems for lithium-ion batteries;[2] rigorous pre-launch testing of the high-voltage battery and hybrid propulsion system that any responsible auto manufacturer would have conducted; and known fire issues arising in other vehicles with lithium-ion battery packs, including those equipped with the same Samsung batteries here and others used in Ford's own Kuga and Fusion PHEVs. Despite this exclusive knowledge, Ford chose profits over safety and sold and leased the Fire Risk Vehicles to Plaintiffs and putative class members without disclosing or rectifying the serious risk of the Spontaneous Fire Risk.

9. Owners and lessees of the Fire Risk Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property because of the Spontaneous Fire Risk. They paid thousands of dollars for a plug-in hybrid electric propulsion system that they could not use and will continue to incur damages until the Spontaneous Fire Risk is adequately fixed. Had Plaintiffs and putative class members known of the Spontaneous Fire Risk, they would not have purchased or leased those vehicles; paid substantially less for them; or purchased non-hybrid versions of the vehicles, which are significantly less expensive.

---

[2] *See generally* **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf.

10. Plaintiffs bring this class action on behalf of themselves and a proposed class of all owners or lessees of a Fire Risk Vehicle to hold Ford accountable for its defective vehicles and the damages these consumers have incurred as a result. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312. Plaintiffs also seek damages and all available remedies for Ford's violations of state consumer protection acts, fraudulent concealment and omission laws, breaches of implied warranties, and unjust enrichment.

## II. JURISDICTION

11. This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

12. This Court has personal jurisdiction over Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

## III. VENUE

13. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

## IV. PARTIES

### A. Plaintiffs

#### 1. Kenneth Steuck

14. Plaintiff and proposed class representative Kenneth Steuck ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Corona, California. On or about December 2, 2023, Plaintiff purchased a used 2022 Ford Escape PHEV from the authorized Ford dealer North County Ford in Vista, California. Plaintiff's Escape PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Escape PHEV than he would have for a comparable non-PHEV Escape. At sale, Plaintiff's Fire Risk Vehicle was covered by Ford's 3-year/36,000-mile bumper-to-bumper warranty, 5-year/60,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff

purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

15. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that he would not have otherwise needed and his vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit his home to accommodate plug-in charging of the vehicle, which was also rendered useless.

16. On or around June 10, 2025, Plaintiff took his Escape PHEV to a Ford-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the

Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk.

17. In or around June 20, 2025, Plaintiff sent Ford notice about the Spontaneous Fire Risk in his vehicle, that Ford's repair under NHTSA Recall No. 24V-954 is inadequate, and demanded an adequate repair and compensation. Ford has not satisfied Plaintiff's demands. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have

purchased a non-PHEV version of the Escape, had Plaintiff known about the Spontaneous Fire Risk.

**2. Charles Chronicle**

18. Plaintiff and proposed class representative Charles Chronicle ("Plaintiff," for purposes of these allegations) is a resident and citizen of Newport Beach, California. In or around August 2022, Plaintiff purchased a new 2022 Lincoln Corsair Grand Touring Plug-In Hybrid Electric Vehicle from Tuttle-Click Ford, an authorized Ford Lincoln dealership in Irvine, California. Plaintiff's Corsair PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Corsair PHEV than he would have for a comparable non-PHEV Corsair. At sale, Plaintiff's Fire Risk Vehicle was covered by Lincoln's 4-year/50,000-mile bumper-to-bumper warranty, 6-year/70,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and

representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

19. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that he would not have otherwise needed and his vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit his home to accommodate plug-in charging of the vehicle, which was also rendered useless.

20. In or around June, 2025, Plaintiff took his Corsair PHEV to a Ford Lincoln-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this

recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk.

21. On or around June 23, 2025, Plaintiff sent Ford notice about the Spontaneous Fire Risk in his vehicle, Ford's violations of California law and Plaintiff's legal claims, and demanded a remedy. Ford has not satisfied Plaintiff's demands. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**3. Amanda Berardi**

22. Plaintiff and proposed class representative Amanda Berardi ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Saint Augustine, Florida. On or about January 6, 2022, Plaintiff purchased a new 2022 Lincoln Corsair Grand Touring PHEV from the authorized Ford Lincoln dealer Pugmire Lincoln of Marietta. Plaintiff's Corsair PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Corsair PHEV than she would have for a comparable non-PHEV Corsair. At sale, Plaintiff's Fire Risk Vehicle was covered by Lincoln's 4-year/50,000-mile bumper-to-bumper warranty, 6-year/70,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and

dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before her purchase. Plaintiff's vehicle research, review of vehicle advertising and marketing, and purchase of the vehicle occurred in Florida and the vehicle was delivered to her in Florida.

23. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that she would not have otherwise needed and her vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit her home to accommodate plug-in charging of the vehicle, which was also rendered useless.

24. In or around July 2025, Plaintiff took her Corsair PHEV to a Ford Lincoln-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff

for her economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking her Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk.

25. Plaintiff contacted Lincoln to demand they buy back her Corsair PHEV because of the Spontaneous Fire Risk and subsequent recall. Defendant denied her demand. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**4. Noah Woodcock**

26. Plaintiff and proposed class representative Noah Woodcock ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Arlington, Texas.

On or about October 16, 2024, Plaintiff purchased a used 2022 Ford Escape PHEV from the authorized Ford dealer Victory Ford in Kansas City, Kansas. Plaintiff's Escape PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Escape PHEV than he would have for a comparable non-PHEV Escape. At sale, Plaintiff's Fire Risk Vehicle was covered by Ford's 5-year/60,000-mile powertrain warranty and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

27. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that he would not have otherwise needed and his vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit his home to accommodate plug-in charging of the vehicle, which was also rendered useless. Plaintiff placed Defendant on notice and complained to Defendant through its authorized dealer about not being able to charge the vehicle and the lack of repair.

28. On or around July 15, 2025, Plaintiff's Escape PHEV received Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954 at a Ford-authorized dealer. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric

function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Escape, had Plaintiff known about the Spontaneous Fire Risk.

**5. Gregory Travers**

29. Plaintiff and proposed class representative Gregory Travers ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Marion, Massachusetts. On or about March 15, 2022, Plaintiff purchased a new 2022 Ford Escape PHEV from the authorized Ford dealer Jannell Ford in Hanover, Massachusetts. Plaintiff's Escape PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for

personal transportation needs. Plaintiff paid more for the Escape PHEV than he would have for a comparable non-PHEV Escape. At sale, Plaintiff's Fire Risk Vehicle was covered by Ford's 3-year/36,000-mile bumper-to-bumper warranty, 5-year/60,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

30. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that

he would not have otherwise needed and his vehicle's fuel economy was reduced while the vehicle's electric function was unusable.

31. On or around May 29, 2025, Plaintiff took his Escape PHEV to a Ford-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have

purchased a non-PHEV version of the Escape, had Plaintiff known about the Spontaneous Fire Risk.

**6. Harry Hilburg**

32. Plaintiff and proposed class representative Harry Hilburg ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Olivette, Missouri. On or about May 25, 2022, Plaintiff purchased a new 2022 Ford Escape PHEV from the authorized Ford dealer Bo Beuckman Ford in Ellisville, Missouri. Plaintiff's Escape PHEV is a Fire Risk Vehicle that suffers from the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff's wife also regularly rides in the vehicle with him. Plaintiff paid more for the Escape PHEV than he would have for a comparable non-PHEV Escape. At sale, Plaintiff's Fire Risk Vehicle was covered by Ford's 3-year/36,000-mile bumper-to-bumper warranty, 5-year/60,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations

and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

33. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that he would not have otherwise needed and his vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit his home to accommodate plug-in charging of the vehicle, which was also rendered useless. Plaintiff placed Defendant on notice and complained to Defendant through its authorized dealer about not being able to charge the vehicle and the lack of repair.

34. On or around May 22, 2025, Plaintiff took his Escape PHEV to a Ford-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the

Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk, including the sudden loss of motive power that Ford states may occur should the high-voltage battery short circuit while driving. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Escape, had Plaintiff known about the Spontaneous Fire Risk.

**7. Edna Vasquez**

35. Plaintiff and proposed class representative Edna Vasquez ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Livonia, Michigan. On or about June 29, 2023, Plaintiff purchased a new 2023 Lincoln Corsair Grand Touring PHEV from the authorized Ford Lincoln dealer Hines Park Lincoln in Plymouth, Michigan. Plaintiff's Corsair PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Corsair PHEV than she would have for a comparable non-PHEV Corsair. At sale, Plaintiff's Fire Risk Vehicle was covered by Lincoln's 4-year/50,000-mile bumper-to-bumper warranty, 6-year/70,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and

dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before her purchase.

36. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that she would not have otherwise needed and her vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit her home to accommodate plug-in charging of the vehicle, which was also rendered useless.

37. On or around May 23, 2025, a Ford Lincoln-authorized dealer performed Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954 on Plaintiff's Corsair PHEV. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for her economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire

Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking her Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk.

38. In or around February and April 2025, Plaintiff contacted Lincoln about the Spontaneous Fire Risk in her vehicle and her safety concerns and inability to use it as intended, but Lincoln failed to adequately remedy or otherwise compensate Plaintiff for her damages. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**8. Robert Muller**

39. Plaintiff and proposed class representative Robert Muller ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Troy, New York. On or about April 17, 2023, Plaintiff purchased a new 2023 Ford Escape PHEV from

the authorized Ford dealer DePaula Ford in Albany, New York. Plaintiff's Escape PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Escape PHEV than he would have for a comparable non-PHEV Escape. At sale, Plaintiff's Fire Risk Vehicle was covered by Ford's 3-year/36,000-mile bumper-to-bumper warranty, 5-year/60,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

40. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that he would not have otherwise needed and his vehicle's fuel economy was reduced while the vehicle's electric function was unusable.

41. On or around June 10, 2025, Plaintiff took his Escape PHEV to a Ford-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near

structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk.

42. In or around May 2025, Plaintiff sent written notice to Ford notice about the Spontaneous Fire Risk in his vehicle and his damages and demanded an adequate repair and vehicle buyback. Ford denied Plaintiff's demands. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Escape, had Plaintiff known about the Spontaneous Fire Risk.

**9. Marc Schwedelson**

43. Plaintiff and proposed class representative Marc Schwedelson ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Wappingers Falls, New York. In or around May 2023, Plaintiff purchased a new 2023 Lincoln Corsair Grand Touring PHEV from the authorized Ford Lincoln dealer Lincoln White Plains in Elmsford, New York. Plaintiff's Corsair PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the

Corsair PHEV than he would have for a comparable non-PHEV Corsair. At sale, Plaintiff's Fire Risk Vehicle was covered by Lincoln's 4-year/50,000-mile bumper-to-bumper warranty, 6-year/70,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

44. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that he would not have otherwise needed and his vehicle's fuel economy was reduced

while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit his home to accommodate plug-in charging of the vehicle, which was also rendered useless. Plaintiff placed Defendant on notice and complained to Defendant through its authorized dealer on February 20, 2025 about not being able to charge the vehicle and then, again, in March and May, 2025, when the car was brought into the authorized Ford dealer for service.

45. On or around July 15, 2025, Plaintiff took his Corsair PHEV to a Ford Lincoln-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near structures and other vehicles

due to the dangers resulting from the Spontaneous Fire Risk. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**10. Marla Kerr**

46. Plaintiff and proposed class representative Marla Kerr ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Delaware, Ohio. On or about September 21, 2023, Plaintiff purchased a used 2021 Lincoln Corsair Grand Touring PHEV from the authorized Ford dealer Haag Ford Sales, Inc. in Greendale, Indiana. Plaintiff's Corsair PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Corsair PHEV than she would have for a comparable non-PHEV Corsair. At sale, Plaintiff's Fire Risk Vehicle was covered by Lincoln's 4-year/50,000-mile bumper-to-bumper warranty, 6-year/70,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff

was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before her purchase. Plaintiff's vehicle research and her review of vehicle advertising and marketing occurred in Ohio.

47. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that she would not have otherwise needed and her vehicle's fuel economy was reduced while the vehicle's electric function was unusable.

48. On or around May 28, 2025, Plaintiff took her Corsair PHEV to a Ford Lincoln-authorized dealer to obtain, and did obtain, Defendant's purported remedy

for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for her economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking her Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**11. Lisa Friedland**

49. Plaintiff and proposed class representative Lisa Friedland ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Nashville, Tennessee. On or about April 29, 2022, Plaintiff purchased a new 2022 Ford Escape

PHEV from the authorized Ford dealer Ford of Franklin in Franklin, Tennessee. Plaintiff's Escape PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Escape PHEV than she would have for a comparable non-PHEV Escape. At sale, Plaintiff's Fire Risk Vehicle was covered by Ford's 3-year/36,000-mile bumper-to-bumper warranty, 5-year/60,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before her purchase.

50. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that she would not have otherwise needed and her vehicle's fuel economy was reduced while the vehicle's electric function was unusable.

51. Plaintiff is in the process of obtaining Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954 via her local Ford-authorized dealer. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for her economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking her Fire Risk Vehicle near structures and other vehicles due to the dangers

resulting from the Spontaneous Fire Risk. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-PHEV version of the Escape, had Plaintiff known about the Spontaneous Fire Risk.

**12. Marianne Bigelow**

52. Plaintiff and proposed class representative Marianne Bigelow ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Tacoma, Washington. On or about January 13, 2022, Plaintiff purchased a new 2022 Lincoln Corsair Grand Touring PHEV from the authorized Ford Lincoln dealer Puyallup Korum Ford in Puyallup, Washington. Plaintiff's Corsair PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff paid more for the Corsair PHEV than she would have for a comparable non-PHEV Corsair. At sale, Plaintiff's Fire Risk Vehicle was covered by Lincoln's 4-year/50,000-mile bumper-to-bumper warranty, 6-year/70,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure and interaction

with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before her purchase.

53. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that she would not have otherwise needed and her vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Likewise, based on Defendant's representations about the vehicle's electric and charging functions, Plaintiff spent money to outfit her home to accommodate plug-in charging of the vehicle, which was also rendered useless.

54. On or around May 27, 2025, Plaintiff took her Corsair PHEV to a Ford Lincoln-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for her economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, lost use of installed charging infrastructure, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking her Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Plaintiff is also concerned about the Spontaneous Fire Risk because she often transports her seven-year-old and nine-month-old grandchildren, as well as her elderly father, in the vehicle.

55. Plaintiff contacted Lincoln twice about the Spontaneous Fire Risk in her vehicle and her safety concerns and inability to use the vehicle as intended, but Lincoln failed to adequately remedy or otherwise compensate Plaintiff for her

damages. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**13. William Simmons**

56. Plaintiff and proposed class representative William Simmons ("Plaintiff" for the purposes of these allegations) is a resident and citizen of Janesville, Wisconsin. On or about September 9, 2022, Plaintiff purchased a new 2022 Lincoln Corsair Grand Touring PHEV from the authorized Ford Lincoln dealer Gordie Boucher Ford Lincoln of Janesville in Janesville, Wisconsin. Plaintiff's Corsair PHEV is a Fire Risk Vehicle equipped with the Spontaneous Fire Risk. Plaintiff purchased the Fire Risk Vehicle primarily for personal, family, and household use in that it was not purchased by or on behalf of a business and was not titled in a business's name, and it was used primarily for personal transportation needs. Plaintiff's wife also regularly rides in the vehicle with him. Plaintiff paid more for the Corsair PHEV than he would have for a comparable non-PHEV Corsair. At sale, Plaintiff's Fire Risk Vehicle was covered by Lincoln's 4-year/50,000-mile bumper-to-bumper warranty, 6-year/70,000-mile powertrain warranty, and 8-year/100,000-mile hybrid/electric unique component warranty. Through exposure

and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Fire Risk Vehicle. Plaintiff relied on Defendant's marketing and representations and omission of material facts regarding the vehicle's hybrid-electric capabilities, performance, and safety features in choosing to purchase this Fire Risk Vehicle. However, despite touting the safety and dependability of the Fire Risk Vehicles and the benefits of driving the vehicle in its electric mode, at no point did Ford or its representatives disclose to Plaintiff the Spontaneous Fire Risk before his purchase.

57. In or around February 2025, Defendant sent written notice to Plaintiff and class members regarding NHTSA Recall No. 24V-954, in which Defendant advised Plaintiff and similarly situated owners not to charge their Fire Risk Vehicles due to the risk of fire. Because of the Spontaneous Fire Risk, Plaintiff was unable to charge or operate the vehicle in electric mode, rendering the feature useless despite paying a premium for this specific feature. Plaintiff also purchased and used gas that he would not have otherwise needed and his vehicle's fuel economy was reduced while the vehicle's electric function was unusable. Plaintiff placed Defendant on notice and complained to Defendant through its authorized dealer several times about not being able to charge the vehicle and the lack of repair.

58. On or around June 20, 2025, Plaintiff took his Corsair PHEV to a Ford Lincoln-authorized dealer to obtain, and did obtain, Defendant's purported remedy for the Spontaneous Fire Risk under NHTSA Recall No. 24V-954. However, this recall repair is an untimely and inadequate remedy that fails to compensate Plaintiff for his economic damages, and as alleged herein, does not actually remedy the Spontaneous Fire Risk. Plaintiff incurred economic damages because of the Spontaneous Fire Risk, including overpayment for the vehicle at purchase, loss of use of the vehicle's plug-in electric function, increased fuel costs, decreased fuel economy, and diminished vehicle value. The diminution in value has been exacerbated by Defendant's public recall and the ongoing safety investigation, which have caused potential buyers to avoid purchasing the affected vehicles in the secondary market. Plaintiff is still concerned about driving and parking his Fire Risk Vehicle near structures and other vehicles due to the dangers resulting from the Spontaneous Fire Risk. Plaintiff brings this action to recover the economic losses suffered and to compel Defendant to remedy the defective condition in Plaintiff's and the other class members' Fire Risk Vehicles. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Corsair, had Plaintiff known about the Spontaneous Fire Risk.

**B. Defendant**

59. Defendant Ford Motor Company ("Ford") is a Delaware corporation organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

60. Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Lincoln is Ford's luxury automobile brand. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

61. Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford designed and manufactured the Fire Risk Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Fire Risk Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles in every state of the United States.

## V. FACTUAL ALLEGATIONS

### A. Ford marketed the Fire Risk Vehicles as a safe and reliable plug-in electric hybrid and knew these attributes were material to customers.

62. Plug-in hybrid-electric vehicles like the Fire Risk Vehicles have significant environmental and economic advantages over conventional vehicles with internal combustion engines.

63. While operating in electric-only mode, the Fire Risk Vehicles do not produce any of the noxious tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that vehicles with internal combustion engines produce.[3] When functioning properly, the Fire Risk Vehicles can be beneficial for air quality and public health, and can help to reduce the overall ecological damage caused by using personal vehicles for transportation.[4]

64. In addition to the environmental benefits of electric propulsion, the cost of the electricity necessary to enable the operation of the Fire Risk Vehicles in

[3] *See* **Exhibit 2**, *Emissions from Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_emissions.html.

[4] *Id.*

electric mode vehicle is generally considerably less than the cost of fueling with gasoline or diesel.[5]

65. Consumers paid a substantial premium for the plug-in hybrid propulsion system in the Fire Risk Vehicles. In 2022, the base sticker price for the Corsair Grand Touring PHEV was $14,000 more than the price for a standard Corsair.[6] Similarly, the Ford Escape PHEV sells for at least $7,500 more than its non-hybrid counterpart.[7]

66. The only reason to pay the premium price commanded by the Fire Risk Vehicles was because of the perceived environmental and financial benefits they offered because of their status as plug-in hybrid electric vehicles.

67. In marketing the Fire Risk Vehicles, Ford stressed both the economic and environmental perks of the hybrid propulsion system, which were material

---

[5] *See* **Exhibit 3**, Mary Cunningham, *How much will an electric vehicle really cost you? Here's what to know.*, CBS NEWS (Aug. 14, 2024), https://www.cbsnews.com/news/electric-vehicle-ev-true-cost-of-ownership/.

[6] *See* **Exhibit 4**, Drew Dorian, *2022 Lincoln Corsair Hybrid*, CAR AND DRIVER, https://www.caranddriver.com/lincoln/corsair-hybrid-2022; **Exhibit 5**, Drew Dorian, *2022 Lincoln Corsair*, CAR AND DRIVER, https://www.caranddriver.com/lincoln/corsair-2022.

[7] *See* **Exhibit 6**, Drew Dorian, *2022 Ford Escape Hybrid*, CAR AND DRIVER, https://www.caranddriver.com/ford/escape-hybrid-2022; **Exhibit 7**, Drew Dorian, *2022 Ford Escape*, CAR AND DRIVER, https://www.caranddriver.com/ford/escape-2022.

issues for prospective buyers. Indeed, a major selling point of the Fire Risk Vehicles is their ability to run on electric power.

68. With the Escape PHEV, Ford emphasized the vehicle's "advanced fourth-generation hybrid technology system" and "best-in-class EPA-estimated economy rating of 100 MPGe combined and an EPA-estimated 37 miles of all-electric driving range:"[8]

[8] *See* **Exhibit 8**, *100 MPGE! All-new Ford Escape Plug-in Hybrid brings best-in-class EPA-estimated combined fuel economy*, FORD NEWSROOM (Jun. 8, 2020), https://media.ford.com/content/fordmedia/fna/us/en/news/2020/06/08/100-mpge-all-new-ford-escape-plug-in-hybrid.html.

# 100 MPGE! ALL-NEW FORD ESCAPE PLUG-IN HYBRID BRINGS BEST-IN-CLASS EPA-ESTIMATED COMBINED FUEL ECONOMY

JUN 8, 2020 | DEARBORN, MICH.



All-new Ford Escape Plug-In Hybrid

- All-new Ford Escape Plug-In Hybrid with advanced fourth-generation hybrid technology system has a class-leading EPA-estimated fuel economy rating of 100 MPGe combined
- Ford Escape Plug-in Hybrid has an EPA-estimated all-electric range of 37 miles – 11 more miles than even Ford Fusion Energi, with more passenger space and up to four times the cargo volume behind its second-row seats
- In addition to potential savings at the pump, purchasing an Escape Plug-In Hybrid may qualify a customer for state tax incentives or rebates[1]; Escape Plug-In Hybrid starts under $35,000 MSRP

69. Ford also touted the Escape's purported gas savings and tax incentives, saying:

> Hybrids can serve as a hedge against rising gas prices. The Escape Plug-In Hybrid is available as gas prices are expected to rise, according to AAA, following the easing of stay-at-home mandates across the country. As consumers begin returning to work and taking weekend trips, demand for gasoline is expected to spike from the

> decades-low prices of the past two months. Whether gas is $1.87 a gallon like today or $2.87 a gallon like this time last year, Escape Plug-In Hybrid is suited for both, with an EPA-estimated all-electric range of 37 miles and an EPA-estimated rating of 41 miles per gallon combined when running strictly on gasoline.[9]

And "[i]n addition to potential savings at the pump, purchasing an Escape Plug-In Hybrid may qualify a customer for state tax incentives or rebates."[10]

70. Ford's hybrid-electric powertrain in the Fire Risk Vehicles is prominently marketed for its utility and versatility.

71. For example, with the Escape PHEVs: "You can drive the Plug-in Hybrid in EV (Electric Vehicle) mode when the battery is charged, and continue seamlessly on your way as the vehicle switches to gas power when needed."

---

[9] *Id.*

[10] *Id.*

## EMPOWERING.
### YOUR CHOICE OF 4 WAYS TO GO.

With a variety of available engines, the Ford Escape® SUV is geared to suit your driving style. Turbocharged EcoBoost® engine models feature plenty of horsepower and torque for making the most of every ride. They also include Auto Start-Stop Technology that can help reduce fuel consumption and vehicle tailpipe emissions when the vehicle is fully stopped.

Hybrid models use a 2.5L Atkinson-cycle I-4 engine and an electric traction motor for maximum range and fuel economy. The Plug-In Hybrid models have an EPA-estimated range of 481 miles![1,2] You can drive the Plug-In Hybrid in EV (Electric Vehicle) mode when the battery is charged, and continue seamlessly on your way as the vehicle switches to gas power when needed.

Whichever model you choose, you'll be able to move from Park to Reverse to Drive with the simple turn of the finely tuned rotary gear shift dial, standard on every 2022 Escape.



**<u>2022 Ford Escape brochure</u>**

[ 2.5L ATKINSON-CYCLE I-4 PLUG-IN HYBRID[3] ]

**EXTEND YOUR OPTIONS**

With its driver's side charge port and standard charging cord, Escape Plug-In Hybrid gives you the option to plug in to charge up the electric battery – at home, work, and even out shopping.

*Standard on SE, SEL and Titanium Plug-In Hybrid FWD*

**<u>2020 Ford Escape brochure</u>**

72. Similarly, Lincoln advertises the Corsair Grand Touring's "advanced hybrid powertrain" and its benefits:

SPARK YOUR SOPHISTICATED SIDE

When innovation sits at the table of luxury, astonishing things will happen. Introducing the Lincoln Corsair Grand Touring plug-in hybrid.[1] Agile but smooth. Sporty but elegant. Powerful but graceful. This is a hybrid in more ways than one. Corsair Grand Touring seamlessly blends an advanced hybrid powertrain with an impressively vigorous electric motor to offer you effortless acceleration, electric AWD, and a peaceful cabin. Go ahead, make a grand escape.



**2021 Lincoln Corsair Grand Touring brochure**

THRIVE WITH LINCOLN DRIVE MODES

Corsair puts the power to adapt right at your fingertips. Simply turn the knob to choose a Lincoln Drive Mode, and the system adjusts traction control, steering and pedal response, available Intelligent AWD and available adaptive suspension settings, even the sound of the engine, to help provide a remarkable driving experience.

Grand Touring models also feature additional drive modes. "Preserve EV" mode can help recharge the vehicle up to as much as 75% by saving battery power for later use. "Pure EV" mode offers a quiet, all-electric drive well-suited to your shorter trips around town. That's two intelligent modes, for one extraordinary drive.

**2021 Lincoln Corsair Grand Touring brochure**

2.5-LITER I-4 GRAND TOURING PLUG-IN HYBRID
266 COMBINED HORSEPOWER[1]

Agile, sporty and a true pleasure to drive, the Lincoln Corsair® Grand Touring[2] SUV is a plug-in hybrid with the confidence of Intelligent all-wheel drive (AWD). It's easy to charge when you want electric power at the ready, and you can simply fuel it up. Experience the seamless convergence of modern technologies in Corsair Grand Touring.

**2022 Lincoln Corsair Grand Touring brochure**

73. As Ford proclaims in marketing for the model year 2023 Escape PHEV: "Ford is among the leading hybrid automakers in the U.S. because we understand that not all of our customers are ready to go all-electric,' said [brand manager

Adrienne] Zaski. 'With two hybrid powertrain choices, customers can spend less time at the gas station and keep more money in their pockets.'"[11]

74. Despite marketing the Escape as a "road-trip ready" vehicle fit for "the fun-loving freedom of spontaneous road trips," as the examples below demonstrate, the Spontaneous Fire Risk has left consumers unable to utilize their hybrid-electric feature at all, let alone for trips, and diminished the Fire Risk Vehicles' overall utility, reliability, and value.

[11] **Exhibit 9**, *2023 Ford Escape*, FORD NEWSROOM, https://media.ford.com/content/fordmedia/fna/us/en/products/crossovers---suvs/escape/2023-ford-escape.html.



ROAD-TRIP READY.

# INSPIRATION.

Since its conception, the Ford Escape® SUV has epitomized the fun-loving freedom of spontaneous road trips. For an engaging driving experience, Hybrid and Plug-in Hybrid models feature an eCVT transmission with electric launch. Gas-only models utilize an 8-speed automatic transmission for smooth, responsive performance. And the electric power-assisted steering provides light, responsive steering while parking, and confident control at higher speeds. These and a myriad of other details are purposefully combined to help Escape empower your urban adventures and back-road getaways alike. Lifting your spirits at every turn.



**SE.** Iced Blue Silver Metallic. Available SE Sport Appearance Package. Available equipment.

**<u>2022 Ford Escape brochure</u>**




**2021 Ford Escape brochure**

75. Throughout its marketing brochures for the Fire Risk Vehicles, Ford also emphasizes the vehicles' safety features and reliability, evidencing the materiality of these qualities to consumers.




**2021 Ford Escape brochure**




**2022 Ford Escape brochure**




**2021 Lincoln Grand Corsair brochure**



011305-11/3246665 V1

**SAFETY & SECURITY**

| |
|---|
| Personal Safety System™ for driver and front passenger with dual-stage front airbags,[8] safety belt pretensioners, safety belt energy-management retractors, safety belt usage sensors, driver's seat position sensor, crash severity sensor, restraint control module and Front-Passenger Sensing System |
| Driver's knee airbag[8] |
| Front- and rear-seat side airbags[8] |
| Glove-box-door-integrated knee airbag[8] |
| AdvanceTrac® with RSC® (Roll Stability Control™) |
| Individual Tire Pressure Monitoring System (excludes spare, when equipped) |
| Intelligent Access with push-button start |
| LATCH (Lower Anchors and Tether Anchors for Children) |
| MyKey® technology to help encourage responsible driving |
| Perimeter alarm |
| Safety Canopy® side-curtain airbags[8] with roll-fold technology and rollover sensor |
| SecuriCode™ invisible keypad |
| SecuriLock® Passive Anti-Theft System |
| SOS Post-Crash Alert System™ |

**<u>2021 Lincoln Grand Corsair brochure</u>**

There to help you stay on the course ahead or to take the guesswork out of what's behind, Corsair driver-assistance features[2] can help you in some tough situations. Take control of your travels with help from our Lincoln Co-Pilot360™ Technology.

STANDARD LINCOLN CO-PILOT360 1.5

Auto High-Beam Headlamps

Blind Spot Information System

Cross-Traffic Alert with Braking

Lane-Keeping System:
includes Lane-Keeping Aid, Lane-Keeping Alert and Driver Alert System

Pre-Collision Assist with Automatic Emergency Braking:
includes Pedestrian Detection, Forward Collision Warning and Dynamic Brake Support

Rear Parking Sensors

Rear View Camera

**<u>2022 Lincoln Grand Corsair brochure</u>**

76. Even as Ford consistently and pervasively promoted the vehicles' safety, reliability, and hybrid-electric powertrains, Ford never disclosed the Spontaneous Fire Risk to buyers before they purchased or leased the Fire Risk Vehicles.

**B. The high-voltage lithium-ion batteries pose a Spontaneous Fire Risk.**

77. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, advertising, promoting, marketing, and selling them as suitable and safe for use in an intended and reasonably foreseeable manner.

78. In its December 20, 2024 notification of safety recall number 24V-954 sent to the National Highway Traffic Safety Administration ("NHTSA"), Ford acknowledges a defect in the Fire Risk Vehicles' high-voltage lithium-ion batteries that can cause them to fail and catch fire.[12] To date, Ford has identified seven high-voltage battery failures and one vehicle fire suspected to arise from the Spontaneous Fire Risk.[13]

79. The high-voltage batteries in the Fire Risk Vehicles are 14.4-kWh lithium-ion batteries that were manufactured by Samsung at its Hungary plant between July 1, 2019, and March 28, 2023.[14]

80. On information and belief, the high-voltage lithium-ion batteries in the Fire Risk Vehicles are made up of 84 prismatic-style cells arranged in 14 modules.[15]

---

[12] **Exhibit 10**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Dec. 20, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-5979.PDF.

[13] **Exhibit 11**, *Recall No. 24V-954 Chronology*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V954-4969.pdf.

[14] **Exhibit 12**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-9851.PDF.

[15] *See* **Exhibit 13**, *2025 Ford Escape PHEV Battery: A Canadian Perspective*, FORMULA FORD (Jan. 7, 2025), https://formulafordlincoln.com/blog/2025-ford-

81. The high-voltage batteries are located under the Fire Risk Vehicles and below the seats. They are labeled as part number 1 in the diagrams below.




**Model Year 2020-2025 Ford Escape PHEV**[16]

escape-phev-battery-a-canadian-perspective/#:~:text=2025%20Ford%20Escape-,Battery%20Specifications,minimizing%20intrusion%20into%20cargo%20space; **Exhibit 14**, *Corsair Grand Touring: Effortless Power, Quiet Confidence*, LINCOLN, https://media.lincoln.com/content/dam/lincolnmedia/lna/us/product/2020/Corsair/Grand-Touring/All-New-Lincoln-Corsair-Grand-Touring-Fact-Sheet.pdf; **Exhibit 15**, Bob Gritzinger, *Ford's First E-Axle Hybrid Debuts in '21 Lincoln Corsair Grand Touring*, WARDSAUTO, (Nov. 19, 2019), https://www.wardsauto.com/lincoln/ford-s-first-e-axle-hybrid-debuts-in-21-lincoln-corsair-grand-touring.

[16] **Exhibit 16**, *2020-2025 Ford Escape Hybrid and Plug-in Hybrid Emergency Response Guide*, FORD (Oct. 2024), https://www.vdm.ford.com/content/dam/

## Section 1: High Voltage Electrical System Information

**Component Location and Identification — PHEV Vehicles**

The following illustrations provide the location, description and basic function of the High Voltage system components.

**NOTE:**
All High Voltage wires and harnesses are orange in color.

**PHEV Vehicles**




N0183121

**Model Year 2021-2025 Lincoln Corsair PHEV**[17]

82. The Fire Risk Vehicles utilize a hybrid drivetrain that integrates a 2.5-liter four-cylinder gasoline engine and two electric motors. Together, these motors enable all-electric, hybrid, and gasoline-powered driving.

---

brand_ford/en_us/brand/firstresponder/pdf/ford/2020-2025_Escape_Hybrid_Emergency_Response_Guide.pdf.

[17] **Exhibit 17**, *2021-2025 Corsair Plug-in Hybrid Emergency Response Guide*, FORD (Oct. 2024), https://www.vdm.ford.com/content/dam/brand_ford/en_us/brand/firstresponder/pdf/lincoln/2021-2025_Corsair_Emergency_Response_Guide.pdf.

83. The high-voltage batteries support charging at both Level 1 (120-volt) and Level 2 (240-volt). Based on Ford's representations about the vehicles' electric driving and charging functions and capabilities, many Plaintiffs and putative class members paid out of pocket to outfit their homes with charging stations to accommodate faster and more efficient charging of their vehicles.

84. The high-voltage batteries in model year 2020 Ford Escape and 2021 Lincoln Corsair PHEVs retail for around $6,756.47,[18] and those for the model year 2023-2025 Ford Escape and Lincoln Corsair PHEVs retail for around $7,185.88.[19]

85. Under NHTSA Recall No. 24V-954, Ford recalled 16,480 model year 2020-2024 Ford Escape and 4,004 model year 2021-2024 Lincoln Corsair vehicles because their high-voltage battery cells' separator layer between its cathode and anode may be damaged, resulting in an internal short circuit.[20]

86. As Ford admits, a high-voltage battery cell internal short circuit can cause "shutdown of the vehicle's propulsion system," and such "[l]oss of motive

---

[18] *See* **Exhibit 18**, *Drive Motor Battery Pack 2.5L*, FORDPARTS.COM, https://parts.ford.com/shop/en/us/electrical/wire-looms-and-connectors/drive-motor-battery-pack-25l-p-lx6z10b759k?pdp=y.

[19] *See* **Exhibit 19**, *Battery – 2.5L*, FORDPARTS.COM, https://parts.ford.com/shop/en/us/electrical/battery-and-related-components/battery-p-pz1z10b759a?pdp=y#/collapseRelated2.

[20] **Exhibit 12**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-9851.PDF.

power increases the risk of crash and injury."[21] Even worse, this internal short circuit can cause "battery thermal venting potentially resulting in a vehicle fire, increasing the risk of injury."[22]

87. Between April and August 2024, three vehicles in Europe were reported to experience this battery thermal venting.[23] Ford and Samsung inspected these high-voltage battery packs to determine the root cause of their internal short circuits between September and November 2024.[24]

88. In December 2024, Ford learned of a fourth vehicle that experienced battery thermal venting suspected to be related to the Spontaneous Fire Risk.[25]

89. Then, after Ford approved the recall to address the Spontaneous Fire Risk on December 13, 2024, Ford learned of three more battery thermal venting reports in the European vehicle population, one of which ignited a vehicle fire that caused property damage.[26]

90. The Fire Risk Vehicles are not the only cars impacted by the Spontaneous Fire Risk. Samsung supplied the same or similar high-voltage battery

---

[21] *See id.*

[22] *See id.*

[23] **Exhibit 11**, *Recall No. 24V-954 Chronology*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V954-4969.pdf.

[24] *Id.*

[25] *Id.*

[26] *Id.*

in the Fire Risk Vehicles for use in other hybrid-electric vehicles that have also recently been recalled by their manufacturers for fire risk, such as FCA's Jeep Wrangler and Grand Cherokee vehicles[27] and Volkswagen's Audi Q5 and A7 vehicles.[28]

91. In response to these vehicle manufacturer recalls, on February 5, 2025, Samsung recalled 180,196 of these high-voltage batteries for fire risk, including those in 20,484 Fire Risk Vehicles, along with those in 155,096 FCA vehicles and 4,616 Audi vehicles.[29]

92. Samsung acknowledges these high-voltage batteries pose a serious fire risk that "could result in personal injury and/or property damage."[30]

93. According to Samsung's recall chronology, it learned of at least twenty fires in Jeep Grand Cherokee and Wrangler plug-in electric vehicles between May 2023 and July 2024, including some fires that occurred after implementation of the software update that purported to remedy the fire risk.[31] Samsung also learned of

[27] *See* NHTSA Recall Nos. 23V-787 (Nov. 2023); 24V-720 (Oct. 2024); 24E-080 (Oct. 2024).

[28] *See* NHTSA Recall No. 24V-898 (Dec. 2024).

[29] **Exhibit 20**, *Part 573 Recall Report 25E-007*, NHTSA.GOV (Feb. 5, 2025), https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25E007-3917.PDF.

[30] *Id.*

[31] **Exhibit 21**, *Samsung SDI – High Voltage Battery Module/Pack*, NHTSA.GOV (Jan. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RMISC-25E007-8543.pdf.

more than four fires in Audi plug-in electric vehicles between August 2023 and April 2024.[32]

94. When Ford first recalled the Fire Risk Vehicles in December 2024, it explicitly told vehicles owners they did not need to stop driving the Fire Risk Vehicles or otherwise stop using its hybrid-electric function.[33]

95. But then, in February 2025, Ford reversed course, re-issuing recall notices to Fire Risk Vehicles owners that instructed them to "immediately refrain from charging [their] vehicle[s] to maintain a lower charge level in the high voltage battery, reducing the risk of a vehicle fire until a remedy is available."[34]

96. Ford's directive prevented vehicle owners from using the primary feature they paid a premium for—the hybrid-electric propulsion system—while forcing them to incur greater fuel costs.

97. In or around May 2025, Ford announced a software update was available for the Fire Risk Vehicles. As reported to NHTSA, Ford stated the software update would "have an enhanced capability to detect cell anomalies indicative of

---

[32] *Id.*

[33] **Exhibit 22**, *Safey Recall Notice 24S79 / NHTSA Recall 24V954*, NHTSA.GOV (Jan. 2025) https://static.nhtsa.gov/odi/rcl/2024/RIONL-24V954-1052.pdf.

[34] *See* **Exhibit 23**, *Safey Recall Notice 24S79 / NHTSA Recall 24V954 - Update*, NHTSA.GOV (Feb. 2025), https://static.nhtsa.gov/odi/rcl/2024/RIONL-24V954-2080.pdf.

separator damage."[35] Ford's claims about the software are untested and Ford has yet to publicly report or provide any update or data on the recall repair roll out.

98. However, a superior remedy is available to Ford: replacing the high-voltage batteries in all Fire Risk Vehicles. Ford acknowledges this remedy, but is implementing it on a limited basis, stating it will only replace the high-voltage batteries where the recall software update detects a cell anomaly.

99. As recent history has shown, this approach is insufficient to remedy the fire risks arising from high-voltage batteries used in vehicle applications. For example, in July 2024, FCA reported three additional vehicle fires in Jeep Wrangler PHEVs after receiving the purported software fix under NHTSA Recall No. 23V-787, leading to additional recalls.[36] Likewise, certain FCA Pacifica PHEVs were recalled twice, in February 2022 and July 2024,[37] for fire risk arising from their LG Energy Solutions-manufactured high-voltage batteries after the initial software remedy failed to prevent at least seven vehicle fires. In both instances, it remains to be seen whether the revised software updates are effective at preventing fires.

---

[35] **Exhibit 12**, *Part 573 Safety Recall Report 24V-954*, NHTSA.GOV (Feb. 7, 2025), https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V954-9851.PDF.

[36] *See* **Exhibit 21**, *Samsung SDI – High Voltage Battery Module/Pack*, NHTSA.GOV (Jan. 24, 2025), https://static.nhtsa.gov/odi/rcl/2025/RMISC-25E007-8543.pdf at 4-5.

[37] *See* NHTSA Recall Nos. 22V-077 and 24V-536.

## C. Ford knew or should have known about the Spontaneous Fire Risk before selling the Fire Risk Vehicles to consumers.

100. Ford knew or should have known about the Spontaneous Fire Risk before it sold the Fire Risk Vehicles, and certainly long before it disclosed the problem, as evidenced by: the well-documented risks of thermal runaway and fires in lithium-ion batteries; NHTSA warnings of safety risks for lithium-ion batteries and design considerations for reducing such risks; the rigorous pre-sale testing Ford did or should have done on the high-voltage batteries and hybrid-electric propulsion system; and similar fire risk issues and recalls with high-voltage lithium-ion batteries like those in the Fire Risk Vehicles.

### 1. Thermal runaway and fire were known risks of lithium-ion batteries and Ford failed to adequately design around them.

101. Most electric and hybrid-electric vehicles like the Fire Risk Vehicles use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge."[38]

102. Lithium-ion batteries are made up of multiple power-generating compartments called cells.[39] Each cell contains the basic functional components of

[38] *See* **Exhibit 24**, *Batteries for Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_batteries.html.

[39] **Exhibit 25**, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF (Sept. 11, 2023), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html.

a simple battery: a positive electrode, a negative electrode, and an electrolyte.[40] Each cell also contains a separator designed to keep the positive electrode from contacting and discharging into the negative electrode.[41]

103. The active materials (either cathode or anode) store the lithium. The electrolyte carries the lithium ions between electrodes.[42] When lithium ions flow from the negative electrode, or anode, to the positive electrode, or cathode, energy is discharged from the battery cell in the form of electricity.[43] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[44]

104. Cells are then grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[45] A module ordinarily contains an array of cells, sensors, controls, protective safety devices, mounts, cooling elements or cooling provisions, and communications capabilities.[46]

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf, at chapter 4.

[46] *Id.* at § 4.1.1.

105. Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with vehicle also plays an important role in the safety of the lithium-ion battery.[47]

106. Thermal runaway and the resulting fire risk in lithium-ion batteries used in vehicles were well-documented at the time Ford designed, manufactured, and sold the Fire Risk Vehicles to consumers.[48]

107. In 2017, NHTSA released a report on lithium-ion battery safety issues that documented known battery fire risks, cited to the vast body of academic and engineering studies on those risks, and recommended rigorous design and testing protocols to protect against those risks. All of this would have been known to Ford at the time it launched the Fire Risk Vehicles.

108. Even before NHTSA released its comprehensive report on lithium-ion battery safety issues in 2017, many scientific and engineering articles discussed the

---

[47] *Id.* at chapter 4.

[48] *See id.* at §§ 2.5, 3.3.

thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.[49]

109. A central focus of the NHTSA report is the fire risk associated with the use of lithium-ion batteries, and recommended protection methods and rigorous testing required to mitigate that risk.[50] It notes the major cause of these fires is the propagation of thermal runaway, including but not limited to lithium plating-caused thermal runaway.

110. As the NHTSA Report stresses:

> [T]hermal runaway of a Lithium-ion cell is one of the fundamental failure mechanisms leading to safety hazards from Lithium-ion batteries. Cell heating is normal, but temperatures must be maintained within a predetermined safe operating level. Thermal runaway is most likely to be realized when an event occurs that results in rapid heating of the cell that outpaces the rate of heat dissipation by the cell. Rapid heating may be caused by internal or external short circuits, overcharging, and general use . . . or may be caused by heat from a source external to the cell, such as can be caused by radiant and conductive heating from

[49] *See, e.g.,* Wen, Jianwu, et al., *A Review on Lithium-Ion Batteries Safety Issues: Existing Problems and Possible Solutions*, AMERICAN SCIENTIFIC PUBLISHERS (2012); Feng, Xuning, *et al.*, *Thermal runaway mechanism of lithium ion battery for electric vehicles: A review*, SCIENCEDIRECT (2015).

[50] *See* **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf, at xvi; *see also id.* at chapter 6 (management and control systems), 8-10 (testing, “gap assessments,” and “hazards, risks and risk mitigation strategies”).

> adjacent cell heating, high ambient temperatures, and various types of mechanical shock.[51]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[52]

111. A lithium-ion cell can heat up and catastrophically fail under various scenarios: e.g., cell design and manufacturing defects, overcharging and overdischarging, mechanical damage such as crush or puncture, thermal abuse, internal short circuit, dendrite growth, and component failures.[53] These scenarios generate local heating in the cell. The local heating induces locally high temperatures, which accelerate additional chemical reactions that can promote the degradation of the organic liquid electrolytes in the cell; these electrolytes and their decomposition products are volatile and flammable at high temperatures.[54]

112. During thermal runaway, chemical reactions produce gases that cause the battery's internal pressure to rise, triggering the battery's vents to open and release the built-up gases.[55] The battery cells may rupture where the cell design does

---

[51] *See id.* at § 3.2.

[52] *Id.*

[53] *Id.* at 10-8 (thermal runaway flowchart).

[54] *Id.* at § 10.2.2.

[55] *Id.* at § 10.2.1.

not include pressure venting at all, if the venting component fails, or if heat generation outpaces the vent response time.[56]

113. In its 24V-954 Recall, Ford reported battery thermal venting in eight vehicles, and this venting was insufficient to prevent a fire in at least one instance. But even battery venting alone can damage or destroy a battery.

114. One well-known cause of internal short circuits in lithium-ion cells arises from the formation and growth of metallic dendrites (i.e., lithium plating). Dendrites are "hard metallic lithium deposits that form on electrode surfaces and may continue to grow until they penetrate the separator and cause an internal electrical short, rapid increases in cell temperature, and thermal runaway."[57] Overcharging, overdischarging, recharging in low temperatures, and metal particles in the cell, among other things, can cause dendrite growth over time.[58] When an internal short circuit occurs (or the separator is breached), there is rapid energy release and fire and explosion can result.[59]

115. Dendrite formation occurs over time and the risk caused by it is cumulative, eventually resulting in catastrophic separator damage and thermal

---

[56] *Id.*

[57] *Id.* at § 2.1.2.

[58] *See id.* at §§ 2.3.1, 2.3.2, 2.3.3.

[59] *See id.* at §§ 2.6, 3.4.1.

runaway propagation. "While failure can sometimes occur very rapidly after a cell is damaged, damage may also sometimes grow over many years and many duty cycles, causing delayed failure long after damage is initiated."[60] In other words, the likelihood of failure continues to increase as the high-voltage batteries are subjected to more and more duty cycles, particularly where the battery system lacks appropriate use parameters.

116. In recalling the Fire Risk Vehicles, Ford acknowledges that separator damage causing an internal short circuit appears to be the root cause of the Spontaneous Fire Risk.

117. Troublingly, if separator damage is the root cause, the lurking internal physical damage to the battery has already been done or will be done after Ford arbitrarily declares the Fire Risk Vehicles once again safe to charge; it is unclear how the risk of fire will be resolved if the battery pack is not redesigned and replaced entirely.

118. Ford's selected lithium-ion cell design likely also contributed to the Spontaneous Fire Risk. Lithium-ion battery cells can take different forms for use in vehicles, including prismatic, pouch, cylindrical, elliptical, and large format.[61] On

[60] *See id.* at 11-1.

[61] *See id.* at § 3.1.

information and belief, the high-voltage batteries utilize prismatic, large format-style cells.

119. As noted in the 2017 NHTSA report, "prismatic cells designed for automotive applications can have much larger capacities than cylindrical cells. … This increased capacity of these large format cells requires the protective devices to be designed and scaled accordingly."[62]

120. The high-voltage 14.4-kWh battery cells in the Fire Risk Vehicles are very large, making them more susceptible to runaway fire propagation because each cell contains more flammable material. In contrast, Tesla uses much smaller (1.5-kWh cells) in its EVs because, though more expensive, these smaller cells are less likely to kick off a runaway fire propagation event because if they fail they will not burn as hot for as long as the nearly ten times bigger 14.4-kWh battery cells in the Fire Risk Vehicles.

121. Given the known, extreme hazards of runaway propagation in high-voltage lithium-ion batteries such as those used in the Fire Risk Vehicles, it is incumbent on manufacturers to implement strong safety measures in the high-voltage battery systems and conduct rigorous testing of these batteries.

[62] *See id.* at § 3.1.2.

122. In this 2017 report, NHTSA reiterated that all car manufacturers have a duty "to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus."[63]

123. It is critical, especially in automotive applications, to have sophisticated controls and safety monitoring features in lithium-ion battery systems. These include parameters that place limits on the state-of-charge, battery and individual cell voltage, current, and cell temperature, among other things to protect battery integrity.[64] For example, setting low and high-end state of charge buffers prevents overcharging and over-discharging of batteries. In addition, appropriate controls to prevent individual cells from exceeding their maximum voltage can mitigate thermal runaway risk.

124. While a high-voltage battery itself may be manufactured separately by a third-party supplier like Samsung, the programming of the battery control system is made by the vehicle manufacturer.

[63] *See id.* at xx.

[64] *See id.* at 6-5 through 6-6 ("While the failure phenomena have been discussed extensively in previous chapters, here we summarize these phenomena in terms related to the [battery] control systems and their actions. . . . Several approaches [in battery control systems] are used to overcome this problem. The first is empirically setting the allowable voltage, current, and temperature ranges to maintain a sufficient margin with respect to undesired behavior. The second is to use a model, combined with data, to infer the operating margin more carefully. Models may be simple or complex; the various types are discussed briefly in this chapter.").

125. As of 2017, there were many standards and testing protocols designed to guide manufacturers in constructing lithium-ion battery systems to be safely used in electric and plug-in hybrid electric vehicles, and many safety technologies and testing protocols existed at the time of the launch of the Fire Risk Vehicles.[65]

126. Appropriate safety measures to prevent thermal runaway at the cellular level included a range of "electrical components and subsystems to prevent heating and overpressure to the cell by opening the circuit, increasing resistance, or changing the chemical composition of the cell."[66]

127. Protection technology at the module level also existed, including technologies for "charge and discharge management," designed to limit the electric current to and from the battery module or cellular arrays within a module. Such technologies also protect against the potential for abnormal discharge caused by failures, such as short circuiting due to separator damage, which can trigger thermal runaway and ultimately runaway propagation.[67]

128. Also at the module level, manufacturers must ensure adequate thermal management to monitor and prevent the spikes in temperature associated with thermal runaway. "Thermal management functions at the module level include, first

[65] *See id.* at 3-9 through 3-11, chapter 8.

[66] *See id.* at 3-10.

[67] *See id.* at 4-6.

monitoring, then cooling," and various available technologies serve this function.[68] Thermal management must also occur at the battery pack level in order to maintain "an average temperature within the battery's specifications, and with even temperature distribution throughout the pack."[69] Cooling and thermal barrier separation between cells can reduce the rate of thermal runaway propagation and can stop cell-to-cell propagation for properly sized cells and cooling systems.

129. Safety features at the module level include "interlock circuits, pressure sensors, and communication architecture that allows the battery status to be monitored by the automobile electronic control unit."[70] Other available safety measures operate at the battery pack level, including but not limited to, thermal management; an array of communication, control, and reporting functions;[71] and the appropriate integration of the battery pack with the vehicle.[72]

130. On information and belief, any number of combinations of the above-referenced safety protocols, in combination with effective safety testing, would have rendered the Fire Risk Vehicles safe and fit for their intended purpose of operating as plug-in hybrid electric vehicles.

---

[68] *See id.* at 4-10 through 4-15.

[69] *See id.* at 4-24.

[70] *See id.* at 4-16 through 4-19.

[71] *See id.* at 4-28.

[72] *See id.* at 4-34.

131. Instead, the programmed safety margins or modules that Ford implemented in its design of the high-voltage battery system in Fire Risk Vehicles were inadequate to protect against premature battery degradation, lithium plating, and thermal runaway.

132. As the 2017 NHTSA report noted in a statement that has been prophetic for Plaintiffs and all other owners and lessees of the Fire Risk Vehicles, as of 2017, car manufacturers were not adequately designing and testing electric and plug-in-hybrid electric systems powered by highly volatile lithium-ion batteries. Indeed, the "safety standards" employed by car manufactures such as Ford appeared "to trail—rather than lead—technology development."[73]

133. The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells."[74] On information and belief, Ford skimped on available protection measures in order to promote the high electric mode range and overall range, speed of charging, and other desirable features, of the Fire Risk Vehicles—

---

[73] *See id.* at 1-3.

[74] *See* **Exhibit 26**, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINEDESIGN (Dec. 26, 2018), https://www.machinedesign.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries.

all to the benefit of Ford's bottom line and to the detriment of owners and lessees of the Fire Risk Vehicles.

134. Regardless of the safety measures incorporated in the battery and related components designed to prevent runaway propagation, before launching an electric or plug-in hybrid electric vehicle, propagation testing is of the utmost importance.[75]

135. In addition to the 2017 NHTSA report, at the time of the launch of the Fire Risk Vehicles, there were a wide array of standards and safety testing procedures for lithium-ion batteries and vehicles that use them, including those promulgated by the Society for Automotive Engineers (SAE), the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[76]

136. Many of these standards and testing protocols protect against runaway propagation and the resulting catastrophe for vehicle owners and anyone or anything in their vicinity.[77]

---

[75] *See* **Exhibit 1**, *Lithium-ion Battery Safety Issues for Electric and Plug-in Hybrid Vehicles*, NHTSA.GOV (Oct. 2017), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/12848-lithiumionsafetyhybrids_101217-v3-tag.pdf, at 3-9 (discussing propagation testing circa 2014).

[76] *See id.* at 8-1.

[77] *See id.* at chapter 8.

137. These standards and testing protocols provided Ford with a wide range of guidelines on design and laboratory testing considerations to ensure the safety of the lithium-ion batteries in the Fire Risk Vehicles.

138. On information and belief, any adequate testing of the Fire Risk Vehicles would have revealed the high-voltage batteries' propensity to fail and combust as the result of thermal runaway. Either Ford followed these standards and testing protocols and discovered the risk, or it failed to follow these protocols and concealed these failures.

**2. Ford knew about the fire risk in this and other similar high-voltage batteries.**

139. Ford knew about the automotive industry's issues with the high-voltage battery packs it utilized in the Fire Risk Vehicles and other vehicles.

140. As previously mentioned, starting in November 2023, two other manufacturers that used the same or similar high-voltage lithium-ion batteries as those in the Fire Risk Vehicles began recalling their vehicles for separator damage and fire risk arising from the batteries. Then, in February 2025, Samsung recalled the high-voltage batteries themselves.

141. But Samsung's high-voltage battery fire issues go even further back, which Ford certainly knew. For example, in August 2020, Ford recalled its Kuga PHEV due to a fire risk defect and, in a familiar refrain, instructed owners not to

charge the battery. The battery manufacturer was Samsung.[78] Similarly, BMW recalled over 26,000 vehicles due to a fire risk defect because "the battery production process allowed impurities to enter the cells."[79]

142. And in March 2022, Samsung recalled more than 1,100 of its high-voltage batteries—including some in Ford vehicles that may be the same or similar high-voltage batteries used in the Fire Risk Vehicles—because of poor manufacturing quality.[80]

143. Ford was also aware of the fire risk posed by lithium-ion batteries based on its recall of vehicles with high-voltage batteries produced by other manufacturers. For example, in June 2023, Ford recalled certain Fusion PHEVs because a defect in their high-voltage batteries could cause excess voltage and current flow to the battery energy control module, damaging the component, and potentially resulting in loss of power and fire.[81]

---

[78] *See* **Exhibit 27**, Gustavo Henrique Ruffo, *Samsung SDI Might Be The Root of Ford And BMW PHEV Recalls*, INSIDEEVS (Oct. 16, 2020), https://insideevs.com/news/449322/samsung-sdi-root-ford-bmw-phev-recalls/.

[79] *Id.*

[80] *See* **Exhibit 28**, Jung Min-hee, *Samsung SDI Voluntarily Recalls EV Batteries in the U.S.*, BUSINESSKOREA (Feb. 7, 2022), https://www.businesskorea.co.kr/news/articleView.html?idxno=87120.

[81] *See* NHTSA Recall No. 23V-440.

144. All these facts make it overwhelmingly likely that the Spontaneous Fire Risk is in fact the result of defectively designed, manufactured, or installed high-voltage lithium-ion batteries.

145. While it is impossible, pre-discovery, to know the precise design of the high-voltage batteries and the methods used or not used in the architecture and testing of the high-voltage batteries in the Fire Risk Vehicles, it is clear that Ford launched them with defective high-voltage battery packs.

146. Ford knew or should have known about the Spontaneous Fire Risk before the Fire Risk Vehicles went to market. Ford did not inform consumers (or dealerships) of the Spontaneous Fire Risk, but could have done so through advertising, communication of information to dealerships to relay to consumers, written disclosures, etcetera. Instead, as detailed herein, Ford manufactured vehicles with the Spontaneous Fire Risk and fraudulently omitted this information from consumers at the point of sale.

## VI. FRAUDULENT CONCEALMENT

147. Plaintiffs' claims arise out of Ford's fraudulent concealment of the Spontaneous Fire Risk and its representations or omissions about the quality, safety, uses, features, and benefits of, and comfort of the Fire Risk Vehicles.

148. Plaintiffs allege that at all relevant times, including specifically at the time they and other class members purchased or leased their Fire Risk Vehicles, Ford

knew or should have known of the Spontaneous Fire Risk; Ford was under a duty to disclose the Spontaneous Fire Risk based upon its exclusive knowledge and concealment of it; and Ford never disclosed the Spontaneous Fire Risk to Plaintiffs, class members, or the public at any time or place or in any manner other than an inadequate and ineffective recall of certain Fire Risk Vehicles.

149. Plaintiffs make the following specific fraud allegations with as much specificity as possible, absent access to the information necessarily available only to Ford:

a. ***Who:*** Ford, as manufacturer and seller of the Fire Risk Vehicles.

b. ***What:*** As described above, Ford knew, or was deliberately indifferent to knowledge of the Spontaneous Fire Risk because of the cumulative notice provided by each of the following sources: (1) general industry knowledge of fire risk in high-voltage lithium-ion batteries use in plug-in hybrid electric vehicles, as described in the 2017 NHTSA report; (2) Ford's accumulation of knowledge regarding similarly defective parts related to the Samsung high-voltage batteries used Ford and other vehicles; (3) Ford's accumulation of knowledge regarding similarly defective high-voltage batteries in other Ford vehicles; (4) the several Ford vehicles equipped with the Samsung high-voltage lithium-ion batteries that Ford investigated or had the opportunity to investigate regarding the Spontaneous Fire

Risk before recalling the Fire Risk Vehicles; and (5) that even a single incident of unexpected vehicle fire can and should draw immediate and intense scrutiny.

c. ***When:*** Ford concealed material information regarding the Spontaneous Fire Risk at all times and made representations about the quality, safety, and comfort of the Fire Risk Vehicles, starting no later than 2019, when it accumulated requisite knowledge of the Spontaneous Fire Risk based on its extensive industry knowledge and fires in similarly defective Samsung high-voltage lithium-ion batteries and other high-voltage lithium-ion batteries used in its vehicles. This was prior to sale of the Fire Risk Vehicles to any class members. Ford still has not disclosed the truth about the full scope of the Spontaneous Fire Risk in the Fire Risk Vehicles to consumers, regulators, and the public.

d. ***Where:*** Ford concealed material information regarding the true nature of the Spontaneous Fire Risk in every communication it had with Plaintiffs and class members, including in the pervasive marketing described herein, and including by making or omitting material representations about the quality, safety, comfort, and features of the Fire Risk Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Ford disclosed the truth about the full scope of the Spontaneous Fire Risk in the Fire Risk Vehicles to anyone outside of Ford. Such information is not adequately disclosed in any sales documents,

displays, stickers, advertisements, warranties, owner's manuals, on Ford's website, or by any salesperson at a Ford dealership.

e. ***How:*** By concealing the truth about the existence, scope, and nature of the Spontaneous Fire Risk from Plaintiffs and class members at all times, even though it knew about the Spontaneous Fire Risk and knew that information about the Spontaneous Fire Risk would be material to a reasonable consumer. Also, by promising and implying in its marketing materials that the Fire Risk Vehicles were safe, reliable, high performing, and had features and attributes they did not actually have.

f. ***Why:*** Ford actively concealed material information about the Spontaneous Fire Risk in the Fire Risk Vehicles, and made representations conveying and implying that the Fire Risk Vehicles were safe, dependable, high performing, and had attributes they did not actually have, for the purpose of inducing Plaintiffs and class members to purchase and lease Fire Risk Vehicles, rather than purchasing and leasing competitors' vehicles or less expensive, non-hybrid versions of Ford's vehicles. Had Ford disclosed the truth—for example, in its advertisements or other materials or communications—Plaintiffs and class members (all reasonable consumers) would have been aware of the Spontaneous Fire Risk and would not have bought or leased the Fire Risk Vehicles or would have paid less for them.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

150. Because Ford concealed the existence of the Spontaneous Fire Risk, Class members had no way of knowing about the unreasonable fire risk of the Fire Risk Vehicles.

151. Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class and Subclasses could not have discovered through the exercise of reasonable diligence that Ford was concealing the conduct complained of herein.

152. Plaintiffs and the other Class and Subclass members did not discover and did not know facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had concealed information about the unreasonable fire risk of the Fire Risk Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

153. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Risk Vehicles.

## B. Fraudulent Concealment Tolling

154. All applicable statutes of limitation have also been tolled by Ford's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

## C. Estoppel

155. Ford was under a continuous duty to disclose to Plaintiffs and the other Class and Subclass members the true character, quality, and nature of the fire risk of the Fire Risk Vehicles.

156. Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Fire Risk Vehicles.

157. Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

# VIII. CLASS ALLEGATIONS

158. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class and Subclasses:

> **Nationwide Class:** All persons or entities who purchased or leased one or more model year 2020–2024 Ford Escape Plug-in Hybrid and 2021–2024 Lincoln Corsair Grand Touring Plug-in Hybrid vehicles (the "Fire Risk Vehicles").

**California Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of California.

**Florida Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Florida.

**Kansas Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Kansas.

**Massachusetts Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Massachusetts.

**Missouri Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Missouri.

**Michigan Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Michigan.

**New York Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of New York.

**Ohio Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Ohio.

**Tennessee Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Tennessee.

**Washington Subclass:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Washington.

> **<u>Wisconsin Subclass</u>:** All persons or entities who purchased or leased one or more of the Fire Risk Vehicles in the State of Wisconsin.

159. Plaintiffs assert claims under the laws of each state set forth below.

160. Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Fire Risk Vehicles. Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and their immediate family; and Plaintiffs' counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

161. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

162. This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

163. **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that

individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be more than 20,000 Fire Risk Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and published notice.

164. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

a. Whether Ford engaged in the conduct alleged herein;

b. Whether the Spontaneous Fire Risk creates an unreasonable risk of fires in the Fire Risk Vehicles;

c. When Ford first knew about the Spontaneous Fire Risk;

d. Whether Ford designed, manufactured, marketed, and distributed the Fire Risk Vehicles with defective high-voltage batteries;

e. Whether Ford's purported recall "repair" is a *bona fide* repair of the faulty high-voltage batteries;

f. Whether Ford's conduct renders it liable for breach of warranties;

g. Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclass members;

h. Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

i. Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

165. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

166. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

167. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate

their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## IX. CLAIMS

### A. Nationwide Claims

**COUNT I**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**
**(Alleged by all Plaintiffs on behalf of the Nationwide Class**
**or, in the alternative, the State Subclasses)**

168. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

169. Plaintiffs bring this claim on behalf of the Nationwide Class.

170. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

171. The Fire Risk Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide

Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

172. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

173. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

174. Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Fire Risk Vehicles were fit for their ordinary purpose as safe plug-in hybrid electric motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

175. Ford breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Fire Risk Vehicles share a common defect in that they are all equipped with a high-voltage battery that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles as well

as their homes, passengers, and bystanders. This defect rendered the Fire Risk Vehicles, when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, Ford specifically advised owners and lessees not to charge their high-voltage batteries and not to drive the Fire Risk Vehicles in electric mode.

176. As alleged above, on information and belief, Ford skimped on available design and safety technologies that would have precluded the Spontaneous Fire Risk, and, through the sort of testing that any responsible vehicle manufacturer would have done prior to launching the Fire Risk Vehicles, Ford knew or should have known of the defect. Yet, to pad its bottom line and launch a plug-in hybrid electric vehicle with the highest possible electric and overall range, Ford intentionally or recklessly foisted the outrageously dangerous Fire Risk Vehicles on unwitting Class members.

177. Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Fire Risk Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

178. Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

179. Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew that the Fire Risk Vehicles were defective and that the Fire Risk Vehicles could ignite when used as intended long before Plaintiffs and the Class. Ford failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

180. Plaintiffs had sufficient direct dealings with Ford to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here or exceptions to privity apply in these circumstances. Finally, privity is also not required because the Fire Risk Vehicles are dangerous instrumentalities due to the aforementioned defect, as battery fires present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Risk Vehicles as well as their homes, other nearby structures and vehicles, passengers, and bystanders.

181. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

182. Plaintiffs would suffer economic hardship if they returned their Fire Risk Vehicles but did not receive the return of all payments made by them. Because

Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Fire Risk Vehicles by retaining them.

183. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class Members in connection with the commencement and prosecution of this action.

184. Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class Members to recover out-of-pocket costs incurred attempting to rectify and mitigate the effects of the Spontaneous Fire Risk in their Fire Risk Vehicles.

## B. State-Specific Claims

### 1. California

**COUNT II**

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**(Cal. Civ. Code § 1750, *et seq.*)**
**(Alleged by Plaintiffs Kenneth Steuck and Charles Chronicle on behalf of the California Subclass)**

185. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

186. Plaintiffs Kenneth Steuck and Charles Chronicle ("Plaintiffs" for purposes of the California claims) bring this claim on behalf of themselves and the California Subclass ("Subclass" for purposes of the California claims).

187. Ford is a person as defined in California Civil Code § 1761(c).

188. Plaintiffs and the Subclass members are consumers as defined in California Civil Code § 1761(d).

189. Defendants engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act (CLRA) through the practices described herein, and by knowingly and intentionally concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles, from Plaintiffs and Subclass members, along with concealing the risks, costs, and monetary damage resulting from the defect. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source,

sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

190. Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

191. Ford knew the Fire Risk Vehicles were defectively designed and manufactured, were prone to cause fires, and were not suitable for their intended use.

192. In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles, and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

193. Ford owed Plaintiffs and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations;

c. Plaintiffs and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiffs and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiffs and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

194. In failing to disclose the Spontaneous Fire Risk and the associated safety risks and repair costs that result from it, Ford has knowingly and intentionally concealed material facts and breached its duty to disclose.

195. The facts concealed or not disclosed by Ford to Plaintiffs and Subclass members are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Fire Risk Vehicles or to pay a lesser price.

196. Plaintiffs and the Subclass reasonably relied on Ford's omissions of material fact and false or misleading representations.

197. Had Plaintiffs and the Subclass known about the defective nature of the Fire Risk Vehicles, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

198. Plaintiffs and the Subclass have incurred damages as a result of Ford's CLRA violations, in an amount to be proved at trial.

199. Plaintiffs and Subclass members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices.

200. Ford's violations present a continuing risk to Plaintiffs as well as the general public. In particular and as alleged herein, Ford's failure to provide an adequate recall remedy leaves Fire Risk Vehicle owners facing three choices: follow Ford's instructions at the great inconvenience of the inability to charge or drive their

vehicles in electric mode and the expense and environmental impact of additional consumption of gasoline; ignore Ford's instructions and risk calamity; or sell the vehicles at a substantial loss as a result of Ford's conduct. With Ford's untested and unproven purported recall repair just only recently rolled out to consumers—under which the primary remedy is a software update and only certain Fire Risk Vehicles will receive a replacement high-voltage battery—Plaintiffs and the Subclass are stuck with an inadequate remedy that does not assuage their safety concerns for themselves, their neighbors, and their property or rectify their incurred damages. Ford's unlawful acts and practices complained of herein affect the public interest.

201. Ford is on notice of the issues raised in this count and this Amended Complaint by way of investigations conducted by governmental regulators, complaints and demands from Plaintiffs and consumers, Plaintiffs' initial Complaint, and Ford's own testing and development of the Fire Risk Vehicles. Additionally, on or around June 23, 2025, counsel for Plaintiffs sent Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Fire Risk Vehicles. Ford, through its counsel, acknowledged receipt of this letter but Ford has yet to correct or agree to correct the actions described therein, and also has not provided adequate compensation to Plaintiffs and the Subclass.

202. Plaintiffs and the Subclass seek all relief available under the CLRA, including equitable relief, damages, punitive damages, and attorneys' fees.

**COUNT III**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200)**
**(Alleged by Plaintiffs Kenneth Steuck and Charles Chronicle on behalf of the California Subclass)**

203. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

204. Plaintiffs bring this claim on behalf of themselves and the Subclass.

205. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

206. Ford engaged in at least the following unlawful, fraudulent, and unfair business acts and practices in the course of its business and in violation of the UCL:

a. Ford made false or misleading representations about the Fire Risk Vehicles as alleged herein, including but not limited to falsely representing that the Fire Risk Vehicles conformed with all applicable federal motor vehicle safety standards.

b. Ford concealed and failed to disclose the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as true nature of the Fire Risk Vehicles, and its failure to adequately design and test the vehicles to ensure their safety from risk of a fire caused by the high-voltage battery as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

c. Ford engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Risk Vehicles.

207. Ford engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by knowingly and intentionally concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles, from Plaintiffs and Subclass members, along with concealing the risks, costs, and monetary damage resulting from the defect. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Spontaneous Fire Risk, and Plaintiffs and Subclass members could not reasonably be expected to learn or discover the true facts related to the Spontaneous Fire Risk.

208. The Spontaneous Fire Risk is a dangerous latent defect that causes catastrophic fire in the Fire Risk Vehicles, and this constitutes a safety issue that triggered Ford's duty to disclose the safety issue to consumers.

209. Ford's acts and practices deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Spontaneous Fire Risk and suppressing other material facts from Plaintiffs and Subclass members, Ford breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Subclass members.

210. Ford's concealed facts, omissions, and false or misleading representations to Plaintiffs and the Subclass, as alleged herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Fire Risk Vehicles or to pay a lesser price.

211. Plaintiffs and the Subclass reasonably relied on Ford's false and misleading representations and omissions. Had Plaintiffs and the Subclass known about the defective nature of the Fire Risk Vehicles, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

212. The injuries suffered by Plaintiffs and Subclass members are not outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and Subclass members could or should have reasonably avoided.

213. Ford's conduct alleged herein also violates California public policy, including as reflected in California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313, and California common law.

214. Ford's acts and practices are unlawful because they violate, among other things, California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

215. Plaintiffs and Subclass members have suffered an injury in fact, including the loss of money, property, and use of property because of Ford's unfair, unlawful, and deceptive practices.

216. Plaintiffs seek to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

217. Plaintiffs, on behalf of themselves and the Subclass, further seek an award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

**COUNT IV**

**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) (Alleged by Plaintiffs Kenneth Steuck and Charles Chronicle on behalf of the California Subclass)**

218. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

219. Plaintiffs bring this claim on behalf of themselves and the Subclass.

220. California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before

the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

221. Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and the Subclass.

222. Ford violated California Business & Professions Code § 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Fire Risk Vehicles as plug-in hybrid electric vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

223. Ford concealed and failed to disclose the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles, and its failure to adequately design and test the vehicles to ensure their safety from risk of a fire caused by the high-voltage battery as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

224. Ford violated California Business & Professions Code § 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Fire Risk Vehicles as plug-in hybrid electric vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

225. Ford's concealed facts, omissions, and false or misleading representations to Plaintiffs and the Subclass, as alleged herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase or lease the Fire Risk Vehicles or to pay a lesser price.

226. Plaintiffs and the Subclass reasonably relied on Ford's false and misleading representations and omissions. Had Plaintiffs and the Subclass known about the defective nature of the Fire Risk Vehicles, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

227. Plaintiffs and Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Fire Risk Vehicles, Plaintiffs and Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Fire Risk Vehicles were sold or leased with a defective hybrid propulsion system. Had Plaintiffs and the Subclass members known this, they would

not have purchased or leased their Subclass Vehicles or paid as much for them. Accordingly, Plaintiffs and the Subclass overpaid for their Fire Risk Vehicles and did not receive the benefit of their bargain.

228. All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

229. Plaintiffs, individually and on behalf of the Subclass members, request this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiffs and the Subclass members any money Ford acquired by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

230. Plaintiffs, on behalf of themselves and the Subclass, further seek an award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

## COUNT V

## FRAUDULENT CONCEALMENT
**(Common Law)**
**(Alleged by Plaintiffs Kenneth Steuck and Charles Chronicle on behalf of the California Subclass)**

231. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

232. Plaintiffs bring this claim on behalf of themselves and the Subclass.

233. Under California law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, or (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

234. Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

235. Ford sold the Fire Risk Vehicles to Plaintiffs without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

236. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiffs.

237. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiffs into believing it was rectifying the Spontaneous Fire Risk.

238. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

239. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiffs, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were

on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

240. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Subclass.

241. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

242. Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and suppressed facts, in that they would not have purchased their Fire Risk Vehicles and paid the high premium as the result of Ford's claims that they could be safely operated as plug-in hybrid electric vehicles. Plaintiffs' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

243. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiffs and the Subclass members relied on, they sustained damage. In purchasing or leasing their Fire Risk Vehicles, Plaintiffs and the Subclass did not get

the benefit of their bargain since the vehicles were worth less than they would have been without the defects and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiffs been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

244. Accordingly, Ford is liable to Plaintiffs and the Subclass for damages in an amount to be proven at trial.

245. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

## FRAUDULENT OMISSION
**(Common Law)**
**(Alleged by Plaintiffs Kenneth Steuck and Charles Chronicle on behalf of the California Subclass)**

246. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

247. Plaintiffs bring this claim on behalf of themselves and the Subclass.

248. Ford was aware of the Spontaneous Fire Risk within the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiffs and the Subclass.

249. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiffs and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

250. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiffs and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

251. For the reasons set forth herein, the Spontaneous Fire Risk within the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

252. In purchasing and leasing the Fire Risk Vehicles, Plaintiffs and the Subclass reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

253. Had Plaintiffs and the Subclass known of the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

254. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiffs and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

255. As a direct and proximate result of Ford's omissions, Plaintiffs and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT VII

## VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792) (Alleged by Plaintiffs Kenneth Steuck and Charles Chronicle on behalf of the California Subclass)

256. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

257. Plaintiffs bring this claim on behalf of themselves and the Subclass.

258. Plaintiffs and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

259. The Fire Risk Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

260. Ford is the "manufacturer" of the Fire Risk Vehicles within the meaning of Cal. Civ. Code § 1791(j).

261. Ford impliedly warranted to Plaintiffs and the California Subclass that the Fire Risk Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fire Risk Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

262. Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: (1) Pass without objection in the trade

under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; (4) Conform to the promises or affirmations of fact made on the container or label.

263. The Fire Risk Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to combustion and pose an unreasonable risk of fires due to the Spontaneous Fire Risk as described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and property damage to lessees and owners of the Fire Risk Vehicles as well as their homes, passengers, and bystanders. This defect renders the Fire Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, because of the defect, Ford specifically advised owners and lessees to stop charging their batteries and stop driving the Fire Risk Vehicles in electric mode.

264. Ford breached the implied warranty of merchantability by selling Fire Risk Vehicles containing defects leading to the sudden incineration of the vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiffs and the California Subclass of the benefit of their bargain.

265. Notice of breach is not required because Plaintiffs and the Subclass members did not purchase their automobiles directly from Ford. Nonetheless, Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by Plaintiffs' presentment of the vehicles for repair, Plaintiffs' communications with Ford and its authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

266. Plaintiffs and the Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Risk Vehicles to Plaintiffs and Subclass members.

267. As a direct and proximate result Ford's breach of the implied warranty of merchantability, Plaintiffs and the Subclass received goods whose dangerous condition rendered them at least partially inoperable and substantially impairs their value. Plaintiffs and the Subclass have been damaged as they overpaid for their vehicles, and suffered the partial or complete loss of use of their Fire Risk Vehicles.

268. Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the Subclass are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fire Risk Vehicles, compensation for the lost

use of their Fire Risk Vehicles, the cost of a competent repair for their Fire Risk Vehicles, or the overpayment or diminution in value of their Fire Risk Vehicles.

269. Under Cal. Civ. Code § 1794, Plaintiffs and the Subclass members are entitled to costs and attorneys' fees.

## COUNT VIII

## UNJUST ENRICHMENT
## (Common Law)
## (Alleged by Plaintiffs Kenneth Steuck and Charles Chronicle on behalf of the California Subclass)

270. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

271. Plaintiffs bring this claim on behalf of themselves and the Subclass.

272. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiffs plead this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

273. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiffs and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

274. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

275. At the expense of Plaintiffs and the Subclass members, Ford received and retained a benefit from Plaintiffs and Subclass members and inequity has resulted.

276. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiffs and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

277. Plaintiffs and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiffs and the Subclass.

278. Thus, Plaintiffs and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

279. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the

expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

280. Plaintiffs and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

281. Plaintiffs and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiffs and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

### 2. Florida

## COUNT IX

## VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT
**(Fla. Stat. § 501.201, *et seq.*)**
**(Alleged by Plaintiff Amanda Berardi on behalf of the Florida Subclass)**

282. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

283. Plaintiff Amanda Berardi ("Plaintiff" for purposes of the Florida claims) brings this claim on behalf of herself and the Florida Subclass ("Subclass" for purposes of the Florida claims).

284. Plaintiff and the Subclass are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

285. Ford engaged in "trade or commerce" within the meaning of Florida Statutes § 501.203(8).

286. The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …." Fla. Stat. § 501.204(1). By concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, Ford participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

287. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

288. In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

289. By failing to disclose and actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which Ford marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the FUDTPA.

290. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Risk Vehicles.

291. Ford knew it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

292. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

293. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

294. Ford knew or should have known that its conduct violated the FUDTPA.

295. As alleged herein, Ford made material statements about the safety, functionality, and reliability of the Fire Risk Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

296. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

297. Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and the Subclass members

were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the Subclass members been aware of the defects in their vehicles, they would have either not bought or leased their Fire Risk Vehicles or would have paid less for them.

298. Ford's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

299. Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

300. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiff and subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

301. As a direct and proximate result of Ford's violations of the FUDTPA, Plaintiff and the Subclass suffered an injury-in-fact and actual damage as alleged herein.

302. Plaintiff and the Subclass are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

303. Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

**COUNT X**

**FRAUDULENT CONCEALMENT**
**(Common Law)**
**(Alleged by Plaintiff Amanda Berardi on behalf of the Florida Subclass)**

304. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

305. Plaintiff brings this claim on behalf of herself and the Subclass.

306. Under Florida law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

307. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

308. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

309. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

310. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiff into believing it was rectifying the Spontaneous Fire Risk.

311. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

312. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

313. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

314. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

315. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

316. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

317. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

318. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XI**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiff Amanda Berardi on behalf of the Florida Subclass)**

319. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

320. Plaintiff brings this claim on behalf of herself and the Subclass.

321. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

322. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to

Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

323. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

324. For the reasons set forth herein, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

325. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

326. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

327. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

328. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT XII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW
**(Fla. Stat. § 672.314)**
**(Alleged by Plaintiff Amanda Berardi on behalf of the Florida Subclass)**

329. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

330. Plaintiff brings this claim on behalf of herself and the Subclass.

331. Ford is a "merchant" within the meaning of Fla. Stat. § 672.104, and a "seller" of motor vehicles within the meaning of Fla. Stat. § 672.103(d).

332. Under Florida law, an implied warranty of merchantability attaches to the Fire Risk Vehicles. Fla. Stat. § 672.314.

333. The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk,

which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

334. As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

335. Plaintiff has had sufficient direct dealings with Ford, its authorized dealers, and its agents to establish privity of contract with Ford. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between Ford and its dealers regarding sales and leases of the Fire Risk Vehicles, including Ford's implied warranties. *See* Fla. Stat. § 672.318. Furthermore, privity is also not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members.

336. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

337. Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by correspondence from Plaintiff, Plaintiff's presentment of the vehicle for repair, Plaintiff's communications with Ford's authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

338. Alternatively, Plaintiff and Subclass members were excused from providing Ford notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Spontaneous Fire Risk, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and the Subclass had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair again.

339. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XIII

## UNJUST ENRICHMENT
**(Common Law)**
**(Alleged by Plaintiff Amanda Berardi on behalf of the Florida Subclass)**

340. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

341. Plaintiff brings this claim on behalf of herself and the Subclass.

342. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

343. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

344. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

345. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

346. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

347. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

348. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

349. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

350. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

351. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

### 3. Kansas

## COUNT XIV

## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT (Kan. Stat. § 50-623, *et seq.*) (Alleged by Plaintiff Noah Woodcock on behalf of the Kansas Subclass)

352. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

353. Plaintiff Noah Woodcock ("Plaintiff" for purposes of the Kansas claims) brings this claim on behalf of himself and the Kansas Subclass ("Subclass" for purposes of the Kansas claims).

354. The Kansas Consumer Protection Act ("Kansas CPA") states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. § 50-626(a).

355. Plaintiff and Subclass members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

356. The sale of Fire Risk Vehicles to Plaintiff and the Subclass was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

357. Deceptive acts or practices under the Kansas CPA include, but are not limited to: "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; and "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions." *Id.* § 50-626(b). These acts constitute deceptive conduct "whether or not any consumer has in fact been misled." *Id*. Ford participated in misleading, false, or deceptive acts that violated the Kansas CPA. By concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, Ford engaged in deceptive acts or practices that violated the Kansas CPA as described herein.

358. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

359. In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

360. By failing to disclose and actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which Ford marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the Kansas CPA.

361. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Risk Vehicles.

362. Ford knew it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

363. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

364. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

365. Ford knew or should have known that its conduct violated the Kansas CPA.

366. As alleged herein, Ford made material statements about the safety, functionality, and reliability of the Fire Risk Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

367. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

368. Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and the Subclass members

were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the Subclass members been aware of the defects in their vehicles, they would have either not bought or leased their Fire Risk Vehicles or would have paid less for them.

369. Ford's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

370. Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

371. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiff and subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

372. As a direct and proximate result of Ford's violations of the Kansas CPA, Plaintiff and the Subclass suffered an injury-in-fact and actual damage as alleged herein.

373. Under Kan. Stat. Ann. § 50-634, Plaintiff seeks monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial or (b) statutory damages in the amount of $10,000 for each plaintiff.

374. Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

**COUNT XV**

**FRAUDULENT CONCEALMENT**
**(Common Law)**
**(Alleged by Plaintiff Noah Woodcock on behalf of the Kansas Subclass)**

375. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

376. Plaintiff brings this claim on behalf of himself and the Subclass.

377. Under Kansas law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

378. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

379. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

380. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

381. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiff into believing it was rectifying the Spontaneous Fire Risk.

382. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

383. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

384. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

385. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

386. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

387. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

388. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

389. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XVI**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiff Noah Woodcock on behalf of the Kansas Subclass)**

390. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

391. Plaintiff brings this claim on behalf of himself and the Subclass.

392. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

393. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to

Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

394. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

395. For the reasons set forth herein, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

396. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

397. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

398. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

399. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

**COUNT XVII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER KANSAS LAW**
**(Kan. Stat. Ann. § 84-2-314)**
**(Alleged by Plaintiff Noah Woodcock on behalf of the Kansas Subclass)**

400. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

401. Plaintiff brings this claim on behalf of himself and the Subclass.

402. Ford was and is a merchant with respect to motor vehicles within the meaning of Kan. Stat. Ann. § 84-2-104(1).

403. Under Kan. Stat. Ann. § 84-2-314, a warranty that the Fire Risk Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and Subclass members purchased or leased their Fire Risk Vehicles.

404. The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

405. As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

406. Because Plaintiff and the Subclass are consumers alleging breach of implied warranty with respect to the Fire Risk Vehicles, and the Fire Risk Vehicles are products subject to a consumer transaction, no privity of contract is required between Plaintiff and Ford. *See* Kan. Stat. Ann. 50-639(b). Further, privity is also not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members.

407. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

408. Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by Plaintiff's presentment of the vehicle for repair, Plaintiff's communications with Ford's authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

409. Alternatively, Plaintiff and Subclass members were excused from providing Ford notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Spontaneous Fire Risk, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and the Subclass had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair again.

410. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XVIII

## UNJUST ENRICHMENT
## (Common Law)
## (Alleged by Plaintiff Noah Woodcock on behalf of the Kansas Subclass)

411. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

412. Plaintiff brings this claim on behalf of himself and the Subclass.

413. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

414. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

415. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

416. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

417. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

418. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

419. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

420. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

421. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

422. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

**4. Massachusetts**

**COUNT XIX**

**DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW**
**(Mass. Gen. Laws Ch. 93A, § 1, *et seq.*)**
**(Alleged by Plaintiff Gregory Travers on behalf of the Massachusetts Subclass)**

423. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

424. Plaintiff Gregory Travers ("Plaintiff" for purposes of the Massachusetts claims) brings this claim on behalf of himself and the Massachusetts Subclass ("Subclass" for purposes of the Massachusetts claims).

425. Ford and Plaintiffs are "persons" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(a).

426. Ford engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(b).

427. Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen.

Laws Ch. 93A, § 2. Ford participated in misleading, false, or deceptive acts that violated the Massachusetts Act. By concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, Ford engaged in deceptive acts or practices that violated the Massachusetts Act as described herein.

428. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

429. In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

430. By failing to disclose and actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which Ford marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

431. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Risk Vehicles.

432. Ford knew it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

433. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

434. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

435. Ford knew or should have known that its conduct violated the Massachusetts Act.

436. As alleged herein, Ford made material statements about the safety, functionality, and reliability of the Fire Risk Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

437. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

438. Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and the Subclass members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the Subclass members been aware of the defects in their vehicles, they would have either not bought or leased their Fire Risk Vehicles or would have paid less for them.

439. Ford's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

440. Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

441. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiff and Subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

442. As a direct and proximate result of Ford's violations of the Massachusetts Act, Plaintiff and the Subclass suffered an injury-in-fact and actual damage as alleged herein.

443. Under Mass. Gen. Laws Ch. 93A, § 9, Plaintiff and the Subclass seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Ford's conduct was committed willfully and knowingly, Plaintiff is entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

444. Plaintiff also seeks an order enjoining Ford's unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Massachusetts Act.

**COUNT XX**

**FRAUDULENT CONCEALMENT**
**(Common Law)**
**(Alleged by Plaintiff Gregory Travers on behalf of the Massachusetts Subclass)**

445. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

446. Plaintiff brings this claim on behalf of himself and the Subclass.

447. Under Massachusetts law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

448. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

449. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

450. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

451. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiff into believing it was rectifying the Spontaneous Fire Risk.

452. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

453. Ford had a duty to disclose the true nature of the Fire Risk Vehicles,

as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

454. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

455. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

456. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

457. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

458. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XXI**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiff Gregory Travers on behalf of the Massachusetts Subclass)**

459. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

460. Plaintiff brings this claim on behalf of himself and the Subclass.

461. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

462. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to

Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

463. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

464. For the reasons set forth herein, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

465. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

466. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

467. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

468. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

**COUNT XXII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MASSACHUSETTS LAW**
**(ALM GL Ch. 106, § 2-314)**
**(Alleged by Plaintiff Gregory Travers on behalf of the Massachusetts Subclass)**

469. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

470. Plaintiff brings this claim on behalf of himself and the Subclass.

471. Ford is a "merchant" with respect to motor vehicles under ALM GL Ch. 106, § 2-104(1).

472. Under ALM GL Ch. 106, § 2-314, a warranty that the Fire Risk Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Massachusetts Subclass members purchased or leased them.

473. The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the

trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

474. As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

475. Because Plaintiff and the Subclass allege breach of implied warranty with respect to the Fire Risk Vehicles against the manufacturer Ford, no privity of contract is required between Plaintiff and Ford. *See* Mass. Gen. Laws Ann. ch. 106, § 2-318.

476. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

477. Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by Plaintiff's presentment of the vehicle for repair, Plaintiff's communications with Ford's authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

478. Alternatively, Plaintiff and Subclass members were excused from providing Ford notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Spontaneous Fire Risk, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and the Subclass had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair again.

479. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXIII

## UNJUST ENRICHMENT
## (Common Law)
## (Alleged by Plaintiff Gregory Travers on behalf of the Massachusetts Subclass)

480. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

481. Plaintiff brings this claim on behalf of himself and the Subclass.

482. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

483. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

484. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

485. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

486. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

487. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

488. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

489. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

490. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

491. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

**5. Missouri**

**COUNT XXIV**

**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Rev. Stat. § 407.010, *et seq.*)**
**(Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)**

492. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

493. Plaintiff Harry Hilburg ("Plaintiff" for purposes of the Missouri claims) brings this claim on behalf of himself and the Missouri Subclass ("Subclass" for purposes of the Missouri claims).

494. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.

495. Ford is a "person" and the Fire Risk Vehicles are "merchandise" within the meaning of Mo. Rev. Stat. §§ 407.010(4)-(5) and 407.020.

496. Plaintiff is a "person" who purchased the Fire Risk Vehicle for personal, family, or household use under Mo. Rev. Stat. §§ 407.010(5) and 407.025.

497. In the course of "trade" or "commerce," within the meaning of Mo. Rev. Stat. § 407.010(7), Ford engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Risk Vehicles.

498. Ford knew it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

499. By marketing the Fire Risk Vehicles as safe, reliable, and of high quality, Ford engaged in deceptive business practices in violation of the Missouri MPA.

500. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Spontaneous Fire Risk. Ford compounded the deception by repeatedly asserting that the Fire Risk Vehicles were safe, reliable, and of high quality.

501. Ford's unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety, performance, and value of the Fire Risk Vehicles.

502. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with an intent to mislead Plaintiff.

503. Ford knew or should have known that its conduct violated the Missouri MPA.

504. As alleged above, Ford made material statements about the safety and utility of the Fire Risk Vehicles that were either false or misleading.

505. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and

battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

506. Ford fraudulently concealed the Spontaneous Fire Risk and the true performance of the Fire Risk Vehicles.

507. The true performance and safety of the Fire Risk Vehicles were material to Plaintiffs.

508. Plaintiff suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose material information. Plaintiff who purchased the Fire Risk Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Missouri MPA.

509. Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of the Fire Risk Vehicles suffered ascertainable loss in the form of overpayment and the diminished

value of their vehicles because of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

510. Ford's violations present a continuing risk to Plaintiff and Subclass members as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiff and Subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

511. As a direct and proximate result of Ford's violations of the Missouri MPA, Plaintiff and the Subclass suffered injury-in-fact and actual damage.

512. As a result of Ford's conduct, Plaintiff and the Subclass seek to recover from Ford all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, civil penalties, punitive damages, attorneys' fees and costs, any orders necessary to enjoin Ford's unfair and deceptive practices, and any other just and proper relief authorized under Mo. Rev. Stat. § 407.025 or Missouri law.

## COUNT XXV

## FRAUDULENT CONCEALMENT
**(Common Law)**
**(Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)**

513. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

514. Plaintiff brings this claim on behalf of himself and the Subclass.

515. Under Missouri law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

516. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

517. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

518. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

519. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiff into believing it was rectifying the Spontaneous Fire Risk.

520. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

521. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and

quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

522. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

523. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

524. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric

vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

525. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

526. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

527. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XXVI**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)**

528. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

529. Plaintiff brings this claim on behalf of himself and the Subclass.

530. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

531. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

532. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

533. For the reasons set forth herein, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

534. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

535. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

536. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

537. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT XXVII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MISSOURI LAW (Mo. Stat. § 400.2-314) (Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)

538. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

539. Plaintiff brings this claim on behalf of himself and the Subclass.

540. Ford is a "merchant" and "seller" of motor vehicles and the Fire Risk Vehicles are "goods" under Missouri law. Mo. Stat. § 400.2-104.

541. Under Missouri law, an implied warranty of merchantability attaches to the Fire Risk Vehicles under Mo. Stat. § 400.2-314.

542. The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members. In fact, as a result of the defect, Ford specifically advised owners and lessees not to charge their batteries and not to drive the Fire Risk

Vehicles in electric mode. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

543. As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

544. Plaintiff and the Subclass members had sufficient direct dealings with Ford to establish privity of contract with Ford. Nonetheless, privity is not required here or exceptions to any privity requirement apply here. Furthermore, privity is also not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members.

545. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

546. Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by Plaintiff's presentment of the vehicle for repair, Plaintiff's

communications with Ford's authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

547. Alternatively, Plaintiff and Subclass members were excused from providing Ford notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Spontaneous Fire Risk, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and the Subclass had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair again.

548. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and Subclass members have been damaged in an amount to be determined at trial.

## COUNT XXVIII

## UNJUST ENRICHMENT
## (Common Law)
## (Alleged by Plaintiff Harry Hilburg on behalf of the Missouri Subclass)

549. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

550. Plaintiff brings this claim on behalf of himself and the Subclass.

551. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

552. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

553. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

554. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

555. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

556. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

557. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

558. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

559. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

560. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

### 6. Michigan

**COUNT XXIX**

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(Mich. Comp. Laws § 445.901, *et seq.*)**
**(Alleged by Plaintiff Edna Vasquez on behalf of the Michigan Subclass)**

561. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

562. Plaintiff Edna Vasquez ("Plaintiff" for purposes of the Michigan claims) brings this claim on behalf of herself and the Michigan Subclass ("Subclass" for purposes of the Michigan claims).

563. Plaintiff and Subclass members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

564. Ford is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

565. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[r]epresenting that goods [] have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods [] are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the

consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

566. By concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, Ford participated in unfair and deceptive trade practices that violated the Michigan CPA as described herein.

567. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

568. In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

569. By failing to disclose and actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which Ford marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the Michigan CPA.

570. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Risk Vehicles.

571. Ford knew it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

572. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

573. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

574. Ford knew or should have known that its conduct violated the Michigan CPA.

575. As alleged herein, Ford made material statements about the safety, functionality, and reliability of the Fire Risk Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

576. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

577. Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and the Subclass members

were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the Subclass members been aware of the defects in their vehicles, they would have either not bought or leased their Fire Risk Vehicles or would have paid less for them.

578. Ford's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

579. Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

580. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiff and Subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

581. As a direct and proximate result of Ford's violations of the Michigan CPA, Plaintiff and the Subclass suffered ascertainable loss and actual damage as alleged herein.

582. Plaintiff and the Subclass seek injunctive relief to enjoin Ford from continuing its unfair and deceptive acts; monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

583. Plaintiff and the Subclass also seek punitive damages against Ford because of its reprehensible conduct carried out willfully and in conscious disregard of the rights and safety of others, subjecting Plaintiff and Subclass to cruel and unjust hardship as a result. Ford intentionally and willfully misrepresented the quality, safety, and benefits of the Fire Risk Vehicles and concealed material facts regarding the extremely dangerous Fire Risk Defect that only it knew, as described herein, all to avoid the expense of properly developing and testing the Fire Risk Vehicles, and then correcting the Spontaneous Fire Risk in the Fire Risk Vehicles that Ford repeatedly promised were safe. Ford's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT XXX

## FRAUDULENT CONCEALMENT
**(Common Law)**
**(Alleged by Plaintiff Edna Vasquez on behalf of the Michigan Subclass)**

584. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

585. Plaintiff brings this claim on behalf of herself and the Subclass.

586. Under Michigan law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

587. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

588. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

589. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

590. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiff into believing it was rectifying the Spontaneous Fire Risk.

591. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

592. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and

quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

593. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

594. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

595. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric

vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

596. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

597. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

598. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an

amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XXXI**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiff Edna Vasquez on behalf of the Michigan Subclass)**

599. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

600. Plaintiff brings this claim on behalf of herself and the Subclass.

601. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

602. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

603. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

604. For the reasons set forth herein, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

605. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

606. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

607. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

608. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT XXXII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MICHIGAN LAW
## (Mich. Comp. Laws § 440.2314)
## (Alleged by Plaintiff Edna Vasquez on behalf of the Michigan Subclass)

609. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

610. Plaintiff brings this claim on behalf of herself and the Subclass.

611. Ford is a "merchant" of motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

612. Under Michigan law, an implied warranty of merchantability attaches to the Fire Risk Defect Vehicles. Mich. Comp. Laws § 440.2314.

613. The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

614. As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

615. Privity of contract is not required to pursue a breach of implied warranty claim under Michigan law. In addition, Plaintiff and the Subclass have had sufficient direct dealings with Ford, its authorized dealers, or its agents to establish privity of contract with Ford. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between Ford and its dealers regarding sales and leases of the Fire Risk Vehicles, including Ford's implied warranties. Furthermore, privity is also not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and the Subclass.

616. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

617. Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by communications from Plaintiff, Plaintiff's presentment of the vehicle for repair, Plaintiff's communications with Ford's authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

618. Alternatively, Plaintiff and Subclass members were excused from providing Ford notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Spontaneous Fire Risk, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and the Subclass had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair again.

619. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXXIII

## UNJUST ENRICHMENT
**(Common Law)**
**(Alleged by Plaintiff Edna Vasquez on behalf of the Michigan Subclass)**

620. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

621. Plaintiff brings this claim on behalf of herself and the Subclass.

622. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

623. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

624. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

625. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

626. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

627. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

628. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

629. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

630. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

631. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

**7. New York**

**COUNT XXXIV**

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law § 349 *et seq.*)**
**(Alleged by Plaintiffs Robert Muller and Marc Schwedelson on behalf of the New York Subclass)**

632. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

633. Plaintiffs Robert Muller and Marc Schwedelson ("Plaintiffs" for purposes of the New York claims) bring this claim on behalf of themselves and the New York Subclass ("Subclass" for purposes of the New York claims).

634. Ford, Plaintiffs, and the Subclass members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349.

635. The New York Deceptive Acts and Practices Act ("NY DAPA") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

636. In the course of its business, Ford violated N.Y. Gen. Bus. Law § 349 as detailed herein. Specifically, in designing and manufacturing the Fire Risk

Vehicles with defective high-voltage battery systems that Ford concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Fire Risk Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.Y. Gen. Bus. Law § 349:

a. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Fire Risk Vehicles;

b. Representing that the Fire Risk Vehicles have approval, characteristics, uses, or benefits that they do not have;

c. Representing that the Fire Risk Vehicles are of a particular standard, quality and grade when they are not;

d. Advertising the Fire Risk Vehicles with the intent not to sell or lease them as advertised;

e. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Fire Risk Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

637. Ford's scheme and concealment of the true characteristics of the Spontaneous Fire Risk in the Fire Risk Vehicles was material to Plaintiffs and Subclass members, as Ford intended. Had they known the truth, Plaintiffs and Subclass members would not have purchased or leased the Fire Risk Vehicles, or—

if the Fire Risk Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

638. Plaintiffs and Subclass members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose, because Ford's high-voltage battery systems are highly sophisticated technology and their physical and software characteristics are closely guarded secrets. Plaintiffs and Subclass members did not, and could not, unravel Ford's deception on their own.

639. Ford owed Plaintiffs and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations;

c. Plaintiffs and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiffs and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiffs and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

640. Ford still has not revealed the extent of its knowledge, the true nature of the Spontaneous Fire Risk, or the results of its examination and testing of the Fire Risk Vehicles. Ford has not disclosed all material facts regarding the defective nature of the Fire Risk Vehicles, so it has breached its duty to Plaintiffs and Subclass members to refrain from unfair and deceptive practices under N.Y. Gen. Bus. Law § 349 in the course of its business.

641. Plaintiffs and Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and failure to disclose material information.

642. Ford's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiffs and subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

643. Plaintiffs and Subclass members seek an order enjoining Ford's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT XXXV**

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. Gen. Bus. Law § 350, *et seq.*)**
**(Alleged by Plaintiffs Robert Muller and Marc Schwedelson on behalf of the New York Subclass)**

644. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

645. Plaintiffs bring this claim on behalf of themselves and the Subclass.

646. Ford is engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350.

647. N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a(1).

648. Ford caused to be made or disseminated through New York and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of

reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and Subclass members.

649. Ford concealed and failed to disclose the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as true nature of the Fire Risk Vehicles, and its failure to adequately design and test the vehicles to ensure their safety from risk of a fire caused by the high-voltage battery as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

650. At a minimum, Ford knew or should have known that its conduct violated N.Y. Gen. Bus. Law § 350 by:

a. representing that the Fire Risk Vehicles had characteristics, uses, benefits, and qualities which they do not have;

b. representing that the Fire Risk Vehicles are of a particular standard, quality and grade when they are not;

c. advertising Fire Risk Vehicles with the intent not to sell or lease them as advertised;

d. engaging in other conduct creating a likelihood of confusion or of misunderstanding; and

e. employing concealment, suppression, or omission of material facts in connection with the advertisement and sale of the Fire Risk Vehicles.

651. Plaintiffs and the Subclass reasonably relied on Ford's false and misleading representations and omissions. Had Plaintiffs and the Subclass members

known about the defective nature of the Fire Risk Vehicles, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

652. Plaintiffs and Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Fire Risk Vehicles, Plaintiffs and Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Fire Risk Vehicles were sold or leased with a defective hybrid propulsion system. Had Plaintiffs and the Subclass members known this, they would not have purchased or leased their Fire Risk Vehicles or paid as much for them. Accordingly, Plaintiffs and the Subclass members overpaid for their Fire Risk Vehicles and did not receive the benefit of their bargain.

653. All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in New York and nationwide.

654. Under to N.Y. Gen. Bus. Law § 350-e, Plaintiffs and Subclass members seek injunctive relief, as well as monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each per Subclass member. Because Ford's conduct

was committed willingly and knowingly, Plaintiffs and the Subclass are entitled to recover three times actual damages, up to $10,000.

## COUNT XXXVI

## FRAUDULENT CONCEALMENT
**(Common Law)**
**(Alleged by Plaintiffs Robert Muller and Marc Schwedelson on behalf of the New York Subclass)**

655. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

656. Plaintiffs bring this claim on behalf of themselves and the New York Subclass.

657. Under New York law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, or (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiffs suffered economic damages.

658. Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiffs' vehicles.

659. Ford sold the Fire Risk Vehicles to Plaintiffs without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

660. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiffs.

661. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiffs into believing it was rectifying the Spontaneous Fire Risk.

662. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

663. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford;

Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiffs. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiffs, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

664. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiffs and the Subclass.

665. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

666. Plaintiffs were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and suppressed facts, in

that they would not have purchased their Fire Risk Vehicles and paid the high premium as the result of Ford's claims that they could be safely operated as plug-in hybrid electric vehicles. Plaintiffs' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiffs.

667. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiffs and the Subclass members relied on, they sustained damage. In purchasing or leasing their Fire Risk Vehicles, Plaintiffs and the Subclass did not get the benefit of their bargain since the vehicles were worth less than they would have been without the defects and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiffs been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

668. Accordingly, Ford is liable to Plaintiffs and the Subclass for damages in an amount to be proven at trial.

669. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XXXVII**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiffs Robert Muller and Marc Schwedelson on behalf of the New York Subclass)**

670. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

671. Plaintiffs bring this claim on behalf of themselves and the Subclass.

672. Ford was aware of the Spontaneous Fire Risk within the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiffs and the Subclass.

673. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiffs and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiffs and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

674. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiffs and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

675. For the reasons set forth herein, the Spontaneous Fire Risk within the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

676. In purchasing and leasing the Fire Risk Vehicles, Plaintiffs and the Subclass reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

677. Had Plaintiffs and the Subclass known of the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

678. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiffs and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

679. As a direct and proximate result of Ford's omissions, Plaintiffs and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the

Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

**COUNT XXXVIII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NEW YORK LAW**
**(N.Y. U.C.C. §§ 2-314 and 2A-212)**
**(Alleged by Plaintiffs Robert Muller and Marc Schwedelson on behalf of the New York Subclass)**

680. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

681. Plaintiffs bring this claim on behalf of themselves and the Subclass.

682. Ford was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

683. With respect to leases, Ford was at all relevant times a "lessor" of motor vehicles under N.Y. UCC § 2A-103(1)(p).

684. The Fire Risk Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC §§ 2-105(1) and 2A-103(1)(h).

685. A warranty that the Fire Risk Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC §§ 2-314 and 2A-212.

686. Under N.Y. UCC § 2-314(2), goods must "at least" meet the following to be considered "merchantable" within the meaning of the implied warranty of merchantability:

a. Pass without objection in the trade under the contract description.

b. Are fit for the ordinary purposes for which such goods are used.

c. Are adequately contained, packaged, and labeled.

d. Conform to the promises or affirmations of fact made on the container or label.

687. The Fire Risk Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to combustion and pose an unreasonable risk of fires due to the Spontaneous Fire Risk as described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they are all equipped with a high-voltage battery system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and property damage to lessees and owners of the Fire Risk Vehicles as well as their homes, passengers, and bystanders. This defect renders the Fire Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, because of the Spontaneous Fire Risk, Ford specifically advises owners and lessees not to charge their batteries and not to drive the Fire Risk Vehicles in electric mode.

688. Ford breached the implied warranty of merchantability by selling Fire Risk Vehicles containing defects leading to the sudden combustion of the vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiffs and the Subclass members of the benefit of their bargain.

689. Plaintiffs have had sufficient direct dealings with Ford, its authorized dealers, and its agents to establish privity of contract with Ford. Nonetheless, privity is not required here because Plaintiffs and the Subclass are the intended third-party beneficiaries of agreements between Ford and its dealers regarding sales and leases of the Fire Risk Vehicles, including Ford's implied warranties. Further, privity is not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiffs and Subclass members.

690. Notice of breach is not required because Plaintiffs and the Subclass did not purchase their automobiles directly from Ford. Regardless, Ford was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles by communications from Plaintiffs, Plaintiffs' presentment of the vehicles for repair, Plaintiffs' communications with Ford's authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of

Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

691. Alternatively, Plaintiffs and Subclass members were excused from providing Ford notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Spontaneous Fire Risk, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiffs and the Subclass had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair again.

692. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiffs and the Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Fire Risk Vehicles.

693. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXXIX

## UNJUST ENRICHMENT
**(Common Law)**
**(Alleged by Plaintiffs Robert Muller and Marc Schwedelson on behalf of the New York Subclass)**

694. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

695. Plaintiffs bring this claim on behalf of themselves and the Subclass.

696. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiffs plead this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

697. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiffs and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

698. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

699. At the expense of Plaintiffs and the Subclass members, Ford received and retained a benefit from Plaintiffs and Subclass members and inequity has resulted.

700. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiffs and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

701. Plaintiffs and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiffs and the Subclass.

702. Thus, Plaintiffs and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

703. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

704. Plaintiffs and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

705. Plaintiffs and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiffs and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

**8. Ohio**

**COUNT XL**

**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT**
**(Ohio Rev. Code Ann. §§ 1345.01, *et seq.*)**
**(Alleged by Plaintiff Marla Kerr on behalf of the Ohio Subclass)**

706. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

707. Plaintiff Marla Kerr ("Plaintiff" for purposes of the Ohio claims) brings this claim on behalf of herself and the Ohio Subclass ("Subclass" for purposes of the Ohio claims).

708. Ford, Plaintiff, and Subclass members are "persons" within the meaning of Ohio Rev. Code Ann. § 1345.01(B). Ford is a "supplier" as defined by Ohio Rev. Code Ann. § 1345.01(C).

709. The Subclass members are "consumers" within the meaning of Ohio Rev. Code Ann. § 1345.01(D), and their purchase and leases of the Fire Risk Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

710. The Ohio Consumer Sales Practices Act ("Ohio CSPA") prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Ohio Rev. Code Ann. § 1345.02.

711. In the course of its business, Ford violated the Ohio CSPA as detailed herein. Specifically, in designing and manufacturing the Fire Risk Vehicles with defective high-voltage battery systems that Ford concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Fire Risk Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Ohio Rev. Code Ann. § 1345.02(A):

a. Representing that the Fire Risk Vehicles had approval, performance characteristics, accessories, uses, or benefits that it does not have;

b. Representing that the Fire Risk Vehicles are of a particular standard, quality, and grade when they are not; or

c. Representing that the Fire Risk Vehicles were sold in accordance with prior representations that, among other things, they were safe and free of defects, and the Fire Risk Vehicles were not sold in accordance with those representations.

712. Ford's scheme and concealment of the true characteristics of the Spontaneous Fire Risk in the Fire Risk Vehicles was material to Plaintiff and Subclass members, as Ford intended. Had they known the truth, Plaintiff and Subclass members would not have purchased or leased the Fire Risk Vehicles, or—if the Fire Risk Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

713. Plaintiff and Subclass members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose, because Ford's high-voltage battery systems are highly sophisticated technology and their physical and software characteristics are closely guarded secrets. Plaintiff and Subclass members did not, and could not, unravel Ford's deception on their own.

714. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk

Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

715. Ford still has not revealed the extent of its knowledge, the true nature of the Spontaneous Fire Risk, or the results of its examination and testing of the Fire Risk Vehicles. Ford has not disclosed all material facts regarding the defective nature of the Fire Risk Vehicles, so it has breached its duty to Plaintiff and Subclass members to refrain from unfair and deceptive practices under the Ohio CSPA in the course of its business.

716. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire

Risk and compensates Plaintiff and subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

717. Plaintiff and Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and failure to disclose material information.

718. Under Ohio Rev. Code Ann. § 1345.09, Plaintiff, individually and on behalf of Subclass members, seeks an order enjoining Ford's unfair and deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Ohio CSPA.

## COUNT XLI

## VIOLATION OF THE OHIO DECEPTIVE TRADE PRACTICES ACT
**(Ohio Rev. Code Ann. §§ 4165.01, *et seq.*)**
**(Alleged by Plaintiff Marla Kerr on behalf of the Ohio Subclass)**

719. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

720. Plaintiff brings this claim on behalf of herself and the Subclass.

721. Ford, Plaintiff, and Subclass members are "persons" within the meaning of Ohio Rev. Code Ann. § 4165.01(D).

722. Ford is, and at all times relevant was, engaged in "the course of [its] business" within the meaning of Ohio Rev. Code Ann. § 4165.02(A).

723. The Ohio Deceptive Trade Practices Act ("Ohio DTPA") makes unlawful deceptive trade practices. Ohio Rev. Code Ann. § 4165.02(A).

724. In the course of its business, Ford violated the Ohio DTPA as detailed herein. Specifically, in designing and manufacturing the Fire Risk Vehicles with defective high-voltage battery systems that Ford concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Fire Risk Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices as defined in Ohio Rev. Code Ann. § 4165.02(A):

a. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Fire Risk Vehicles;

b. Representing that the Fire Risk Vehicles have approval, characteristics, uses, or benefits that they do not have;

c. Representing that the Fire Risk Vehicles are of a particular standard, quality and grade when they are not; and/or

d. Advertising the Fire Risk Vehicles with the intent not to sell or lease them as advertised.

725. Ford's scheme and concealment of the true characteristics of the Spontaneous Fire Risk in the Fire Risk Vehicles was material to Plaintiff and Subclass members, as Ford intended. Had they known the truth, Plaintiff and Subclass members would not have purchased or leased the Fire Risk Vehicles, or—if the Fire Risk Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

726. Plaintiff and Subclass members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose, because Ford's high-voltage battery systems are highly sophisticated technology and their physical and software characteristics are closely guarded secrets. Plaintiff and Subclass members did not, and could not, unravel Ford's deception on their own.

727. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

728. Ford still has not revealed the extent of its knowledge, the true nature of the Spontaneous Fire Risk, or the results of its examination and testing of the Fire Risk Vehicles. Ford has not disclosed all material facts regarding the defective nature of the Fire Risk Vehicles, so it has breached its duty to Plaintiff and Subclass members to refrain from unfair and deceptive practices under the Ohio DTPA in the course of its business.

729. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiff and subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

730. Plaintiff and Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and failure to disclose material information.

731. Under Ohio Rev. Code Ann. §§ 2727.02 and 4165.03, Plaintiff and the Subclass members seek an order enjoining Ford's unfair and deceptive acts or

practices, and awarding damages, punitive damages, and any other just and proper relief available under the Ohio DTPA.

**COUNT XLII**

**FRAUDULENT CONCEALMENT**
**(Common Law)**
**(Alleged by Plaintiff Marla Kerr on behalf of the Ohio Subclass)**

732. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

733. Plaintiff brings this claim on behalf of herself and the Subclass.

734. Under Ohio law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

735. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

736. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

737. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

738. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiff into believing it was rectifying the Spontaneous Fire Risk.

739. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

740. Ford had a duty to disclose the true nature of the Fire Risk Vehicles,

as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

741. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

742. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

743. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

744. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

745. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

746. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XLIII**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiff Marla Kerr on behalf of the Ohio Subclass)**

747. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

748. Plaintiff brings this claim on behalf of herself and the Subclass.

749. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

750. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to

Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

751. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

752. For the reasons set forth herein, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

753. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

754. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

755. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

756. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT XLIV

## VIOLATION OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER OHIO LAW
**(Ohio Rev. Code Ann. §§ 1302.27 and 1310.19)**
**(Alleged by Plaintiff Marla Kerr on behalf of the Ohio Subclass)**

757. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

758. Plaintiff brings this claim on behalf of herself and the Subclass.

759. Ford was, at all relevant times, a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. § 1302.01(A)(5), and "sellers" of motor vehicles under § 1302.01(A)(4).

760. With respect to leases, Ford is and was at all relevant times "lessors" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(16).

761. The Fire Risk Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(A)(8) and 1310.01(A)(8).

762. A warranty that the Fire Risk Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code Ann. §§ 1302.27(A) and 1310.19(A).

763. Under Ohio Rev. Code Ann. §§ 1302.27(B) and 1310.19(A), goods must "at least" meet the following to be considered "merchantable" within the meaning of the implied warranty of merchantability:

a. Pass without objection in the trade under the contract (or lease) description.

b. Are fit for the ordinary purposes for which such goods are used.

c. Are adequately contained, packaged, and labeled.

d. Conform to the promises or affirmations of fact made on the container or label.

764. The Fire Risk Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to combustion and pose an unreasonable risk of fires due to the Spontaneous Fire Risk as described herein. Without limitation, the Fire Risk Vehicles share a common defect in that they are all equipped with a high-voltage battery system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and property damage to lessees and owners of the Fire Risk Vehicles as well as their homes, passengers, and bystanders. This defect renders the Fire Risk Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary

use of driving. In fact, because of the Spontaneous Fire Risk, Ford specifically advises owners and lessees not to charge their batteries and not to drive the Fire Risk Vehicles in electric mode.

765. Ford breached the implied warranty of merchantability by selling Fire Risk Vehicles containing defects leading to the sudden combustion of the vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiffs and the Subclass members of the benefit of their bargain.

766. Plaintiff has had sufficient direct dealings with Ford, its authorized dealers, and its agents to establish privity of contract with Ford. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between Ford and its dealers regarding sales and leases of the Fire Risk Vehicles, including Ford's implied warranties. Further, privity is not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members.

767. Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by Plaintiff's presentment of the vehicle for repair, Plaintiff's communications with Ford's authorized dealers, consumer complaints to NHTSA regarding the defect that is the subject of this Amended Complaint, the filing of

Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

768. Alternatively, Plaintiff and Subclass members were excused from providing Ford notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it announced the recall for the Spontaneous Fire Risk, and it still has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and the Subclass had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair again.

769. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiff and the Subclass members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Fire Risk Vehicles.

770. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XLV

## UNJUST ENRICHMENT
**(Common Law)**
**(Alleged by Plaintiff Marla Kerr on behalf of the Ohio Subclass)**

771. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

772. Plaintiff brings this claim on behalf of herself and the Subclass.

773. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

774. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

775. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

776. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

777. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

778. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

779. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

780. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

781. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

782. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

**9. Tennessee**

**COUNT XLVI**

**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT**
**(Tenn. Code Ann. § 47-18-101, *et seq.*)**
**(Alleged by Plaintiff Lisa Friedland on behalf of the Tennessee Subclass)**

783. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

784. Plaintiff Lisa Friedland ("Plaintiff" for purposes of the Tennessee claims) brings this claim on behalf of herself and the Tennessee Subclass ("Subclass" for purposes of the Tennessee claims).

785. Plaintiff and the Subclass members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

786. Ford is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

787. Ford's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

788. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104. By concealing the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein, including representing that Fire Risk Vehicles have characteristics or benefits that they did not have; representing that Fire Risk Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Fire Risk Vehicles with intent not to sell them as advertised, Ford engaged in unfair or deceptive acts in violation of the Tennessee CPA.

789. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

790. In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely

upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

791. By failing to disclose and actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which Ford marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

792. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Risk Vehicles.

793. Ford knew it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants, surrounding vehicles and property, and bystanders. Ford concealed this information as well.

794. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

795. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

796. Ford knew or should have known that its conduct violated the Tennessee CPA.

797. As alleged herein, Ford made material statements about the safety, functionality, and reliability of the Fire Risk Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

798. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

799. Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and the Subclass members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the Subclass members been aware of the defects in their vehicles, they would have either not bought or leased their Fire Risk Vehicles or would have paid less for them.

800. Ford's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

801. Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

802. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer an adequate fix for the Fire Risk Vehicles that rectifies the Spontaneous Fire Risk and compensates Plaintiff and subclass members for their damages. Ford's unlawful acts and practices complained of herein affect the public interest.

803. As a direct and proximate result of Ford's violations of the Tennessee CPA, Plaintiff and the Subclass suffered an injury-in-fact and actual damage as alleged herein.

804. Under Tenn. Code § 47-18-109(a), Plaintiff and the Subclass seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages because of Ford's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT XLVII

## FRAUDULENT CONCEALMENT
## (Common Law)
## (Alleged by Plaintiff Lisa Friedland on behalf of the Tennessee Subclass)

805. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

806. Plaintiff brings this claim on behalf of herself and the Subclass.

807. Under Tennessee law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale

or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

808. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

809. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

810. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

811. Ford concealed and suppressed the true nature of the "recall repair" it is performing on the Fire Risk Vehicles, with the intent to deceive Plaintiff into believing it was rectifying the Spontaneous Fire Risk.

812. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall and class-wide battery repair. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the

information would have significantly decreased the value and sales price of the vehicles.

813. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

814. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

815. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information

regarding the Spontaneous Fire Risk as well as whether the "recall repair" actually repairs the faulty battery packs in the Fire Risk Vehicles.

816. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

817. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of

the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

818. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

819. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XLVIII**

**FRAUDULENT OMISSION**
**(Common Law)**
**(Alleged by Plaintiff Lisa Friedland on behalf of the Tennessee Subclass)**

820. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

821. Plaintiff brings this claim on behalf of herself and the Subclass.

822. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

823. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having

known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

824. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

825. For the reasons set forth herein, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

826. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

827. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

828. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles

that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

829. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

**COUNT XLIX**

**UNJUST ENRICHMENT**
**(Common Law)**
**(Alleged by Plaintiff Lisa Friedland on behalf of the Tennessee Subclass)**

830. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

831. Plaintiff brings this claim on behalf of herself and the Subclass.

832. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

833. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and

misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

834. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

835. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

836. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

837. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

838. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

839. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

840. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

841. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

**10. Washington**

**COUNT L**

**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(RCW § 19.86.010, *et seq.*)**
**(Alleged by Plaintiff Marianne Bigelow on behalf of the Washington Subclass)**

842. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

843. Plaintiff Marianne Bigelow ("Plaintiff" for purposes of the Washington claims) brings this claim on behalf of herself and the Washington Subclass ("Subclass" for purposes of the Washington claims).

844. Washington Consumer Protection Act ("WCPA") declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

845. Plaintiff and the Subclass members are "persons" and the Fire Risk Vehicles are "assets" that were sold in "trade" and "commerce" under RCW § 19.86.010. Plaintiff and the Subclass members were injured in their business or property by Ford's violations of the WCPA. Ford is a proper defendant under the WCPA.

846. Ford violated the WCPA in multiple ways including by engaging in unfair or deceptive acts or practices in its conduct of trade or commerce regarding the Fire Risk Vehicles, in violation of RCW § 19.86.020.

847. Ford concealed and failed to disclose the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Fire Risk Vehicles.

848. By failing to disclose and actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality,

and fit for use as plug-in hybrid electric vehicles, Ford engaged in unfair and deceptive acts or practices in violation of the WCPA.

849. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Fire Risk Vehicles.

850. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

851. Ford intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

852. Ford's unfair or deceptive acts or practices were injurious to the public interest because Ford's conduct injured other persons and has the capacity to injure other persons, under RCW § 19.86.093.

853. Ford knew or should have known that its conduct violated the WCPA.

854. As alleged above, Ford made material statements about the safety and reliability of the Fire Risk Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

855. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications,

Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

856. Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and Subclass members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the other Subclass members known of the Spontaneous Fire Risk in their Fire

Risk Vehicles, they would not have bought or leased the Fire Risk Vehicles or would have paid less for them.

857. Ford's concealment of the Spontaneous Fire Risk in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

858. Plaintiff and the Subclass suffered actual damages caused by Ford's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk. Had they known the truth about the Fire Risk Vehicles, Plaintiff and Subclass members either would have paid less for the Fire Risk Vehicles or would not have purchased or leased them at all. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to offer any effective remedy for the Fire Risk Vehicles. Ford's unlawful acts and practices complained of herein affect the public interest.

859. As a direct and proximate result of Ford's violations of the WCPA, Plaintiff and Subclass members have suffered injury-in-fact and actual damage as alleged above.

860. As a result of Ford's conduct, Plaintiff and the Subclass seek to recover from Ford all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, treble damages, civil penalties, attorneys' fees and costs, any orders necessary to enjoin Ford's acts or failures to act, and any other just

and proper relief authorized under RCW § 19.86.090, RCW § 19.86.140, or other Washington law.

## COUNT LI

## FRAUDULENT CONCEALMENT
**(Common Law)**
**(Alleged by Plaintiff Marianne Bigelow on behalf of the Washington Subclass)**

861. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

862. Plaintiff brings this claim on behalf of herself and the Subclass.

863. Under Washington law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

864. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

865. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

866. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

867. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

868. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as

plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

869. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

870. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk.

871. Plaintiff was unaware of these omitted material facts and would not have acted as she did if she had known of the concealed and suppressed facts, in that she would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

872. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

873. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

874. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT LII

## FRAUDULENT OMISSION
**(Common Law)**
**(Alleged by Plaintiff Marianne Bigelow on behalf of the Washington Subclass)**

875. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

876. Plaintiff brings this claim on behalf of herself and the Subclass.

877. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

878. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

879. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

880. For the reasons set forth above, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

881. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

882. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

883. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

884. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT LIII

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER WASHINGTON LAW (RCW § 62A.2-314) (Alleged by Plaintiff Marianne Bigelow on behalf of the Washington Subclass)

885. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

886. Plaintiff brings this claim on behalf of herself and the Subclass.

887. Ford was and is a merchant with respect to motor vehicles under Revised Code of Washington § 62A.2-104.

888. Under Revised Code of Washington § 62A.2-314, a warranty that the Fire Risk Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Subclass purchased or leased their Fire Risk Vehicles.

889. The Fire Risk Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Fire Risk Vehicles are all afflicted by the Spontaneous Fire Risk, which, among other things, makes the vehicles susceptible to battery fire and poses an unreasonable risk of death, serious bodily harm, and property damage to Plaintiff

and Subclass members. In fact, as a result of the defect, Ford specifically advised owners and lessees not to charge their batteries and not to drive the Fire Risk Vehicles in electric mode. This dangerous latent defect renders the Fire Risk Vehicles unmerchantable and unfit for their ordinary use of driving.

890. As a result of the Spontaneous Fire Risk, and per Ford's instructions, Plaintiff and Subclass members had to limit their use and charging of the Fire Risk Vehicles, and they were unable to rely on their Fire Risk Vehicles to provide them with safe transportation. Notably, Ford's recall notice instructed Plaintiff and Subclass members to refrain from charging their Fire Risk Vehicles, which deprived Plaintiff and Subclass members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

891. Plaintiff and the Subclass members had sufficient direct dealings with Ford to establish privity of contract with Ford. Nonetheless, privity is not required or exceptions to any privity requirement apply here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between Ford and its dealers regarding sales and leases of the Fire Risk Vehicles, including Ford's implied warranties. Further, privity is not required because the Fire Risk Vehicles are inherently dangerous and defective due to the Spontaneous Fire Risk, which presents a hidden and unreasonable risk of death, serious bodily harm, and property damage to Plaintiff and Subclass members.

892. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Fire Risk Vehicles.

893. Ford was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Fire Risk Vehicles by Plaintiff's presentment of the vehicle for repair, Plaintiff's communications with Ford, Plaintiff's communications with Ford's authorized dealers, consumer complaints regarding the defect that is the subject of this Amended Complaint, the filing of Plaintiffs' April 4, 2025 Complaint (ECF No. 1), and by the allegations contained in this Amended Complaint.

894. Alternatively, Plaintiff and Subclass members were excused from providing Ford with notice and an opportunity to cure the breach of warranty because it would have been futile. Ford did not have a repair available when it recalled the Fire Risk Vehicles, Ford still does not have a repair available, and Ford has not identified the root cause of the Spontaneous Fire Risk or provided an effective recall remedy to address the actual cause of the Spontaneous Fire Risk. As a result, Plaintiff and Subclass members had no reason to believe that Ford would have repaired the Spontaneous Fire Risk if they presented their Fire Risk Vehicles to Ford for repair.

895. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT LIV

## UNJUST ENRICHMENT
**(Common Law)**
**(Alleged by Plaintiff Marianne Bigelow on behalf of the Washington Subclass)**

896. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

897. Plaintiff brings this claim on behalf of herself and the Subclass.

898. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

899. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

900. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

901. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

902. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

903. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

904. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

905. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

906. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

907. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

**11. Wisconsin**

**COUNT LV**

**VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (Wis. Stat. § 110.18) (Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)**

908. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

909. Plaintiff William Simmons ("Plaintiff" for purposes of the Wisconsin claims) brings this claim on behalf of himself and the Wisconsin Subclass ("Subclass" for purposes of the Wisconsin claims).

910. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

911. Ford is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

912. Plaintiff is a member of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiff and the Subclass members purchased or leased one or more of the Fire Risk Vehicles.

913. Ford participated in misleading, false, or deceptive acts that violated the Wisconsin DTPA. By concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, Ford engaged in deceptive business practices prohibited by the Wisconsin DTPA, including: (1) representing that the Fire Risk Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Fire Risk Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Fire Risk Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

914. Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

915. In the course of its business, Ford concealed the Spontaneous Fire Risk in the Fire Risk Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely

upon such concealment, suppression or omission, in connection with the sale of the Fire Risk Vehicles.

916. By failing to disclose and by actively concealing the Spontaneous Fire Risk in the Fire Risk Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as hybrid electric vehicles, Ford engaged in unfair and deceptive business practices in violation of the Wisconsin DTPA.

917. In the course of Ford's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Fire Risk Vehicles.

918. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass members, about the true safety and reliability of their vehicles.

919. Ford intentionally and knowingly misrepresented and omitted material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and the Subclass.

920. Ford knew or should have known that its conduct violated the Wisconsin DTPA.

921. As alleged above, Ford made material statements about the safety and reliability of the Fire Risk Vehicles when operating as hybrid electric vehicles that were either false or misleading.

922. Ford owed Plaintiff and Subclass members a duty to disclose the true safety, performance, and reliability of the Fire Risk Vehicles because, among other things:

a. As the manufacturer and designer of the Fire Risk Vehicles, and recipient of customer complaints and NHTSA communications, Ford was in a superior position to know the true state of facts about the Spontaneous Fire Risk and associated risks of combustion in the Fire Risk Vehicles, and the defect affects a core function of the Fire Risk Vehicles;

b. Ford made incomplete representations about the safety, performance, functionality, and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations;

c. Plaintiff and the Subclass could not reasonably have been expected to learn or discover that the Fire Risk Vehicles had a dangerous safety defect until repeated fires, thermal events, and battery failures forced Ford to finally issue the recall without a fix;

d. Ford knew that Plaintiff and Subclass members could not reasonably have been expected to learn or discover the Spontaneous Fire Risk and the catastrophic consequences thereof until repeated fires, thermal events, and battery failures forced Ford to finally disclose the Spontaneous Fire Risk;

e. Ford actively and intentionally concealed the Spontaneous Fire Risk and the consequences thereof from Plaintiff and the Subclass by knowingly failing to recall the Class Vehicles at an earlier date and enacting a recall that was insufficient; and

f. Ford had duties under the TREAD Act and related regulations to disclose and adequately remedy the Spontaneous Fire Risk.

923. Because Ford fraudulently concealed the Spontaneous Fire Risk, as well as the true nature of the Fire Risk Vehicles, Plaintiff and Subclass members

were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and Subclass members been aware of the defects in their vehicles, they would have either not have bought or leased their Fire Risk Vehicles or would have paid less for them.

924. Ford's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and the Subclass.

925. Plaintiff and the Subclass suffered ascertainable loss caused by Ford's misrepresentations and its concealment of and failure to disclose Spontaneous Fire Risk. Plaintiff and Subclass members either would have paid less for their vehicles or would not have purchased or leased them at all.

926. Ford's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, Ford has yet to fix the Fire Risk Vehicles. Ford's unlawful acts and practices complained of herein affect the public interest.

927. As a direct and proximate result of Ford's violations of the Wisconsin DTPA, Plaintiff and the Subclass have suffered injury-in-fact and actual damage as alleged above.

928. As a result of Ford's conduct, Plaintiff and the Subclass seek to recover from Ford all actual, economic damages incurred in the past, economic damages that

continue to accrue into the future, treble damages, punitive damages, attorneys' fees and costs, any orders necessary to enjoin Ford's acts or failures to act, and any other just and proper relief authorized under the Wisconsin DTPA or Wisconsin law.

## COUNT LVI

## FRAUDULENT CONCEALMENT
## (Common Law)
## (Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)

929. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

930. Plaintiff brings this claim on behalf of himself and the Subclass.

931. Under Wisconsin law: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Fire Risk Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Fire Risk Vehicles, (b) knowingly concealed material information in connection with the sale or lease of the Fire Risk Vehicles, or (c) knowingly failed to disclose material information in connection with the sale or lease of the Fire Risk Vehicles; and (iii) as a result of Ford's conduct, Plaintiff and the Subclass members suffered economic damages.

932. Ford concealed and suppressed material facts concerning the serious safety defect in Plaintiff's vehicle.

933. Ford sold the Fire Risk Vehicle to Plaintiff without disclosing the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, and concealed and suppressed the defect from regulators and consumers.

934. Ford concealed and suppressed the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, with the intent to deceive Plaintiff.

935. Ford did so to falsely assure purchasers, lessees, and owners of the Fire Risk Vehicles that the vehicles they were purchasing or leasing were safe and could be operated in electric mode in order to cut costs and avoid the requisite safety technology and rigorous testing of the hybrid-electric propulsion system and its volatile high-voltage lithium-ion batteries prior to launching the Fire Risk Vehicles, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality and safety of the Fire Risk Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

936. Ford had a duty to disclose the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, because it was known and only knowable to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety and quality of the Fire Risk Vehicles and touted the ability of the vehicles to operate as

plug-in hybrid electric vehicles, as set forth herein; these representations were misleading, deceptive, and incomplete without the disclosure of the Spontaneous Fire Risk. Having provided information to Plaintiff, Ford had a duty to disclose not just the partial truth, but the entire truth. Finally, once the Fire Risk Vehicles were on the road, Ford had a duty to monitor the Fire Risk Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

937. Ford concealed and suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Subclass.

938. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and conceal material information regarding the Spontaneous Fire Risk.

939. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and suppressed facts, in that he would not have purchased the Fire Risk Vehicle and paid the high premium as the result of Ford's claims that it could be safely operated as a plug-in hybrid electric vehicle. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

940. Because of Ford's concealment, suppression, and omission of the facts, which Plaintiff and the Subclass members relied on, Plaintiff and Subclass members sustained damage. In purchasing or leasing the Fire Risk Vehicle, Plaintiff and the Subclass did not get the benefit of the bargain since their vehicles were worth less than they would have been without the defect and they did not get the expected and promised use of their vehicles because of the defect, and because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Those Subclass members who sold their catastrophically dangerous Fire Risk Vehicles at a substantial loss have also suffered quantifiable damages, as will all those who sell between now and the time Ford implements an adequate recall repair (if it ever does). Had Plaintiff been aware of the concealed defects that existed in the Fire Risk Vehicles, Plaintiff would have paid less for the vehicle or would not have purchased or leased it at all.

941. Accordingly, Ford is liable to Plaintiff and the Subclass for damages in an amount to be proven at trial.

942. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT LVII

## FRAUDULENT OMISSION
**(Common Law)**
**(Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)**

943. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

944. Plaintiff brings this claim on behalf of himself and the Subclass.

945. Ford was aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, when it marketed and sold the Fire Risk Vehicles to Plaintiff and the Subclass.

946. Having been aware of the Spontaneous Fire Risk in the Fire Risk Vehicles, as well as the true nature of the Fire Risk Vehicles as a whole, and having known that Plaintiff and the Subclass members could not have reasonably been expected to know these material facts, Ford had a duty to disclose these facts to Plaintiff and the Subclass members in connection with the sale or lease of the Fire Risk Vehicles.

947. Ford did not disclose the Spontaneous Fire Risk or the true nature of the Fire Risk Vehicles to Plaintiff and the Subclass in connection with the sale or lease of the Fire Risk Vehicles.

948. For the reasons set forth above, the Spontaneous Fire Risk in the Fire Risk Vehicles comprises material information with respect to the sale or lease of the Fire Risk Vehicles.

949. In purchasing and leasing the Fire Risk Vehicles, Plaintiff and the Subclass members reasonably relied on Ford to disclose known material defects with respect to the Fire Risk Vehicles.

950. Had Plaintiff and the Subclass known the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, they would not have purchased or leased the Fire Risk Vehicles or would have paid less for them.

951. Through its omissions regarding the true nature of the Fire Risk Vehicles, as well as the Spontaneous Fire Risk, Ford intended to induce, and did induce, Plaintiff and the Subclass to either purchase or lease the Fire Risk Vehicles that they otherwise would not have purchased or pay more for the Fire Risk Vehicles than they otherwise would have paid.

952. As a direct and proximate result of Ford's omissions, Plaintiff and the Subclass either overpaid for the Fire Risk Vehicles or would not have purchased the Fire Risk Vehicles at all if the true nature of the Fire Risk Vehicles, including the Spontaneous Fire Risk, had been disclosed to them and, therefore, they have incurred damages in an amount to be determined at trial.

## COUNT LVIII

## UNJUST ENRICHMENT
**(Common Law)**
**(Alleged by Plaintiff William Simmons on behalf of the Wisconsin Subclass)**

953. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

954. Plaintiff brings this claim on behalf of himself and the Subclass.

955. Under Fed. R. Civ. P. 8(d)(2) and (3), Plaintiff pleads this claim in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

956. Ford is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the high-voltage batteries that it installed in the Fire Risk Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass members regarding the nature and quality of the Fire Risk Vehicles while profiting from this deception.

957. Ford failed to adequately research, design, test, and manufacture the Fire Risk Vehicles before warranting, promoting, selling and distributing the Fire Risk Vehicles as suitable and safe for reasonably foreseeable uses.

958. At the expense of Plaintiff and the Subclass members, Ford received and retained a benefit from Plaintiff and Subclass members and inequity has resulted.

959. Ford benefitted from selling, leasing, and distributing the Fire Risk Vehicles for more than they were worth because of Ford's conduct, and Plaintiff and Subclass members have overpaid for the Fire Risk Vehicles and been forced to pay other costs.

960. Plaintiff and the Subclass members would not have purchased or leased the Fire Risk Vehicles, or would have paid less for them, had they known of the Spontaneous Fire Risk at the time of purchase or lease. Therefore, Ford profited from the sale and lease of the Fire Risk Vehicles to the detriment and expense of Plaintiff and the Subclass.

961. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon Ford when they purchased or leased the Fire Risk Vehicles.

962. Ford knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of Ford acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for Ford to retain these benefits.

963. Plaintiff and the Subclass were not aware of the true facts about the Fire Risk Vehicles when they acquired them and did not benefit from Ford's conduct.

964. Plaintiff and Subclass members are entitled to restitution of the benefits Ford unjustly retained and any amounts necessary to return Plaintiff and Subclass members to the position they occupied prior to dealing with Ford, with such amounts to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A. Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B. A repair for the Spontaneous Fire Risk and restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Fire Risk Vehicles, or the overpayment for their vehicles;

C. Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D. An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E. An award of costs and attorneys' fees; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Dated: July 25, 2025

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Rachel E. Fitzpatrick
**HAGENS BERMAN SOBOL SHAPIRO LLP**
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 224-2636
rachelf@hbsslaw.com

E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com

Gary S. Graifman
Melissa R. Emert
Daniel Edelman
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, New Jersey 07645
Telephone: (201) 391-7000
Facsimile: (201) 307-1086
ggraifman@kgglaw.com
memert@kgglaw.com
dedelman@kgglaw.com

*Attorneys for Plaintiffs and the Putative Classes*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 25, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record. I further certify that a copy of the foregoing was emailed to counsel of record.

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*

Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com